UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

NEW HAMPSHIRE HOSPITAL                    **:**
ASSOCIATION, et al.,                      **:**
                                          **:**
    Plaintiffs,            **:**
                                          **:**
          v.                    **:**        CIVIL ACTION No. 1:15-cv-00460
                                          **:**
SYLVIA MATHEWS BURWELL, in her official   **:**
capacity as Secretary of the United States **:**
Department of Health and Human Services,  **:**
                                          **:**
ANDREW SLAVITT, in his official capacity as **:**
Acting Administrator, Centers for Medicare and **:**
Medicaid Services,                        **:**
                                          **:**
        and                **:**
                                          **:**
CENTERS FOR MEDICARE AND MEDICAID         **:**
SERVICES,                                 **:**
                                          **:**
    Defendants.            **:**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR FOR
FAILURE TO STATE A CLAIM**

# I.     PRELIMINARY STATEMENT

In their four-count Complaint, the plaintiffs challenge the defendants' enforcement of two answers to Frequently Asked Questions—"FAQs Nos. 33 and 34"—as unlawful under the Administrative Procedure Act ("APA").  The FAQs purport to alter materially the statutory formula for calculating the hospital-specific limit for Medicaid disproportionate share hospital ("DSH") payments.  The plaintiffs moved for preliminary injunctive relief on Counts I-III.  The defendants objected and moved to dismiss, asserting plaintiffs lack standing and that Counts I-III fail to state claims.  The Court should deny the defendants' motion.

Plaintiffs have substantive and procedural standing.  They have suffered and will suffer several injuries-in-fact as a result of FAQ Nos. 33 & 34, including imminent recoupment of alleged DSH overpayments made in SFY 2011, substantially reduced DSH payments due to them in May 2016, and the loss of their procedural rights to notice-and-comment under the APA and the Medicaid Act and its regulations.  These substantive and procedural injuries are directly linked to the defendants' illegal policies such that relief from this Court will fully redress those injuries.  The fact that New Hampshire is not a party to this action does not change this outcome.  New Hampshire recently conveyed its view that if plaintiffs obtain the relief they are seeking in this case, the New Hampshire Department of Health and Human Services ("DHHS") will not be able to recoup alleged overpayments created by FAQ Nos. 33 & 34.  Consequently, plaintiffs are able to show a likelihood of causation and redressability in order to maintain their claims.

Additionally, Counts I-III state valid claims.  The policies first announced in FAQ Nos. 33 & 34 are inconsistent with 42 U.S.C. § 1396r-4(g)(1)(A) (Count I); constitute legislative rules that had to be, and were not, subject to notice-and-comment rulemaking under the APA (Count II); and constitute amendments to the New Hampshire State Medicaid Plan (the "State Plan")

1

that could only be made after notice-and-comment in accordance with 42 U.S.C. §

1396a(a)(13)(A) and 42 C.F.R. §§ 430.12, 447.205 (Count III).

## II.    BACKGROUND

This dispute has already been the subject of extensive briefing.  In the interest of judicial

economy, the plaintiffs will refer to relevant allegations in the Complaint in the body of this

memorandum.  By way of further background, plaintiffs submit the following.

The plaintiffs seek, in part, to enjoin application of the illegal policies contained in FAQs

33 & 34 as to any "recoupment" of alleged overpayments identified in audits of 2011 DSH

payments.  By letter dated January 27, 2016 to Plaintiff New Hampshire Hospital Association

("NHHA"), the DHHS Commissioner, Jeffrey Meyers, made clear his department's position

about the effect of a potential court order in this case: "If your request for injunctive relief is

granted, it is our view that NHDHHS would not be able to require recoupment while the

injunction is in place, or be obligated to redistribute, based on the 2011 Myers and Stauffer audit,

to the extent that recoupment is required due to the application by the auditor of the principles in

FAQ Nos. 33 & 34."  Suppl. Decl. of Stephen Ahnen ("Suppl. Ahnen Decl."), Ex. A (emphases

added).

On January 28, 2016, DHHS issued a "Notice of Overpayment and Repayment

Agreement."  *See* Suppl. Decl. of Henry Lipman ("Suppl. Lipman Decl."), Ex. A; Suppl. Decl. of

Michelle McEwen, Ex. A; Suppl. Decl. of Peter J. Wright, Ex. A; Suppl. Decl. of Tina E.

Naimie, Ex. A.  The notice states that DHHS is "taking the necessary steps to comply with the

Federal Medicaid provisions and the New Hampshire State Plan as approved by CMS" to impose

limits on the DSH payments received in 2011.  *See, e.g.*, Suppl. Lipman Decl., Ex. A.  The

Repayment Agreement acknowledges this case and indicates that DHHS will not proceed with

recoupment of funds affected by an order in this case.  *Id.* at ¶¶ 3-5 & Ex. A.  Plaintiff Hospitals have signed the Repayment Agreement.  *See, e.g., id.* at Ex. A.

### III.    STANDARD OF REVIEW

The defendants move to dismiss this case on subject matter jurisdiction grounds under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Two different standards of review are therefore implicated.

"The proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)."  *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001). Two types of challenges exist on a Rule 12(b)(1) motion to dismiss: sufficiency challenges and factual challenges.  *Id.* at 363-64.  The defendants make a sufficiency challenge.  *See* Defs.' Mot. to Dismiss at 2 (citing *Valentin* and referencing standard related to sufficiency challenges).

A sufficiency challenge "accepts the plaintiff's version of jurisdictionally-significant facts as true and addresses their sufficiency, thus requiring the court to assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction."  *Id.* at 363.  "In performing this task, the court must credit plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly."  *Id.*  Plaintiffs have submitted supplemental explanatory declarations addressing recent developments bearing on standing.  Together with the Complaint, these supplemental declarations establish plaintiffs' standing in this case.

APA claims generally cannot be resolved on a Rule 12(b)(6) motion to dismiss.  *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013).  The defendants incorrectly suggest that the Complaint is "legally flawed."  Defs.' Mot. at 3 (citing *Atieh*, 727 F.3d at 76 n.4).   The plaintiffs do agree

3

that where questions of law exist that require the Court to determine whether an agency interpretation is consistent with a statute, *see* Compl. at Count I; whether an agency interpretation constitutes a legislative rule or an interpretive rule, *see id.* at Count II; or whether an agency pronouncement had to be, and was not, put in place using a specific legal process, *see id.* at Counts II & III; the Court may resolve those legal questions on a motion to dismiss. *See Am. Bankers Ass'n. v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266-67 (D.C. Cir. 2001) (holding administrative record was not required to determine whether agency rule violated statute; the claim could be resolved solely by reference to the statute and its legislative history); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 440 n.37 (5th Cir. 2001) (administrative record not required because "review is limited to interpreting the extent to which the regulation is consistent with the statute"). The defendants' motion to dismiss appears to present numerous legal questions that this Court may resolve without an administrative record.

## IV.   ARGUMENT

**A.  Plaintiffs Have Substantive and Procedural Standing to Maintain Their Claims**

**1.  Applicable Principles**

"The Constitution limits the judicial power of federal courts to actual cases and controversies." *Culhane v. Aurora Loan Servs. of Neb.*, 708 F.3d 282, 289 (1st Cir. 2013) (citing U.S. Const. Art. III, § 2, cl. 1).  It therefore requires litigants to have standing to maintain claims in federal court.  "The essence of standing is that a plaintiff must have a personal stake in the outcome of the litigation." *Id.*  Two doctrines of standing apply in this case: substantive standing and procedural standing.

Substantive standing requires plaintiffs to meet the traditional three-part test: injury, causation, and redressability. *Id.*  Injury requires plaintiffs to show "an invasion of a legally

protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Causation requires "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" *Id.* at 560-61 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Redressability requires it to "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

"A special standing doctrine applies when litigants attempt to vindicate procedural rights, such as the right to have notice of proposed regulatory action and to offer comments relating to such action." *Ctr. for Auto Safety, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 342 F. Supp. 2d 1, 11-12 (D.D.C. 2004). In such cases, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. "[A] plaintiff asserting a procedural violation must show a 'causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest.'" *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 12-13 (D.D.C. 2002) (quoting *Fla. Audubon Soc'y v. Bensten*, 94 F.3d 658, 664 (D.C. Cir. 1996)). "In other words, 'a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority' – such as the APA's notice and comment requirements – 'at least if the procedure is intended to enhance the quality of the substantive decision.'" *Ctr. For Auto Safety, Inc.*, 342 F. Supp. 2d at 12 (quoting *Int'l Bd. of Teamsters v. Pena*, 17 F.3d 1478, 1484 (D.C. Cir. 1994)). With respect to redressability, all

that is required in cases of procedural injury is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Mass. v. EPA*, 549 U.S. 497, 518 (2007).

Courts have addressed the circumstances under which the presence of a third party affects standing. "When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to government action or inaction . . . ." *Lujan*, 504 U.S. at 562. In order to establish causation and redressability in such a circumstance, a plaintiff must "adduce facts showing that those [third party] choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.* Thus, causation and redressability have been found to exist where the "third party would very likely alter its behavior based on [the court's] decision, even if not bound by it." *Teton Historic Aviation Found. v. United States DOD*, 785 F.3d 719, 728 (D.C. Cir. 2015); *see, e.g.*, *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005) (holding state agency was not "the sort of truly independent actor who could destroy the causation required for standing" because the superintending federal agency sued "expects and intends its decision to influence the permitting authority").

## 2.  Plaintiffs Have Substantive and Procedural Standing

Plaintiffs have asserted substantive and procedural injuries sufficient to maintain their claims in this case. The defendants do not argue that these injuries are not actual and imminent and concrete and particularized. Instead, they argue that these injuries are not fairly traceable to FAQ Nos. 33 & 34 and, they contend, favorable preliminary and final decisions from this Court will not likely remedy those injuries. The defendants are incorrect.

"Medicaid is a cooperative venture between the federal and state governments aligning the state Medicaid agencies with the defendants." *Tex. Children's Hosp.*, 76 F. Supp. 3d 224, 239 (D.D.C. 2014) (internal quotation and citation omitted). "The defendants enjoy significant authority over this venture: they can reject state plans that do not comport with their view of Medicaid's requirements . . . and may revoke federal financial participation." *Id.* (citing 42 U.S.C. §§ 1316(a), (c)-(e), 1396a, 1396b). FAQ Nos. 33 & 34 require New Hampshire to include Medicare and private insurance payments for Medicaid-eligible services in calculating the hospital-specific DSH limit. *See id.* at 239. The defendants have stated that they will penalize New Hampshire for not complying with these policies. ECF No. 10-8, Galdieri Decl., Ex. R at 2 (October 6, 2015 Ltr. from Def. Slavitt) ("CMS may disallow federal financial participation if a state does not comply with the policy articulated in FAQ No. 33").

### a. Causation And Redressability Exist With Respect To Recoupment

DHHS has commenced recoupment and redistribution in accordance with federal law and FAQ Nos. 33 & 34. *See, e.g.*, Supp. Lipman Decl., Ex. A. However, DHHS's Commissioner has made clear that if injunctive relief is granted in this case, his Department "would not be able to require recoupment while the injunction is in place . . . to the extent that recoupment is required due to application by the auditor of the principles in FAQ Nos. 33 & 34." Supp. Ahnen Decl., Ex. A. DHHS has also tendered a Repayment Agreement to hospitals subject to recoupment, including Plaintiff Hospitals. Supp. Lipman Decl., Ex. A, Repayment Agreement. The Repayment Agreement specifies that, if injunctive relief is granted in this case, DHHS will not recoup alleged overpayments created by the application of FAQ Nos. 33 & 34. *Id.* at ¶¶ 3-5 & Ex. A.

7

These statements and contractual obligations establish that DHHS will alter its conduct based on this Court's orders so as to produce causation and redressability for plaintiffs' recoupment injuries.  *See, e.g.*, *Teton*, 785 F.3d at 729 ("We have previously relied on such expressions from relevant third parties in concluding that redressability existed."); *Tex. Children's Hosp.*, 76 F. Supp. 2d at 239 (relying on statements from state Medicaid agencies indicating that they would not recoup if enforcement of FAQ No. 33 was enjoined and finding causation and redressability).  Thus, as to recoupment, causation and redressability exist.

**b.  Causation and Redressability Exist as to the May 2016 DSH Payments**

The plaintiffs seek to prevent application of FAQ Nos. 33 & 34 to DSH payments due to them by DHHS no later than May 31, 2016.  Compl. at ¶¶ 12, 82-85.  Causation and redressability exist with respect to this component of the plaintiffs' claims as well.

The May 2016 DSH payment will be made based on a specific percentage of hospitals' "uncompensated care costs as reported to [DHHS]."  RSA 167:64, I(a)(3).  DHHS requires the hospitals to complete and submit these reports to it.  ECF Nos. 21-1 & 21-2, Decl. of Paula Minnehan, Ex. A, Section G.  These reports require the following certification:

> In connection with Hospital Cost Report (CMS 2552-10) reporting procedures and Disproportionate Share Hospital provisions under 42 USC 1396r-4(a)-(d) and (g), aka Section 1923(a)-(d) and (g) of the federal Social Security Act, and federal regulations at 42 CFR 447.299, I certify that the information provided herein and the amounts claimed for inclusion in the calculation of eligibility for certain Disproportionate Share Hospital (DSH) reimbursement is true, accurate, complete and in accordance with generally accepted accounting principles and, to the best of my knowledge, applicable Federal and State laws.

*Id.* (emphases added).

The certification recites the statutory provision—42 U.S.C. 1396r-4(g)—that FAQ Nos. 33 & 34 purport to interpret and the regulation—42 C.F.R. § 447.299—the defendants contend supports the policies contained in those FAQs.  The relief the plaintiffs seek will permit them to

certify uncompensated costs without the inclusion of Medicare and private insurance payments, as opposed to what FAQ Nos. 33 & 34 purport to require.  Without Medicare and private insurance payments included in this calculation, the plaintiffs' reported uncompensated costs will remain higher than they would be under FAQ Nos. 33 & 34 and, therefore, the amount of DSH payments they receive in May 2016 will be increased.  Causation and redressability therefore exist with respect to the May 2016 DSH payments.

### c. Causation and Redressability as to Plaintiffs' Procedural Injuries

Favorable decisions in this case will also produce causation and redressability with respect to plaintiffs' procedural injuries under the APA and the Medicaid Act and its regulations. Favorable decisions will restore to plaintiffs their opportunity to supply comments to defendants and to seek reconsideration of the policies underlying FAQ Nos. 33 & 34 or to persuade defendants to institute those policies so as to minimize the adverse impacts on financially-strained hospitals.  They will also require defendants to explain why, after analyzing the same DSH payment data several years earlier and finding no problems with it, the defendants have now reached a different conclusion with respect to it.  *See, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (holding that "[u]explained inconsistency" between agency actions is "a reason for holding an interpretation to be arbitrary and capricious"). Thus, causation and redressability exist as to plaintiffs' procedural injuries.

### 3. Defendants' Arguments that Plaintiffs Lack Standing are Meritless

The defendants assert that DHHS, unbound by this Court's decisions, may choose to apply FAQ Nos. 33 & 34 even after this Court declares them invalid under federal law and enjoins the defendants from enforcing them.  This argument lacks merit.  In order to establish standing, "a plaintiff need not 'negate . . . speculative and hypothetical possibilities . . . in order

to demonstrate the likely effectiveness of judicial relief.'"  *Teton*, 785 F.3d at 726 (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978)).  "Article III does not demand a demonstration that victory in court will without doubt cure the identified injury."  *Id.* at 727.  Rather, it demands more than speculation but less than certainty.  *Lujan*, 504 U.S. at 561. As demonstrated above, plaintiffs have amply met their burden of demonstrating that DHHS will likely act in a way that produces causation and redressability upon entry of the relief they seek.

The defendants' reliance on *Bourgoin v. Sebelius*, 296 F.R.D. 15 (D. Me. 2013), for a different proposition is misplaced.  *Bourgoin* concerned a provision of the Patient Protection and Affordable Care Act ("ACA") that the court believed the Secretary might not be able to enforce against Maine by withholding federal Medicaid funds in the wake of the United States Supreme Court's opinion in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2601-09 (2012) ("*NFIB*"). *Bourgoin*, 296 F.R.D. at 29.  The administrative record revealed that Maine had made that constitutional argument to the Secretary during the state plan amendment approval process, but was absent and unable to make that argument to the court.  *Id.*  The court concluded that it would be entirely speculative whether an order vacating the Secretary's approvals would cause Maine to reinstate plaintiffs' Medicaid benefits.  *Id.* at 20, 29.

This case is distinguishable.  DHHS has unambiguously conveyed to plaintiffs its position that if the injunctive relief they have requested is granted, it will not recoup any alleged overpayments created by the FAQs.  The injunctive relief sought will also enable hospitals to certify, for purposes of the May 2016 DSH payment, their uncompensated costs without being required to comply with the FAQs' illegal policies.  Additionally, the relief plaintiffs seek will also vindicate their procedural notice-and-comment rights under the APA and the Medicaid Act

and its regulations.  Consequently, the plaintiffs have met their burden of proving a likelihood of causation and redressability, unlike the plaintiffs in *Bourgoin*.

**B. Counts I-III of Plaintiffs' Complaint State Claims For Relief on Which Plaintiffs are Likely to Prevail**

**1. Count I States a Claim that FAQ Nos. 33 & 34 Violate Section 1396r-4(g)(1)(A)**

Count I seeks to vacate the FAQs because the defendants have exceeded their statutory authority.  *See* 5 U.S.C. § 706(2)(C).  This claim must be assessed under the framework set forth in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and its progeny.  Applying *Chevron* principles, the Court must deny the defendants' motion.

**a. FAQ Nos. 33 & 34 Fail *Chevron* Step One Because Congress Has Addressed Precisely the Payments Included In The Hospital-Specific DSH Limit.**

The Court need go no further than *Chevron* "step one."  "Under *Chevron*, [this Court] ask[s] first if Congress has addressed the precise question at issue."  *Dickow v. United States*, 654 F.3d 144, 149 (1st Cir. 2011).  "If so, that ends the matter."  *Castaneda v. Souza*, 2015 U.S. App. LEXIS 22565, at *16 (1st Cir. Dec. 23, 2015).  That is the case here.

FAQ Nos. 33 & 34 invoke and purport to interpret 42 U.S.C. § 1396r-4(g).  They require all days, costs, and payments associated with Medicaid-eligible patients, including Medicare and private health insurance payments, to be included in the hospital-specific DSH payment limit calculation.  Thus, the precise question at issue is whether Congress intended all payments associated with Medicaid-eligible individuals to be included in that statutory calculation.

In resolving this question, this Court begins with the plain text of the statute.  *Dickow*, 654 F.3d at 150.  The text of 42 U.S.C. § 1396r-4(g)(1)(A) makes Congress' intent clear.  It sets forth a specific formula to calculate the hospital-specific DSH payment limit for DSH-qualifying hospitals.  That formula specifies the costs and the payments included in that calculation as

11

follows: the cost of providing care to Medicaid-eligible and uninsured patients, "net of payments under this subchapter, other than under this section, and by uninsured patients."  42 U.S.C. § 1396r-4(g)(1)(A).  As used in 42 U.S.C. § 1396r-4(g)(1)(A), "this subchapter" means Title XIX, the Medicaid Act.  The statute makes no mention of including Medicare or private insurance payments as offsets in this calculation.  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at 236 ("The Act does not include private-insurance payments among those that are specifically enumerated as offsets.  Only Medicaid payments – those 'under this subchapter' – are mentioned.").

The text and structure of the statute reinforce this plain language analysis.  Specifically, the term "third party" appears only three times in subsection (g).  The first is in reference to payments made on behalf of persons with "no health insurance (or other source of third party coverage) for services provided during the year."  42 U.S.C. § 1396r-4(g)(1)(A).  Congress then limited the meaning of the term "third party coverage" in the next sentence, wherein the phrase appears for the second time: "For purposes of the preceding sentence, payments made to a hospital for services provided to indigent patients made by a State or a unit of local government within a State shall not be considered to be a source of third party payment."  *Id.*  Thus, in drafting 42 U.S.C. § 1396r-4(g)(1)(A), Congress clearly understood how to exclude "third party" payments such as Medicare and private insurance payments but expressly chose not to include them as offsets to Medicaid-eligible costs.

The third appearance of the term "third party" is particularly telling.  It appears in 42 U.S.C. § 1396r-4(g)(2)(A), which provides additional DSH payment amounts to certain hospitals with high disproportionate share.  In calculating payment adjustments under that section, Congress expressly required all third party payments to be excluded from that calculation.  *Id.* Congress stated:  "In determining the amount that is used for such services during a year, there

shall be excluded <u>any amounts received . . . from third party payors (not including the State plan under this subchapter)</u> that are used for providing such services during the year." *Id.* (emphasis added).  A similar formulation appears in 42 U.S.C. § 1396r-4(g)(1)(A) except that only Medicaid payments are referenced as offsets: "net of payments under this subchapter, other than under this section."  Thus, the notion that Congress meant to include all third party payments, including Medicare and private health insurance payments, as offsets to Medicaid-eligible costs rings hollow.  *See Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presume[s] that Congress intended a difference in meaning.").

Nonetheless, in an attempt to create ambiguity where none exists, the defendants assert that the statutory caption's reference to "uncompensated costs" renders the statute ambiguous. That argument is unpersuasive.  "The caption of a statute . . . cannot undo or limit that which the [statute's] text makes plain."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (internal quotation omitted).  The statute itself sets forth an unambiguous calculation: (Medicaid-eligible Costs + Uninsured Costs) – (Medicaid Payments + Uninsured Payments) = Hospital-Specific DSH Payment Limit.  The caption of the statute cannot rewrite that calculation.  To that end, the statute expressly excludes payments made by a State or a unit of local government for provision of care to the uninsured.  Plainly, such payments <u>compensate</u> costs for treating those patients.  Thus, the text of the statute makes clear that Congress did not intend the term "uncompensated costs" to alter its unambiguous cost/payment calculation.

The defendants' argument that the term "costs incurred" can be interpreted to include "payments"—in addition to those payments set forth in the statute—is incorrect for at least three reasons.  First, it would double count Medicaid-related payments, a nonsensical result given the

evident purpose of the statute.  Under the defendants' reading, Medicaid "costs" would first be offset to the extent that hospitals have been "compensated" (or "reimbursed") for them, and then those costs would be reduced further by the payments specifically enumerated in the statute.  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at 237-38 (construing 42 C.F.R. § 447.299(c) and concluding, "[d]efendants' reading would appear to double count Medicaid-related payments . . . .").

Second, the cases are clear that the term "costs" is not as elastic as the defendants suggest.  It is only when the term "costs" stands alone, "without any better indication of meaning than the unadorned term," that an agency is given "broad methodological leeway."  *Verizon Comm'ns Inc. v. FCC*, 535 U.S. 467, 500 (2002).  Here, the term "costs" hardly stands alone and unadorned.  Rather, in 42 U.S.C. § 1396r-4(g)(1)(A), the term "costs" is highly adorned as it exists as a single variable in a specific statutory equation.  The statute expressly defines "costs" as Medicaid-eligible and uninsured costs, and goes on to define the payments to be offset as Medicaid payments, excluding DSH payments, and payments made on behalf of the uninsured, excluding payments made on behalf of indigent patients by the state or other locality.  If Congress intended the term "costs" or "costs incurred" in the statute to include "payments," Congress would have had no need to specify any payments as offsets within the statute itself. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").

Third, the regulations and agency guidance surrounding 42 U.S.C. § 1396r-4(g)(1)(A) indicate that the term "costs" means only "costs" and does not include "payments."  FAQ Nos. 33 & 34 themselves are not consistent with the defendants' interpretation.  FAQ Nos. 33 & 34

state only that Medicare and private insurance payments must be included in the calculation of the hospital-specific DSH payment limit as separate offsets. They do not say that the terms "costs" or "costs incurred" as used in the statute include "payments."

The regulation implementing the statute, 42 C.F.R. § 447.299, expressly details the costs to be included and the payments to be offset in the statutory calculation. It makes absolutely no mention of Medicare or private insurance payments as separate offsets. *See Tex. Children's Hosp.*, 76 F. Supp. 3d at 237 (noting that the regulation further defines costs and payments, "making no mention of payments from private insurance"). A 1994 letter from the defendants to State Medicaid Directors confirms this by defining the Medicaid Shortfall as: "Cost of Services to Medicaid patient, less the amount paid by the State under the non-DSH payment provisions of the State plan."[1] It makes no mention of Medicare and private insurance payments as offsets nor does it interpret the term "costs incurred" to include "payments." As approved by the defendants, the State Plan from 2004 to 2013 similarly set forth the costs to be included and the payments to be offset. Compl. ¶¶ 49-64. It makes no mention of Medicare or private insurance payments as offsets nor does it interpret the term "costs incurred" to include "payments." *Id.* The defendants' General DSH Audit and Reporting Protocol also sets forth the costs to be included and the payments to be offset. *Id.* at ¶¶ 41-48. Neither does it make any mention of Medicare or private insurance payments as offsets nor does it define the cost-side of the equation as including "payments." *Id.* at ¶ 42.

Even other FAQs the defendants have issued contradict the statutory interpretation they now offer as their litigation position. Specifically, FAQ No. 23 recites the hospital-specific DSH payment limit calculation as follows: "The hospital-specific DSH limit includes the costs

---

[1] Available at https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/SMD081794.pdf (last visited Feb. 9, 2016).

incurred during the year of furnishing hospital services to Medicaid beneficiaries and the uninsured, net of Medicaid payments and payments made by or on behalf of the uninsured." ECF No. 10-15, Galdieri Decl., Ex. G at 14.  It does not mention Medicare or private insurance payments as offsets.  FAQ No. 31 explains that the term "costs" as used in the audit reporting regulation means just costs and "is not interchangeable with the term 'charges'."  *Id.* at 18. Moreover, in the preamble to a recent rulemaking, the defendants explained that "[t]he first component [the Medicaid shortfall] of the net costs is described in statute as attributable to hospital costs incurred by individuals eligible for medical assistance under the state plan and net of payments made under title XIX of the Act [Medicaid]."  *Medicaid Program; Disproportionate Share Hospital Payments – Uninsured Definition* 79 Fed. Reg. 71,679, 71,681 (Dec. 3, 2014).

In short, nearly every authority, formal or informal, that purports to interpret or explain 42 U.S.C. § 1396r-4(g)(1)(A) does not interpret the word "costs" or "costs incurred" as used in the statute to include "payments."  Rather, they specify that "costs" means just costs and that "payments" means only payments.[2]  Consequently, because Congress has unambiguously addressed the precise question at issue – the payments to be included in the hospital-specific DSH limit calculation – the Court's inquiry should stop.

Nonetheless, even if the Court is persuaded that some ambiguity attends the statutory term "costs incurred," it is clear from the statute's text that whatever the term "costs incurred" could mean, it does not include "payments."  *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when

---

[2] The defendants cite an August 16, 2002 letter to State Medicaid Directors in an attempt to support the notion that FAQ Nos. 33 & 34 reflect their longstanding interpretation, but that letter is at best ambiguous as to its meaning and scope and, if interpreted as defendants suggest, would conflict materially with defendants' later informal pronouncements. Defs.' Opp. at 29.  Moreover, that 2002 letter does not interpret the term "costs" or "costs incurred" to include "payments."

it goes beyond the meaning that the statute can bear.").  Consequently, FAQ Nos. 33 & 34 fail *Chevron* step one.

      **b.**     **Under *Chevron* Step Two, FAQ Nos. 33 & 34 Warrant No Deference.**

Where statutory ambiguity exists, "step two" of the *Chevron* framework accords deference to the agency interpretation in certain circumstances.  As argued above, the statute is not ambiguous.  However, assuming *arguendo* that ambiguity exists, *Chevron* deference is not warranted in these circumstances.

*Chevron* deference does not apply to every agency pronouncement.  Whether *Chevron* deference applies depends on the circumstances under which the agency pronouncement was created.  *See, e.g.*, *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 54 (1st Cir. 2014); *Lovegren v. Locke*, 701 F.3d 5, 30 (1st Cir. 2012); *Noviello v. City of Boston*, 398 F.3d 76, 90 n.3 (1st Cir. 2005).  FAQ Nos. 33 & 34 purport to be substantive rules developed without formal notice-and-comment rulemaking.  Under these circumstances, the Court should conclude that *Chevron* deference does not apply to them; at most, weight under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), applies.

Under *Skidmore*, the weight accorded FAQ Nos. 33 & 34 "'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking the power to control.'"  *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (quoting *Skidmore*, 323 U.S. at 140).  Applying these factors, the FAQs lack the power to persuade.  In conclusory fashion, they purport to require the inclusion of Medicare and private insurance payments as express offsets in the hospital-specific DSH payment limit calculation.  By all indicia, there is no evidence that FAQ Nos. 33 & 34 have been "thoroughly considered."  They

17

conflict with the plain terms of both 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299, and

they make no attempt to reconcile these conflicts.  They are devoid of any remote link to the

defendants' arguments in this case that the terms "costs" or "costs incurred" in the statute or

regulation includes "payments."  In short, FAQ Nos. 33 & 34 lack the "scrupulousness,"

"analytic rigor," and consistency with the statutory text they purport to interpret to be deserving

of any weight under *Skidmore*. *Merrimon*, 758 F.3d at 56.  Consequently, FAQ Nos. 33 & 34

lack the power to persuade and their interpretation of the statute should be rejected.

 Even if *Chevron* deference applied, however, the defendants' interpretation of the statute

fails.  The discretion Congress gave to the Secretary to determine costs is limited to determining

the costs that are allowable under the Medicaid statute, *i.e.*, all medically necessary costs

associated with Medicaid-eligible individuals.  The defendants' interpretation that costs means

something more than just costs is untenable and unreasonable given the text of the statute.

Accordingly, even under *Chevron*, defendants' interpretation is unreasonable.

 The defendants' attempt to invoke "*Auer* deference" also fails.  The defendants assert that

the Secretary exercised her rulemaking authority to promulgate 42 C.F.R. § 447.299, which

interprets 42 U.S.C. § 1396r-4(j).  While 42 C.F.R. § 447.299 does not expressly mention

Medicare or private insurance payments as separate offsets, the defendants contend that the

regulation is ambiguous.  They further contend that this ambiguity allows them to interpret the

term "costs incurred" as used in 42 C.F.R. § 447.299(c) to include "payments" and to receive

deference under *Auer v. Robbins*, 519 U.S. 452 (1997) for that interpretation.

 "*Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous

regulation . . . [unless] the agency's interpretation is plainly erroneous or inconsistent with the

regulation."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal

18

quotation omitted).  Deference is also unwarranted under *Auer* "when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question."  *Id.* (internal quotation omitted).  "This might occur when the agency's interpretation conflicts with a prior interpretation, . . . or when it appears that the interpretation is nothing more than a convenient litigating position, . . . or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack."  *Id.* at 2166-67.  Additionally, *Auer* deference is inappropriate where the regulation being interpreted merely parrots the same language contained in the statute.  *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006)

The defendants' argument for *Auer* deference hinges on the doubtful proposition that FAQ Nos. 33 & 34 actually interpret 42 C.F.R. § 447.299(c).  The Answers to FAQ Nos. 33 & 34 make no reference to 42 C.F.R. § 447.299, nor do they purport to interpret the term "costs incurred" in 42 C.F.R. § 447.299(c)(10) to include "payments."  Moreover, 42 C.F.R. § 447.299 was created to interpret 42 U.S.C. § 1396r-4(j), not 42 U.S.C. § 1396r-4(g). *Medicaid Program; Disproportionate Share Hospital Payments* 73 Fed. Reg. 77,904 (Dec. 17, 2008) ("This final rule sets forth the data elements necessary to comply with the requirements of Section 1923(j) . . . .").  *Auer* deference is therefore unwarranted.

Even assuming that FAQ Nos. 33 & 34 could be construed as attempting to interpret 42 C.F.R. § 447.299, *Auer* deference is unwarranted because the regulation is unambiguous.  The regulation precisely defines the cost side, 42 C.F.R. §§ 447.299(c)(10), (14), and the payment side, 42 C.F.R. §§ 447.299(c)(9), (12)-(13), of the hospital-specific DSH limit equation.  The regulation does not mention Medicare and private insurance payments as offsets in this highly-specific regulatory calculation, nor does the regulation limit the term "costs" to costs that are "unreimbursed" or "uncompensated."  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at 237.

Consequently, because 42 C.F.R. § 447.299 is unambiguous, *Auer* deference is inappropriate and the defendants' argument that FAQ Nos. 33 & 34 emanate from an interpretation of that regulation must be rejected.

Even assuming 42 C.F.R. § 447.299 was ambiguous, *Auer* deference would still be inappropriate for at least the following three reasons.  First, the defendants' "interpretation"— that "costs incurred" includes "payments"—is plainly erroneous and inconsistent with the regulatory text.   As the District Court for the District of Columbia observed, "[d]efendants' reading  would appear to double count Medicaid-related payments (first as 'reimbursements' to be subtracted to arrive at the 'cost' figure, then again as payments specifically enumerated in the regulation as being subtracted from the overall cost figure to obtain the 'unreimbursed costs')." *Tex. Children's Hosp.*, 76 F. Supp. 3d at 237-38.  That is the same interpretation the defendants offer in this case, and which the District Court for the District of Columbia rejected as plainly erroneous because it "ignores a specific definition provided by the regulation, and relies solely on creative reading of certain portions of the Rule's Preamble."  *Id.* at 238 n.3.

Second, the regulatory language the defendants claim is ambiguous—the term "costs incurred"—does nothing more than "parrot" the same language contained in 42 U.S.C. § 1396r-4(g)(1)(A).  As the Supreme Court has stated, "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute.  An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language."  *Gonzales*, 546 U.S. at 257.  42 C.F.R. § 447.299(c)(10) merely parrots the term "costs incurred" as that term is used in 42 U.S.C. § 1396r-4(g)(1)(A) in the context of Medicaid-eligible costs.  Consequently, the defendants' interpretation of that term is functionally

an interpretation of that statute and is not entitled to *Auer* deference. *Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund*, 724 F.3d 129, 141 (1st Cir. 2013) (applying the anti-parroting rule from *Gonzales* to reject *Auer* deference).

Third, as discussed above in Section IV(B)(1)(a), the defendants' longstanding interpretation of the term "costs incurred" as used in 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299 has been "the cost of services furnished," and not the unreimbursed costs of services furnished, as the defendants suggest. Indeed, as the plaintiffs have pointed out, nearly every formal and informal authority that purportedly interprets 42 U.S.C. § 1396r-4(g)(1), including other FAQs within the same document as FAQ Nos. 33 & 34, refers to costs and payments as separate offsets from one another. Even the preamble language the defendants rely heavily on to support their position is at best ambiguous in this regard and does not say that the term "costs" or "costs incurred" as used in the statute or 42 C.F.R. § 447.299 includes all or certain payments. This break from the defendants' longstanding interpretation of the statute and regulation exposes the defendants' argument for what it really is: a *post hoc* rationalization put forth for the first time in the context of this litigation and the *Texas Children's Hospital* litigation in an attempt to save FAQ Nos. 33 & 34 from being vacated. Accordingly, giving *Auer* deference to this newly-minted, ill-fitting interpretation is unwarranted.

**2. Plaintiffs Have Stated a Claim that Notice-and-Comment Rulemaking Was Required**

Count II alleges that the defendants failed to engage in notice-and-comment rulemaking with respect to FAQ Nos. 33 & 34 as required under APA section 553. The defendants claim that the FAQs are interpretive as opposed to substantive rules, and are therefore exempt from rulemaking. *See* 5 U.S.C. § 553(b)(3)(A) (exempting, *inter alia*, "interpretive" rules from rulemaking). Because the FAQs are substantive, the Court should deny the motion as to Count II.

Only legislative or substantive rules have the force and effect of law. *Perez v. Mortg. Bankers Ass'n.*, 135 S. Ct. 1199, 1203 (2015). Interpretive rules do not. *Id.* "An interpretive rule is one that 'derive[s] a proposition from an existing document whose meaning compels or logically justifies the proposition.'" *Tex. Children's Hosp.*, 76 F. Supp. at 240 (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)). Thus, if a rule assigns duties, imposes new obligations, or alters or enlarges existing obligations, the rule is a legislative rule, not merely an interpretive rule, and notice-and-comment rulemaking under the APA is required. *See, e.g.*, *Aviators for Safe & Fairer Reg., Inc. v. FAA*, 221 F.3d 222, 226-27 (1st Cir. 2000); *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998).

FAQ Nos. 33 & 34 add Medicare and private insurance payments to the calculation of the hospital-specific DSH payment limit under 42 U.S.C. § 1396r-4(g)(1)(A). That statute "does not include private-insurance payments among those that are specifically enumerated as offsets." *Tex. Children's Hosp.*, 76 F. Supp. 3d at 236. Nor does the statute include Medicare payments among those enumerated offsets. "Only Medicaid payments – those 'under this subchapter' – are mentioned." *Id.* (quoting 42 U.S.C. § 1396r-4(g)(1)(A)). Similarly, 42 C.F.R. § 447.299 makes no mention of Medicare or private insurance payments. 42 C.F.R. § 447.299 contains a "step-by-step guide to calculating . . . 'unreimbursed costs,' including specific definitions of what makes up the 'cost' side of the equation and what makes up the 'payment' side." *Tex. Children's Hosp.*, 76 F. Supp. 3d at 237. Those components do "not contemplate the inclusion of private-insurance payments" or Medicare payments "for Medicaid-eligible services." *Id.* Moreover, as argued above, 42 C.F.R. § 447.299 cannot be interpreted in a manner consistent with the text of FAQ Nos. 33 & 34.

FAQ Nos. 33 & 34 effectively amend 42 C.F.R. § 447.299.  They impose new requirements on state Medicaid agencies, auditors, and DSH-qualifying hospitals, and therefore constitute substantive rather than interpretive rules.  Several features of FAQ Nos. 33 & 34 support this conclusion.  First, FAQ Nos. 33 & 34 substantively alter the existing regulatory calculation.  *Mendoza*, 754 F.3d at 1021 ("[a] rule is legislative if it . . . effects a substantive change in existing law or policy").  Second, the changes FAQ Nos. 33 & 34 impose are binding on state Medicaid agencies.  Indeed, the defendants have threatened to enforce FAQ Nos. 33 & 34 against New Hampshire by withholding federal funds if New Hampshire fails to comply with their terms.   Third, FAQ Nos. 33 & 34 are inconsistent with the existing regulatory regime and effectively amend it.  *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) ("APA rulemaking would still be required if [the agency's Medicare reimbursement calculation] adopted a new position inconsistent with . . . existing regulations").

Moreover, the preamble to the final rule creating 42 C.F.R. § 447.299 does not support defendants' argument that FAQ Nos. 33 & 34 emanated from, and therefore interpret, the words "costs incurred" as used in that regulation.  First, the preamble states in multiple places that the final rule did not affect any change in the calculation of the hospital-specific DSH payment limit.  *See* 73 Fed. Reg. at 77,906, 77,921.  Second, the preamble references specific offsets that are actually included in the final text of the regulation, such as Section 1011 payments.  *See id.* at 77,917-18.  Third, the preamble text cited does not say that the term "costs incurred" as used in the regulation includes payments.  Fourth, contemporaneous, detailed agency guidance issued in or around the time this final rule issued makes no mention of including Medicare and private insurance payments as offsets.  *See, e.g.*, Compl. at ¶¶ 41-48; Section IV(B)(1)(a), *supra*.  Fifth, to the extent the preamble text is inconsistent with the regulatory text, it is invalid as a matter of

law.  *See Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 36 (D.D.C. 2003)

(holding that where "the preamble to [a] rulemaking is inconsistent with the plain language of

the regulation, it is invalid"); *Tex. Children's Hosp.*, 76 F. Supp. 3d at 237 (preamble to the same

final rule not entitled to weight because it conflicts with the statutory and regulatory text).[3]

Thus, FAQ Nos. 33 & 34 are substantive rules.  They had to be, and were not, subject to

notice-and-comment rulemaking under the APA.  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at

241 (preliminarily concluding FAQ No. 33 was a substantive change that could only be made

using the notice-and-comment procedures of APA § 553).  Thus, Count II states a claim.

### 3.  Plaintiffs Have Stated a Claim that FAQ Nos. 33 & 34 Violate the Medicaid Act

In Count III, plaintiffs allege that FAQ Nos. 33 & 34 are invalid and unenforceable

because they were not properly incorporated into the State Plan, 42 C.F.R. § 430.12, and, as a

result, did not meet the notice-and-comment requirements of 42 U.S.C. § 1396a(a)(13)(A) and

42 C.F.R. § 447.205.  Under 42 C.F.R. § 430.12, the State Plan must be amended "whenever

necessary to reflect . . . (i) [c]hanges in Federal law, regulations, policy interpretations, or court

decisions."  Thus, even if FAQ Nos. 33 & 34 constitute valid interpretations, they were required

to be incorporated into the New Hampshire State Plan.

As discussed in Section IV(B)(1)(a), the defendants' longstanding interpretation of 42

U.S.C. § 1396r-4(g)(1)(A) was expressly contained in the State Plan from at least 2004 to 2013

and had been repeatedly approved by the defendants for inclusion in the State Plan after 42

C.F.R. § 447.299 was promulgated in 2008 and after FAQ Nos. 33 & 34 first appeared in 2010.

That longstanding interpretation did not include Medicare and private insurance payments in the

---

[3] The First Circuit cases the defendants cite for the proposition that the preamble text carries weight so hold because the preamble text in those cases is consistent with the regulatory text at issue.  In this case, however, the preamble text relied upon is inconsistent with the regulatory text.  In such cases, the preamble text is accorded no weight.

hospital-specific DSH limit calculation.  FAQ Nos. 33 & 34 therefore fundamentally change the methods and standards for calculating DSH payment adjustments to hospital rates by decreasing the amount of DSH payments hospitals are entitled to receive.

Section 13(A) mandates a public process for determining hospital rates under which proposed rates and methodologies underlying those rates are published, a reasonable opportunity for comment is provided, final rates and the methodologies underlying those final rates are published, and the final rates "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs."  42 U.S.C. § 1396a(a)(13)(A).  Under 42 C.F.R. § 447.205, public notice is required for "any significant proposed change in [the state's] methods and standards for setting payment rates for services."

If defendants had required FAQ Nos. 33 & 34 to be incorporated into the State Plan as their own regulations required, plaintiffs would have received an opportunity for notice-and-comment under Section 13(A) and 42 C.F.R. § 447.205.  However, by placing those interpretations in FAQs buried on the Internet while simultaneously approving amendments to the State Plan that make no mention of Medicare or private insurance payments as variables in the hospital-specific DSH limit calculation, the defendants have effectively deprived the plaintiffs of their important notice-and-comment rights under the Medicaid Act and its regulations.  Count III therefore states a claim for relief on which plaintiffs are likely to succeed.

## V.   CONCLUSION

Plaintiffs have standing to maintain their claims in this case.  Moreover, Counts I-III of plaintiffs' complaint state valid claims for relief upon which plaintiffs are likely to succeed on the merits.  Accordingly, the defendants' motions to dismiss must be denied.

Respectfully submitted,

**PLAINTIFF NEW HAMPSHIRE HOSPITAL
ASSOCIATION & PLAINTIFF HOSPITALS**

By Their Attorneys,

**NIXON PEABODY LLP**

Dated:  February 12, 2016

*/s/ Gordon J. MacDonald*
Gordon J. MacDonald, Esquire, N.H. Bar No. 11011
Anthony J. Galdieri, Esquire, N.H. Bar No. 18594
Holly J. Barcroft, Esquire, N.H. Bar No. 16463
900 Elm Street, 14th Floor
Manchester, NH  03101-2031
(603) 628-4000
gmacdonald@nixonpeabody.com
agaldieri@nixonpeabody.com
hbarcroft@nixonpeabody.com

## CERTIFICATE OF SERVICE

I, Gordon J. MacDonald, hereby certify that on this 12th day of February 2016, a copy of the foregoing *Plaintiffs' Memorandum Of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Failure to State a Claim* was served via the Court's electronic mail system to all parties of record.

*/s/ Gordon J. MacDonald*
Gordon J. MacDonald