## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE HOSPITAL ASS'N, *et al.* | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) Civil Action No. 15-cv-460-LM |
| | ) |
| SYLVIA M. BURWELL, Secretary, U.S. | ) |
| Department of Health and Human Services, *et al.* | ) |
| | ) |
| Defendants | ) |

### DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR FOR FAILURE TO STATE A CLAIM

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

    I.      The plaintiffs have not established standing. ........................................................... 1

           A.      Even though the plaintiffs claim procedural violations, they still must show that a ruling in their favor would lead New Hampshire to act differently. ..................................................................................................1

           B.      The plaintiffs have not shown that a favorable decision in this case would lead the State to adopt their interpretation of the statute and regulation. ....2

           C.      The plaintiffs cannot establish standing based on events after the filing of the complaint, and the new facts would not support standing in any event.4

    II.     The Secretary's policy should be upheld because it does not directly conflict with the statute and regulation, and FAQ Nos. 33 and 34 are therefore valid interpretive rules that did not require notice and comment. ....................................................... 6

           A.      The Secretary's interpretations of the statute and regulation are entitled to deference under binding Supreme Court precedent. ....................................6

           B.      The Secretary has reasonably interpreted the phrase "costs incurred" as meaning costs adjusted for offsetting amounts received from Medicare or private insurance. ........................................................................................7

CONCLUSION ........................................................................................................................... 10

# TABLE OF AUTHORITIES

**CASES**

*Am. Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013) ............................................................................. 7

*Aviators for Safe & Fairer Regulation v. FAA*,
  221 F.3d 222 (1st Cir. 2000) ................................................................................. 7

*Bhd. of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*,
  457 F.3d 24 (D.C. Cir. 2006) ................................................................................ 4

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984) ............................................................................................. 6

*City of Dania Beach v. FAA*,
  485 F.3d 1181 (D.C. Cir. 2007) ............................................................................ 2

*Dunn v. Sec'y of the U.S. Dep't of Agric.*,
  921 F.2d 365 (1st Cir. 1990) ............................................................................ 8, 9

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,
  802 F.3d 99 (1st Cir. 2015) ................................................................................ 10

*Klamath Water Users Ass'n v. FERC*,
  534 F.3d 735 (D.C. Cir. 2008) ............................................................................. 4

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ......................................................................................... 6, 7

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................. 5

*Nat'l Parks Conservation Ass'n v. Manson*,
  414 F.3d 1 (D.C. Cir. 2005) ............................................................................. 2, 3

*Pharm. Research & Mfrs. of Am. v. Thompson*,
  251 F.3d 219 (D.C. Cir. 2001) ............................................................................. 8

*R.I. Hosp. v. Leavitt*,
  548 F.3d 29 (1st Cir. 2008) .................................................................................. 9

*Steir v. Girl Scouts of the USA*,
  383 F.3d 7 (1st Cir. 2004) .................................................................................... 5

*Strickland v. Comm'r, Me. Dep't of Human Servs.*,
  48 F.3d 12 (1st Cir. 1995) .............................................................................. 8, 10

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
   785 F.3d 719 (D.C. Cir. 2015) (per curiam) .......................................................... 3

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ................................................................................................ 7

**FEDERAL STATUTES**

26 U.S.C. § 1001(b) ............................................................................................................ 9

42 U.S.C. § 1396r-4(g)(1) ........................................................................................... passim

**FEDERAL REGULATIONS**

26 C.F.R. § 1.1034-1(b)(4) ................................................................................................. 9

42 C.F.R. § 447.299 ............................................................................................... 1, 6, 7, 8

**OTHER AUTHORITIES**

Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates, and Gifts*
   (2005) ...................................................................................................................... 9

**PRELIMINARY STATEMENT**

The plaintiffs have failed to establish Article III standing, and they have failed to explain why a calculation that Congress intended to reflect "uncompensated costs" should disregard compensation received in the form of Medicare or private insurance payments. Although the statute and regulation do not specifically address the handling of Medicare and private insurance payments, the Secretary has reasonably interpreted the phrase "costs incurred" within 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299(c)(10) to mean costs net of offsetting amounts received from Medicare or private insurance. The Secretary has adhered to that interpretation at least since 2002, and the plaintiffs have not pointed to any statement or action by the Secretary that conflicts with that interpretation. The Court should grant the defendants' motion to dismiss.

**ARGUMENT**

**I.  The plaintiffs have not established standing.**

The plaintiffs cannot establish standing because the State of New Hampshire, and not the Federal Government, is responsible for making payments to the plaintiffs or recouping or redistributing overpayments. Because the State is not a party to this action, it would not be bound by any judgment or order in this action or by any conclusions of law made by the Court. Thus, even if the Court were to rule for the plaintiffs, the State of New Hampshire could continue to follow the Secretary's present interpretation of the statute and regulations based on the authority of the statute and regulations themselves. Accordingly, the plaintiffs cannot meet the causation and redressability components of standing.

**A.  Even though the plaintiffs claim procedural violations, they still must show that a ruling in their favor would lead New Hampshire to act differently.**

The plaintiffs' claim of a procedural violation does not change their burden to show that a favorable judgment is likely to redress any harm they will suffer at the hands of State authorities.

When a plaintiff alleges that a federal agency has violated a statutory procedural requirement, the causation and redressability requirements of standing are partly relaxed; the plaintiff does not need to establish a strong link between the agency's alleged procedural violations and the agency's ultimate decision. But the plaintiff still must meet the ordinary requirements of causation and redressability with respect to the link between the agency's decision and the plaintiff's ultimate injury. *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) ("The relaxation of procedural standing requirements would excuse National Parks from having to prove the causal relationship regarding the Interior Department's action, *but its burden regarding the action of the Montana authorities would not change*." (emphasis added)); *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) ("Though this Court will assume a causal relationship between the procedural defect and the final agency action, *the petitioners must still demonstrate a causal connection between the agency action and the alleged injury*." (emphasis added)). In this case, this means the plaintiffs do not need to show that different procedures would have caused the federal defendants to adopt a different interpretation of the statute and regulations. But the plaintiffs still must show that a ruling preventing the defendants from enforcing their policies is likely to lead the State to adopt the plaintiffs' favored interpretation of the statute and regulation. They have not made this showing.

**B.     The plaintiffs have not shown that a favorable decision in this case would lead the State to adopt their interpretation of the statute and regulation.**

The plaintiffs still have not shown that a favorable ruling from this Court will likely lead the State of New Hampshire to adopt a different interpretation of the contested statute and regulation. Even if the Court were to bar the Federal Government from enforcing its interpretation of these provisions, the State—which is not a party to this case and would not be subject to any ruling by the Court—could choose to follow the same or a similar interpretation

2

under the direct authority of the statute and regulation themselves.

The plaintiffs rely on two D.C. Circuit cases, *Teton Historic Aviation Found. v. U.S. Department of Defense*, 785 F.3d 719 (D.C. Cir. 2015) (per curiam), and *National Parks Conservation Ass'n v. Manson*, 414 F.3d 1 (D.C. Cir. 2005). These cases are not binding on this Court, and the plaintiffs have not cited any similar cases from the First Circuit. The First Circuit precedent cited by the defendants weighs against a finding of redressability here. *See* Defs.' Prelim. Inj. Opp'n 17, ECF No. 17 (citing *Biszko v. RIHT Fin. Corp.*, 758 F.2d 769, 772–73 (1st Cir. 1985), and *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 58 (1st Cir. 1998)); *see also* Defs.' Prelim. Inj. Opp'n 17–18 (discussing *Bourgoin v. Sebelius*, 296 F.R.D. 15 (D. Me. 2013)).

The cases cited by the plaintiffs are also distinguishable. The dispute in *Teton* was whether surplus aircraft parts possessed by the Department of Defense would likely be made available to the plaintiffs if the Department were compelled to drop restrictions on the sale of such parts. The court placed great weight on the financial incentives the Department and its contractor would have to sell the parts. *Teton*, 785 F.3d at 725–29. Here, by contrast, a decision not to recoup funds would run against the State's immediate fiscal interests. *National Parks Conservation Ass'n* also does not support the plaintiffs. In that case, Montana state authorities were required by a federal regulation to modify their actions in response to a finding by a federal agency. *See Nat'l Parks Conservation Ass'n*, 414 F.3d at 6 (citing 40 C.F.R. § 51.307(a)(3)). Here, federal law does not require States to recoup or redistribute overpayments made to hospitals, and federal agencies do not direct State authorities to recoup or redistribute overpayments. Any such action would be taken by the State independent of federal action.

Payments to be made to New Hampshire hospitals under their settlement agreement with the State also are not governed by federal law or the actions of federal agencies. Private

3

contractual agreements turning on the actions of a federal agency cannot support standing to challenge the agency's actions. In *Brotherhood of Locomotive Engineers and Trainmen v. Surface Transportation Board*, 457 F.3d 24 (D.C. Cir. 2006), a union sought to challenge an agency determination that a railroad-track acquisition was within the scope of a federal statute. *Id.* at 26. The union had entered a collective bargaining agreement providing that bargaining would not be required in connection with transactions falling within the scope of the statute. *Id.* The D.C. Circuit found that the union lacked standing to challenge the agency determination, since the union's loss of bargaining rights was the result of its own decision to agree to the terms of the collective bargaining agreement, not the result of the agency's action. *See id.* at 27–30. The court remarked that "the Union can no more claim standing than could a person who placed a wager upon the outcome of an agency decision and lost the bet . . . ." *Id.* at 28; *see also* Defs.' Prelim. Inj. Opp'n 20.

It is certainly possible that if the Federal Government were prevented from enforcing its policies, the State might act more favorably toward the plaintiffs. But a possibility of redress is not enough—the plaintiffs bear a burden to show that the State will *likely* respond to a court ruling against the Federal Government in the manner the plaintiffs predict, and the plaintiffs have not met that burden. *See Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 740 (D.C. Cir. 2008) (finding *National Parks Conservation Ass'n* inapplicable in a case raising issues of how State authorities would react to a court ruling because the petitioner had failed to show that the State would react in the manner the petitioner suggested, and noting that it was the petitioner's burden to establish redressability).

      **C.**     **The plaintiffs cannot establish standing based on events after the filing of the complaint, and the new facts would not support standing in any event.**

The plaintiffs have also attempted to bolster their case for standing by submitting two sets

4

of new documents: a January 28, 2016, letter from the New Hampshire Department of Health and Human Services and copies of "Repayment Agreements" that each of the plaintiff hospitals entered with State authorities between February 8, 2016 and February 12, 2016. These documents do not establish standing.

Standing is evaluated based on "the facts *as they exist when the complaint is filed*," and a plaintiff cannot rely on developments after the filing of the complaint to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (plurality opinion); *see also Steir v. Girl Scouts of the USA*, 383 F.3d 7, 15 (1st Cir. 2004). Thus, the plaintiffs cannot rely on either the January 28, 2016, letter or the February 2016 repayment agreements to establish redressability.

Even if the plaintiffs could rely on these documents, they would not meet the plaintiffs' burden to show that their harm will be redressed by a favorable decision. The terse, gnomic January 28, 2016, letter raises more questions than it answers. The plaintiffs have not provided details of the communications that led to the letter, and the letter does not indicate why the State's intentions would change if this Court rules in favor of the plaintiffs. Indeed, there is no reason a court ruling *should* change the State's plans, since the federal defendants do not exercise control over payments made to hospitals or recoupment or redistribution of overpayments, and any court ruling would not be binding on State authorities, since they are not parties to this case.

As for the February 2016 repayment agreements, none of those agreements would supply a basis for standing even if they had been entered before the complaint was filed. The plaintiff hospitals say that the repayment agreements ensure that they will not have to repay funds to the State if they obtain relief from this Court, but that is not accurate. Paragraphs 4 and 5 in each of the agreements explicitly allow for the possibility that an order from this Court may not have any effect on the State. Paragraph 4 speaks of overpayment amounts that are "not the subject of . . .

5

injunctive relief" issued by the Court, and Paragraph 5 specifies terms that apply "[t]o the extent that the [New Hampshire DHHS] is not prohibited by" a ruling in this case from recouping funds from the hospital. Indeed, these provisions of Paragraphs 4 and 5 seemingly will be operative regardless of how the Court rules in this case, because there is no basis for the Court to issue relief against the nonparty State authorities in this action. And even if the plaintiffs were to obtain some benefit under these contractual provisions, they would be receiving that benefit from the *contracts*, and not from the Court's ruling. *See supra* pp. 3–4.

**II.     The Secretary's policy should be upheld because it does not directly conflict with the statute and regulation, and FAQ Nos. 33 and 34 are therefore valid interpretive rules that did not require notice and comment.**

   **A.     The Secretary's interpretations of the statute and regulation are entitled to deference under binding Supreme Court precedent.**

For the reasons explained in the Secretary's earlier filings, the Secretary's interpretations of 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299(c)(10) are entitled to deference under binding Supreme Court precedent. *See* Defs.' Prelim. Inj. Opp'n 21–23, 30.

The Secretary's interpretation of § 1396r-4(g)(1)(A) is subject to deference under *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). *See* Defs.' Prelim. Inj. Opp'n 21–23. The plaintiffs argue that *Chevron* deference is unwarranted because FAQ Nos. 33 and 34 were developed without notice and comment. The defendants agree that FAQ Nos. 33 and 34 are not by themselves subject to *Chevron* deference, since they are merely interpretive rules that explain and clarify substantive rules adopted earlier. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172 (2007) (noting that interpretive rules are generally not subject to *Chevron* deference). But the interpretation of § 1396r-4(g)(1)(A) reflected within FAQ Nos. 33 and 34 is entitled to *Chevron* deference. The interpretation was adopted with notice and comment in the December 2008 rule, and the agency has consistently treated it as a "binding application of its

6

rulemaking authority," *Long Island Care at Home*, 551 U.S. at 172. Indeed, if the Secretary's policy were merely a nonbinding interpretation of the statute, there would be no basis for judicial review, because interpretive rules do not qualify as final agency action reviewable under the APA. *See Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013).

The Secretary's interpretation of 42 C.F.R. § 447.299 is also subject to deference under *Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994). *See* Defs.' Prelim. Inj. Opp'n 30. The plaintiffs argue that an agency's interpretation of a regulation is not entitled to deference when the regulation "parrots the language of the statute." But that principle is plainly inapplicable here; the structure and wording of 42 C.F.R. § 447.299 differ markedly from the structure and wording of 42 U.S.C. § 1396r-4(g)(1)(A). The plaintiffs alternatively contend that the Secretary's interpretation does not represent the agency's considered view of the issue and is instead a "post hoc rationalization" developed for litigation. This argument makes no sense, given that the agency's interpretation is the entire subject of this litigation—had the agency merely developed its interpretation "post hoc" for purposes of litigation, the plaintiffs would have had no reason to bring suit in the first place. The agency has explained its position on numerous occasions before the litigation, and the plaintiffs have not pointed to *any* instance in which the agency took a different position. *Cf. Aviators for Safe & Fairer Regulation v. FAA*, 221 F.3d 222, 227–28 (1st Cir. 2000) (finding that although the agency's present interpretation of a regulation was "not as clear as it could be," it should be accepted in part because there was no evidence the agency had ever said anything that contradicted its present interpretation).

    **B.**    **The Secretary has reasonably interpreted the phrase "costs incurred" as meaning costs adjusted for offsetting amounts received from Medicare or private insurance.**

The Secretary has reasonably interpreted the phrase "costs incurred," as employed within 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R § 447.299(c)(10), as meaning costs for treating

7

Medicaid-eligible patients, adjusted for offsetting amounts received from Medicare or private insurance for those patients—that is, a net cost figure from which Medicare and private insurance payments have been subtracted. While that interpretation is not wholly obvious from the text of the statute and regulation, it also does not conflict with the statute and regulation, and it should be upheld.

The plaintiffs have suggested that the term "costs incurred" in § 1396r-4(g)(1)(A) and § 447.299(c) cannot be interpreted as requiring subtraction of Medicare and private insurance payments because the provisions contain separate references to other types of "payments" that should be subtracted. The plaintiffs have not cited any binding precedent supporting this argument, and it is flawed for reasons previously explained by the defendants: Supreme Court precedent favors granting agencies "leeway" in interpreting the term "costs"; the statute expressly leaves it to the agency to interpret the term; and the explicit specification of certain types of "payments" to be subtracted should not be interpreted to preclude the agency from defining "costs" as an amount net of other payments. *See* Defs.' Prelim. Inj. Opp'n 24–28; *see also Strickland v. Comm'r, Me. Dep't of Human Servs.*, 48 F.3d 12, 19 (1st Cir. 1995) ("Like many words, 'cost' has more than a single, unitary meaning."). Indeed, in *Pharmaceutical Research & Manufacturers of America v. Thompson*, 251 F.3d 219 (D.C. Cir. 2001), the D.C. Circuit held that the agency was *required* to interpret the term "costs" in a manner that accounted for reimbursements received. *See id.* at 226, *discussed in* Defs.' Prelim. Inj. Opp'n 31–32.

As explained in the defendants' earlier filings, the First Circuit's decision in *Dunn v. Secretary of the U.S. Department of Agriculture*, 921 F.2d 365 (1st Cir. 1990), shows that a statute or regulation should not be interpreted to preclude offsets or subtractions merely because the statute or regulation does not explicitly call for such offsets or subtractions. The Court

8

suggested at the February 18 hearing that *Dunn* might be distinguishable because the statutory provision in *Dunn* set forth a single requirement, while the regulation at issue here specifies a list of elements to be used in a calculation. But there is nothing in the *Dunn* opinion that would suggest that is a meaningful distinction. As explained in the defendants' earlier briefs, the fact that certain subtractions and adjustments are explicitly specified in the statute and regulations is not sufficient reason to conclude that other subtractions or adjustments are implicitly precluded.

The plaintiffs have not cited any binding precedent suggesting that these principles fall away when a computation or formula is at issue. Even when a statute or regulation sets forth a formula for a calculation, it is commonplace for an agency to specify further adjustments to be made within that calculation, especially in a complex statutory regime like Medicaid. To offer just one example from another complex statutory regime, the Internal Revenue Code prescribes a clear formula for calculating the proceeds, or "amount realized," from a sale of property—the amount realized is "the sum of any money received plus the fair market value of the property (other than money) received." 26 U.S.C. § 1001(b). But regulations and administrative interpretations specify additional adjustments to the calculation; for example, a taxpayer may subtract amounts such as commissions or expenses paid to complete the transaction. *See, e.g.*, 26 C.F.R. § 1.1034-1(b)(4); Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates, and Gifts* ¶ 43.1 (explaining that "[a]lthough § 1001(b) makes no reference to expenses incurred in selling the property," such expenses "reduce the amount realized"). This is not a unique example; the First Circuit has repeatedly upheld agency interpretations that require adjustments to the components of statutorily prescribed formulas. *See, e.g.*, *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 32, 39–44 (1st Cir. 2008) (upholding a regulation specifying that in the calculation of an indirect medical education (IME) adjustment for Medicare payments, a hospital's count of

9

full-time-equivalent medical residents should exclude time spent on research); *Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 107–09 (1st Cir. 2015) (upholding a regulation specifying that for purposes of a calculation prescribed by statute, a "school's revenues" should include only revenues from students enrolled in programs funded by the statute, and not the school's total revenues); *Strickland*, 48 F.3d at 19–22 (upholding a regulation specifying that depreciation should be omitted from the "cost" of producing self-employment income in a statutory calculation). Similarly, in this case, it is permissible for the Secretary to interpret the phrase "costs incurred" to mean costs net of Medicare and private insurance payments.

The plaintiffs have been unable to explain why Congress would have used the term "uncompensated costs" in § 1396r-4(g)(1) if it had wanted *compensated* costs to count toward the hospital-specific limit. The plaintiffs suggested in Court that Congress sought to maximize payments to hospitals that serve the least well-off patients. But the plaintiffs' interpretation in fact works to the *disadvantage* of hospitals that serve the neediest patients. When *compensated* costs are counted as "uncompensated costs," a hospital that receives abundant compensation from Medicare or private insurance for treatment of Medicaid-eligible patients could receive the same DSH payment as a hospital that incurs comparable expenses but receives less compensation. In many States, this would affect the allocation of the State's limited DSH funds among hospitals, benefitting well-compensated hospitals at the expense of less well-compensated hospitals. That would do the work of Robin Hood in reverse, robbing from poor hospitals to give to rich hospitals. And it would thwart the original purpose of § 1396r-4(g)(1)(A), which was to prevent hospitals from receiving DSH payments above the actual net costs incurred in care of Medicaid patients. *See* Defs.' Prelim. Inj. Opp'n at 7.

## **CONCLUSION**

The Court should uphold the Secretary's policies and dismiss the plaintiffs' claims.

Date: February 24, 2016                    Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

DONALD FEITH
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

SHEILA M. LIEBER
Deputy Director

/s/ JAMES C. LUH
JAMES C. LUH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorneys for Defendants