**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


New Hampshire Hospital
Association, et al.

     v.                                  Civil No. 15-cv-460-LM
                                                Opinion No. 2016 DNH 053
Sylvia Matthews Burwell
et al.


**O R D E R**

    Several New Hampshire hospitals[1] and the New Hampshire

Hospital Association ("NHHA"), a non-profit trade association,

bring this suit against the Secretary of Health and Human

Services (the "Secretary"), the Centers for Medicare and

Medicaid Services ("CMS"), and the Administrator of CMS,

alleging that defendants have set forth certain "policy

clarifications" that contradict the plain language of the

Medicaid Act and violate the Administrative Procedure Act

("APA").  Plaintiffs seek a preliminary injunction barring

defendants from enforcing the policy clarifications during the

pendency of this litigation.  Defendants object.  The court held

an evidentiary hearing on February 18, 2016, and, for the

---

[1] Plaintiff hospitals are Mary Hitchcock Memorial Hospital ("Mary Hitchcock"), LRGHealthcare, Speare Memorial Hospital ("Speare"), and Valley Regional Hospital, Inc. ("Valley Regional").

reasons that follow, plaintiffs' motion for preliminary injunction is granted.

**Background**

I.   The Medicaid Act

Medicaid is a cooperative federal-state program designed to provide medical services to those members of society who, because they lack the necessary financial resources, cannot otherwise obtain medical care.  See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502 (1990).  That is, the program provides medical care to a population generally consisting of the poor, including dependent children, the disabled, and the elderly. See 42 C.F.R. § 430.0.  Legislation creating the program, the Medicaid Act, 42 U.S.C. §§ 1396 et seq., "provides financial support to states that establish and administer state Medicaid programs in accordance with federal law."  Long Term Care Pharm. All. v. Ferguson, 362 F.3d 50, 51 (1st Cir. 2004).

"Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of [the Medicaid Act]."  Harris v. McRae, 448 U.S. 297, 301 (1980).  In order to qualify for Medicaid funding, a state must adopt a Medicaid "plan," 42 U.S.C. § 1396a(a), which must be approved by CMS, a subdivision of the United States Department of Health and Human Services.  See

Ferguson, 362 F.3d at 51.  "The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals."  Wilder, 496 U.S. at 502.  If CMS approves a state's plan, the federal government provides reimbursements to the state for a portion of the expenditures that it incurs for Medicaid benefits, and for necessary and proper costs of administering the state plan.  See 42 U.S.C. § 1396b(a).  The state is responsible for paying the remainder of its Medicaid expenditures.  See § 1396b.

Concerned with the "greater costs it found to be associated with the treatment of indigent patients," D.C. Hosp. Ass'n v. District of Columbia, 224 F.3d 776, 777 (D.C. Cir. 2000), Congress amended the Medicaid Act in 1981 to ensure that payments to hospitals providing Medicaid-eligible services to indigent patients "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." § 1396a(a)(13)(A)(iv). Congress's intent "was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients."  Va., Dep't of Med. Assistance Servs. v. Johnson, 609 F. Supp. 2d 1, 3 (D.D.C. 2009).

Under the Medicaid Act, states must ensure that such hospitals receive an "appropriate increase in the rate or amount of payment for such services" and that the reimbursements "reflect not only the cost of caring for Medicaid recipients, but also the cost of charity care given to uninsured patients." La. Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs., 346 F.3d 571, 573 (5th Cir. 2003) (discussing 42 U.S.C. § 1396r-4(b)(1), (3)).  Such increased payments are available to any hospital that treats a disproportionate share of Medicaid patients (a "disproportionate-share hospital" or "DSH"). § 1396r-4(b).[2]

In 1993, Congress amended the DSH program to limit DSH payments on a hospital-specific basis.  See § 1396r-4(g). Congress enacted the hospital-specific limit in response to reports that some hospitals received DSH payment adjustments that exceeded "the net costs, and in some instances the total costs, of operating the facilities."  Omnibus Budget Reconciliation Act of 1993, H.R. Rep. No. 103-111, at 211–12 (1993).  The hospital-specific limit was established in § 1396r-4(g)(1), which is captioned: "Amount of adjustment subject to

---

[2] The increased payments made to disproportionate-share hospitals are referred to as "DSH payments."

uncompensated costs."  That section provides that DSH payments

made to a hospital cannot exceed:

> the costs incurred during the year of furnishing
> hospital services (as determined by the Secretary and
> net of payments under this subchapter, other than
> under this section, and by uninsured patients) by the
> hospital to individuals who either are eligible for
> medical assistance under the State [Medicaid] plan or
> have no health insurance (or other source of third
> party coverage) for services provided during the year.

§ 1396r-4(g)(1)(A).  Thus, for Medicaid patients (as opposed to

uninsured patients), the Medicaid Act sets the hospital-specific

DSH limit as the costs a hospital incurs in furnishing hospital

services to Medicaid-eligible patients "as determined by the

Secretary and net of payments" under the Medicaid Act.[3]

II.  <u>Audit and Reporting Requirements</u>

    In 2003, to monitor DSH payments, Congress enacted into law

a requirement that each state provide to the Secretary an annual

report and audit on its DSH program.  <u>See</u> § 1396r-4(j).  The

audit must confirm, among other things, that "[o]nly the

uncompensated care costs of providing inpatient hospital and

outpatient hospital services to individuals described in [§

1396r-4(g)(1)(A)] . . . are included in the calculation of the

hospital-specific limits."  § 1396r-4(j)(2)(C).  Any

---

[3] The parties often refer to the portion of § 1396r-4(g)(1)
dealing with the costs of furnishing hospital services to
Medicaid-eligible patients as the "Medicaid Shortfall."

overpayments that an audit reveals must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution.  See § 1396b(d)(2)(C).

On December 19, 2008, CMS promulgated a final rule implementing the statutory reporting and auditing requirement (the "2008 Rule").  See Disproportionate Share Hospital Payments, 73 Fed. Reg. 77904 (Dec. 19, 2008).  The 2008 Rule requires that states annually submit information "for each DSH hospital to which the State made a DSH payment."  42 C.F.R. § 447.299(c).  One such piece of information is the hospital's "total annual uncompensated care costs," which is defined as follows:

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments . . . .

§ 447.299(c)(16).  This section establishes a formula for a state to determine whether the hospital-specific DSH limit, as set forth in § 1396-r(4)(g)(1), was calculated correctly.

The 2008 Rule also provides that any audits of DSH payments made prior to Fiscal Year 2011 would not result in the recoupment or reduction of federal funds used for DSH payments. See 73 Fed. Reg. at 77906.  Beginning with payments made in

Fiscal Year 2011, any DSH overpayments must be recovered by the state and returned to the federal government, unless they "are redistributed by the State to other qualifying hospitals."  Id.

III.  FAQs 33 and 34

On January 10, 2010, CMS posted answers on its website to "frequently asked questions" regarding the audit and reporting requirements of the 2008 Rule.  See Additional Information on the DSH Reporting and Auditing Requirement, http://www.medicaid. gov/medicaid-chip-program-information/by-topics/financing-and-reimbursement/downloads/additionalinformationonthedshreporting.p df (last visited March 11, 2016).  Two of the frequently asked questions, FAQ 33 and FAQ 34, and CMS's responses to those questions are at issue in this case.  FAQ 33 and CMS's response thereto, are as follows:

> **33:  Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the ... DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**
>
> Days, cost[s], and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid inpatient utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1)[4] does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance.  Therefore,

_____

[4] Section 1923 is the same as § 1396r-4.

days, costs, and revenues associated with patients
that are eligible for Medicaid and also have private
insurance should be included in the calculation of the
hospital-specific DSH limit.

Id. at 18.  FAQ 34 and CMS's response thereto, states:

> **34. The regulation states that costs for dual
> eligibles should be included in uncompensated care
> costs. Could you please explain further? Under what
> circumstances should we include Medicare payments?**
>
> Section 1923(g) of the Act defines hospital-specific
> limits on FFP for Medicaid DSH payments. Under the
> hospital-specific limits, a hospital's DSH payment
> must not exceed the costs incurred by that hospital in
> furnishing services during the year to Medicaid and
> uninsured patients less payments received for those
> patients. There is no exclusion in section 1923(g)(1)
> for costs for, and payment made, on behalf of
> individuals dually eligible for Medicare and Medicaid.
> Hospitals that include dually-eligible days to
> determine DSH qualification must also include the
> costs attributable to dual eligibles when calculating
> the uncompensated costs of serving Medicaid eligible
> individuals. Hospitals must also take into account
> payment made on behalf of the individual, including
> all Medicare and Medicaid payments made on behalf of
> dual eligibles. In calculating the Medicare payment
> for service, the hospital would have to include the
> Medicare DSH adjustment and any other Medicare
> payments (including, but not limited to Medicare IME
> and GME) with respect to that service. This would
> include payments for Medicare allowable bad debt
> attributable to dual eligibles.

Id.

Thus, FAQs 33 and 34 provide that in calculating the
hospital-specific DSH limit, a state must subtract payments
received from private health insurance (FAQ 33) and Medicare
(FAQ 34) for dually-eligible Medicaid patients from the costs
incurred in providing hospital services to those patients.

IV.  <u>Texas Children's Hospital v. Burwell</u>

On December 5, 2014, two disproportionate-share hospitals, Texas Children's Hospital and Seattle Children's Hospital, brought suit against the same defendants named in this case in the District Court for the District of Columbia.  <u>See</u> <u>Texas Children's Hospital v. Burwell</u>, Civil Action No. 14-2060 (EGS) (D.D.C. 2014).  The plaintiffs in <u>Texas Children's Hospital</u> assert that FAQ 33 is contrary to the provisions of the Medicaid Act and that CMS's publication of FAQ 33 violates the procedural requirements of the APA.  On December 29, 2014, the court in <u>Texas Children's Hospital</u> granted the plaintiffs' motion for preliminary injunction and entered an order enjoining CMS from enforcing, applying, or implementing FAQ 33 pending further order of the court.  <u>Texas Children's Hosp. v. Burwell</u>, 76 F. Supp. 3d 224, 246-47 (D.D.C. 2014).  The court further ordered CMS to notify the Texas and Washington State Medicaid programs that, pending further order by the court, the enforcement of FAQ 33 is enjoined and CMS will take no action to recoup federal DSH funds provided to Texas and Washington based on the states' noncompliance with FAQ 33.  <u>Id.</u>  The plaintiffs in that case have not challenged FAQ 34 or CMS's policy regarding patients dually eligible for Medicare and Medicaid.

V. <u>Plaintiffs' Petition to CMS</u>

On June 17, 2015, plaintiffs petitioned CMS requesting that the agency repeal the policies referenced in FAQs 33 and 34 regarding the inclusion of private health insurance and Medicare payments in the calculation of the Medicaid Shortfall. <u>See</u> Galdieri Decl., Ex. P (doc. no. 10-24).  Plaintiffs submitted a supplement to the petition dated June 24, 2015.  <u>See</u> <u>id.,</u> Ex. Q (doc. no. 10-25).  The petition and the supplement asserted that the policies in FAQs 33 and 34 operate as substantive amendments to existing federal law and regulations, as well as to the New Hampshire State Medicaid Plan.  <u>See</u> doc. nos. 10-24 and 10-25.  The petition and supplement also asserted that the policies are illegal and void and requested that CMS repeal and revoke them.  <u>Id.</u>

In a letter dated October 6, 2015, CMS Acting Administrator Andrew Slavitt responded to plaintiffs' petition.  <u>See</u> Galdieri Decl., Ex. R (doc. no. 10-26).  In the letter, Slavitt stated:

> The CMS continues to maintain that this longstanding, consistent policy, which is reflected in FAQ No. 33 with respect to private insurance payments, and is discussed elsewhere in the FAQs and in the preamble to the December 2008 regulation with respect to Medicare payments for dually-eligible beneficiaries, reflects a valid interpretation of the statute governing the calculation of uncompensated care costs for purposes of the DSH hospital-specific limit, 42 U.S.C. § 1396r-4, and the associated regulations.

Id. at 2 (citations omitted).  Slavitt acknowledged the

preliminary injunction in Texas Children's Hospital, but stated:

> For all other states, including New Hampshire, CMS may
> disallow federal financial participation if a state
> does not comply with the policy articulated in FAQ No.
> 33.
>
> Moreover, for state plan rate year 2011 and
> thereafter, any other audit-identified DSH payments
> that exceed documented hospital-specific DSH limits
> may be treated as provider overpayments that, pursuant
> to 42 CFR Part 433, Subpart F, trigger the return of
> the federal share to the federal government.

Id. at 2-3.


VI.  Procedural History

Plaintiffs filed this lawsuit on January 15, 2016.  That

same day, they filed a motion for preliminary injunction, which

seeks to enjoin defendants from enforcing or applying the

policies set forth in FAQs 33 and 34.  Defendants objected to

the motion, plaintiffs filed a reply, and defendants filed a

surreply.[5]  On February 18, 2016, the court held an evidentiary

hearing, during which the court heard oral argument and

plaintiffs submitted evidence.

---

[5] Defendants have also moved to dismiss the complaint, and
the motion is ripe for the court's consideration.  The court
does not address that motion in this order.

**Discussion**

"A preliminary injunction is an 'extraordinary and drastic remedy;' it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995) (further citations omitted)). Rather, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Bl(a)ck Tea Soc'y v. City of Bos., 378 F.3d 8, 11 (1st Cir. 2004). The court will assess each of these four elements in turn, mindful that the burden of satisfying them rests and remains with the party seeking the injunction. Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).[6]

---

[6] Plaintiffs' claims arise under the APA, which sets forth standards a court may employ when considering a request for a stay of administrative action. See 5 U.S.C. § 705. Here, plaintiffs have moved for a preliminary injunction, rather than a motion for stay under the APA. Regardless, "[c]ourts use the same standard to decide applications for stays of administrative action as for preliminary injunction determinations." First Premier Bank v. U.S. Consumer Fin. Protection Bureau, 819 F. Supp. 2d 906, 912 (D.S.D. 2011).

I. Likelihood of Success on the Merits

"Though each factor is important ... 'the sine qua non of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (alteration omitted)).  "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." Sindicato Puertorriqueño, 699 F.3d at 10 (citations omitted) (internal quotation marks omitted).  In the context of a preliminary injunction, "the merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction," including standing. Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J., concurring in part and dissenting in part).

Plaintiffs allege in their complaint that FAQs 33 and 34 are contrary to the plain language of the Medicaid Act and were promulgated in violation of the APA.  Defendants argue that plaintiffs are unlikely to succeed on the merits of their claims because they lack standing to pursue their claims, and because

FAQs 33 and 34 are consistent with the language of the Medicaid Act and the 2008 Rule.  The court addresses the standing issue first, before turning to the parties' arguments on the merits. See Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006) ("A federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims . . . .").

A.    Standing

     "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const., Art. III, § 2).  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"  Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the

14

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).[7]

Defendants argue that the harm plaintiffs allege they will suffer in this case—harm from potential recoupment of past DSH overpayments and harm from reduction in prospective DSH payments—is not fairly traceable to federal policy or likely to be redressed by a favorable decision.

"When the suit is one challenging the legality of government action or inaction . . . [and] a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) . . . of someone else, . . . causation and redressability ordinarily hinge on the response of the regulated . . . third party to the government action." Lujan, 504 U.S. at 561-62.  In that case, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."  Id. at 562.  Standing may be established in such situations "where the record presents

_____

[7] Plaintiffs contend that they have both substantive standing, because of their injuries arising out of the recoupment and prospective loss of DSH funding, and procedural standing, because of defendants' failure to afford plaintiffs the right to notice-and-comment under the APA.  Regardless of whether the injury is procedural or substantive, plaintiffs must meet the same standard.  See, e.g., U.S. Women's Chamber of Commerce v. U.S. Small Bus. Admin., No. 1:04-CV-01889, 2005 WL 3244182, at *13 (D.D.C. Nov. 30, 2005).

substantial evidence of a causal relationship between the government policy and the third party conduct, leaving little doubt as to causation and likelihood of redress." Constitution Party of Penn. v. Aichele, 757 F.3d 347, 366 (3d Cir. 2014) (citation and alteration omitted).

    1.   Recoupment of Past DSH Overpayments

Plaintiffs argue that the audit of their DSH payments for Fiscal Year 2011 revealed that plaintiff hospitals were overpaid because the auditors followed the policies set forth in FAQs 33 and 34.  They contend, therefore, that the recoupment of past DSH overpayments based on the audit is directly traceable to the policies in FAQs 33 and 34.  They further argue that no recoupment would be required if defendants were enjoined from enforcing the policies.

Defendants contend that when, as here, a DSH audit reveals an overpayment to a hospital, the recoupment of that overpayment is in the hands of state authorities and subject to state law. Defendants argue that, as such, an injunction issued against them in this case would not bar the State of New Hampshire[8] from

---

[8] The New Hampshire Department of Health and Human Services ("NHDHHS") is the state agency charged with administration of the Medicaid program.  Therefore, NHDHHS is the entity responsible for recouping past DSH overpayments and for making prospective DSH payments to plaintiff hospitals.

recouping funds from plaintiff hospitals and redistributing them
to other DSH hospitals.  They contend, therefore, that,
plaintiffs' injury in the form of NHDHHS's recoupment of past
DSH payments is not fairly traceable to the policies in FAQs 33
and 34, and is not likely to be redressed by any action against
them.

There is no doubt that the recoupment of past DSH payments
by NHDHHS is fairly traceable to defendants' enforcement of the
policies in FAQs 33 and 34.  Defendants do not meaningfully
dispute that (i) NHDHHS is set to recoup past DSH payments for
Fiscal Year 2011 from plaintiff hospitals; and (ii) it will
recoup those payments because its audit revealed overpayments to
those hospitals based on the policies in FAQs 33 and 34.
Therefore, plaintiffs' injury is fairly traceable to defendants'
conduct that is challenged in this case.[9]  See Nat'l Wrestling
Coaches Assoc. v. Dep't of Educ., 383 F.3d 1047, 1049 (D.C. Cir.
2004) (Plaintiffs could show causation "if they could show that
the agency's allegedly illicit action was a substantial factor

---

[9] Under the Medicaid Act, the federal government cannot
compel states to recoup funds from disproportionate-share
hospitals in the event of an overpayment.  Rather, in those
circumstances, the federal government adjusts the amount paid to
the states one year after the overpayment is discovered.  See 42
U.S.C. § 1396b(d)(2)(C).  As discussed below, however, evidence
in the record establishes that NHDHHS is set to recoup DSH
overpayments revealed in the Fiscal Year 2011 audit from
plaintiff hospitals.

in bringing about the injurious conduct of the third parties.")
(internal quotation marks and citation omitted); see also Wine &
Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 45 (1st
Cir. 2005) ("The requirement that an alleged injury be fairly
traceable to the defendant's action does not mean that the
defendant's action must be the final link in the chain of events
leading up to the alleged harm.").

The same is true for redressability.  Defendants argue that
plaintiffs' injury in the form of recoupment of past DSH
overpayments is not redressable because even if the court grants
plaintiffs' motion for preliminary injunction, NHDHHS could
still recoup funds from plaintiff hospitals and redistribute
them to other DSH hospitals.  While that may be true in a
literal sense, it defies logic to believe that NHDHHS would take
action pursuant to federal policies which defendants would be
enjoined from enforcing.  In other words, if FAQs 33 and 34 are
unenforceable, then the audit of Fiscal Year 2011 based on FAQs
33 and 34 is no longer accurate.  Defendants offer no
explanation as to why NHDHHS would still attempt to recoup non-
existent overpayments.

In addition, defendants' argument is belied by the evidence
in this case.  Plaintiffs attached as an exhibit to their motion
a letter dated March 3, 2015, from Kathleen Dunn, the Associate
Commissioner of NHDHHS, to Franklin Regional Hospital,

18

LRGHealthcare's critical access hospital.  See Galdieri Decl.,
Ex. N (doc. no. 10-22).  In the letter, Dunn refers to the
preliminary injunction issued against defendants in Texas
Children's Hosp., enjoining the enforcement of FAQ 33.  Dunn
notes that NHDHHS "has and will continue to seek guidance from
CMS on its policy response to this court order."  Id. at 2.  She
also states that because NHDHHS does not need to take recoupment
actions until the middle of Fiscal Year 2016, it will not "take
any recoupment actions on these DSH payment audit results at
this time," and she expects that before recoupment actions must
be taken, "a clear federal policy on this issue will have been
issued in accordance with federal reviewing court decisions."
Id.  Dunn's letter demonstrates that NHDHHS will act in
accordance with CMS's guidance as to the enforcement of the
policies in FAQs 33 and 34, which will be directly affected by
the court's order in this case.

In addition, at the hearing, plaintiffs submitted as an
exhibit a letter dated January 27, 2016, from Jeffrey A. Meyers,
the Acting Commissioner of NHDHHS, to Steve Ahnen, the Executive
Director of plaintiff NHHA.  The letter states, in pertinent
part:

> If your request for injunctive relief [in this case]
> is granted, it is our view that NHDHHS would not be
> able to require recoupment while the injunction is in
> place, or be obligated to redistribute, based on the
> 2011 Myers and Stauffer audit, to the extent that

recoupment is required due to the application by the
auditor of the principles in FAQ Nos. 33 & 34.

Ex. 1.

Further, on January 28, 2016, NHDHHS issued a "Notice of
Overpayment and Repayment Agreement" to Franklin Regional
Hospital.  Ex. 2.  The notice states that NHDHHS is proceeding
with the recoupment of DSH overpayments for the 2011 Fiscal Year
that were discovered during the audit.  Id. at 1-2.  The
Repayment Agreement references this lawsuit, and notes that, to
the extent the court grants injunctive relief, NHDHHS will not
proceed with the recoupment of funds affected by the court's
order.[10]  Id. at 5.

Defendants cite Bourgoin v. Sebelius, 296 F.R.D. 15 (D. Me.
2013) in support of their argument that plaintiffs' injury in
the form of recoupment of past DSH overpayments is not

---

[10] Both Ex. 1 and Ex. 2 post-date the complaint and the
motion for preliminary injunction.  Defendants argue that
plaintiffs cannot establish standing based on exhibits dated
after the date the complaint was filed, citing Lujan, 504 U.S.
at 570 n.4.  Lujan holds that "the existence of federal
jurisdiction ordinarily depends on the facts as they exist when
the complaint is filed."  Id.  The court, however, does not view
Lujan as precluding consideration of the exhibits.  The exhibits
are not facts that establish the existence of the court's
jurisdiction.  Rather, they are evidence that such facts existed
at the time the complaint was filed.  Therefore, the court
considers the exhibits in ruling on plaintiffs' motion.  As
explained above, however, even if the court did not consider the
exhibits, it would still find that plaintiffs have met the
redressability prong of the standing analysis with regard to the
recoupment of past DSH overpayments.

redressable.  In Bourgoin, the district court held that Medicaid
beneficiaries did not have standing to sue the federal
government based on their theory that a ruling against the
federal government would induce the state of Maine, which was
not a party, to provide the benefits they sought.  Id. at 29-30.
Bourgoin is not dispositive on the issue of standing in this
case.  In Bourgoin, the court noted several "plausible
arguments" that Maine would not be affected by the court's order
against the federal government, "and it would be surprising if
the State did not press these arguments."  Id. at 29.  Here, in
contrast, defendants fail to put forth any argument—much less a
plausible one—suggesting that NHDHHS would still recoup funds if
the court issued an injunction.  Moreover, plaintiffs have
submitted evidence showing that NHDHHS would forego recoupment
in the face of an injunction in this case.[11]

In sum, plaintiffs have shown that defendants' enforcement
of FAQs 33 and 34 has a sufficient causal connection to
plaintiffs' injuries arising from the recoupment of past DSH
overpayments, and an injunction against defendants' enforcement

---

[11] In addition, in Bourgoin, the plaintiffs challenged a
recent amendment to Maine's Medicaid Plan but sued only the
Secretary, on the basis that she approved the amendment.  Thus,
the plaintiffs' injuries in that case were far less traceable to
the Secretary's actions than in this case, and were likely not
redressable by a favorable decision.

of the FAQs would likely redress plaintiffs' injuries in that
regard.

> 2.   Reduction in Prospective DSH Payments

Defendants contend that any reduction in prospective DSH
payments is not traceable to federal policy, because prospective
payments are governed by a settlement agreement between the New
Hampshire state government and New Hampshire hospitals,
including plaintiffs, which resolved lawsuits over the
implementation of the New Hampshire Medicaid plan.[12]  Defendants
argue that plaintiffs' voluntary decision to enter into the
settlement agreement precludes them from claiming they are
injured by the federal standards that are incorporated into the
agreement.

Defendants' argument is without merit.  It is true that the
settlement agreement changed New Hampshire's DSH program
beginning in Fiscal Year 2016, and provides that DSH funding
levels are set at a specific percentage, depending on the
hospital, of a hospital's total annual uncompensated care costs.
Defendants' alleged conduct, however, has the effect of lowering
the calculation of total annual uncompensated care costs, which
necessarily lowers the DSH funding levels.  Therefore,

---

[12] Unlike the recoupment of DSH overpayments, defendants do
not argue lack of redressability from the reduction in
prospective DSH payments.

plaintiffs have shown that there is a causal relationship between defendants' enforcement of the policies in FAQs 33 and 34 and the reduction in prospective DSH payments.

Defendants cite Pennsylvania v. New Jersey, 426 U.S. 660 (1976) (per curiam) for the proposition that plaintiffs' injury is self-inflicted and, therefore, not traceable to defendants' conduct. In Pennsylvania, the Supreme Court held that the plaintiff states lacked standing to contest the defendant states' laws taxing a portion of nonresidents' incomes. The plaintiffs alleged that the defendants' taxes injured them because the plaintiffs gave their residents credits for taxes paid to other states, and the defendants' taxes increased the amount of those credits, causing the plaintiffs to lose revenue. Id. at 663. The Supreme Court noted that "[t]he injuries to the plaintiffs' fiscs were self-inflicted . . . and nothing prevents [plaintiffs] from withdrawing [the] credit for taxes paid to [defendant states]." Id. at 664. Here, defendants' change to the calculation of total annual uncompensated care costs would have injured plaintiffs regardless of the settlement agreement, because it would have materially lowered the yearly DSH payment. In other words, unlike the plaintiffs in Pennsylvania, plaintiffs in this case would be adversely affected by defendants' policies regardless of the settlement agreement.

To illustrate how defendants' argument does not withstand scrutiny, imagine a family of four children.  Each year, the parents buy the children a pie to share from the same bakery.  After an argument, the children and parents agree that each child will be entitled to exactly 25% of the pie.  Without warning and without lowering the price, the bakery reduces the size of the pie significantly.  Under defendants' theory, the children's injury—a much smaller portion of the pie than usual—has not been caused by the bakery, but instead is "self-inflicted," because they agreed on how to divide up the pie.  For obvious reasons, that argument fails.

Accordingly, plaintiffs have met their burden to show a likelihood of causation and redressability.  Therefore, plaintiffs have shown a likelihood of standing.[13]

B.  Claims

Plaintiffs' motion seeks a preliminary injunction on Counts I-III of their complaint.  Although each count represents a separate challenge to defendants' actions, all allege that defendants' enforcement of the policies in FAQs 33 and 34 violate the APA.  At its center, plaintiffs' likelihood of

---

[13] Defendants do not dispute that if plaintiff hospitals have standing, the NHHA has standing as well.  See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).

success on the merits turns on a single question: Do the
directives contained in FAQs 33 and 34 substantively alter the
obligations established in the Medicaid Act and the 2008 Rule?
If plaintiffs show that the answer to that question is likely
yes, then defendants have likely violated the APA.  If they do
not, then defendants have likely not violated the APA.

     Under the APA, a court must "hold unlawful and set aside
agency action, findings, and conclusions" that are "in excess of
statutory jurisdiction, authority, or limitations, or short of
statutory right," 5 U.S.C. § 706(2)(C), "arbitrary, capricious,
an abuse of discretion, or otherwise not in accordance with
law," id. § 706(2)(A), or "without observance of procedure
required by law," id. § 706(2)(D).  Plaintiffs assert that
defendants' implementation and enforcement of the policies in
FAQs 33 and 34 violate all three sections of the APA.  Although
the standard of review for challenges under the sections
"overlap, they are not identical." Individual Reference Servs.
Grp., Inc. v. F.T.C., 145 F. Supp. 2d 6, 25 (D.D.C. 2001).
Therefore, in the interest of clarity, the court will address
plaintiffs' challenges according to the manner in which
plaintiffs organized them: first, with respect to their
challenge that the policies in FAQs 33 and 34 conflict with the
plain language of the Medicaid Act in violation of § 706(2)(C)
and, then, whether defendants' actions had to be, but were not,

subject to notice-and-comment rulemaking under §§ 706(2)(A), (D).

    1.   FAQS 33 and 34 Violate the Medicaid Act

    Plaintiffs contend that the policies in FAQs 33 and 34 violate § 706(2)(C) of the APA because they conflict with the unambiguous language of the Medicaid Act. See § 1396r-4(g)(1)(A). Defendants argue that FAQs 33 and 34 do not conflict with the Medicaid Act, and instead represent a "reasonable interpretation of the statute entitled to deference" under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)."[14] Obj. (doc. no. 17) at 29 of 53.

    A court considering whether to defer to an administrative construction of a statute must follow the two-step inquiry set forth by the Supreme Court in Chevron. "First, [courts] look to the statute to ascertain whether 'Congress has directly spoken to the precise question at issue.'" Santana v. Holder, 731 F.3d 50, 55 (1st Cir. 2013) (quoting Chevron, 467 U.S. at 842). "If the statute is clear in its meaning, [courts] must 'give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 842-43). In determining if

---

    [14] The parties agree that claims brought under § 706(2)(C) are analyzed under the Chevron framework. See, e.g., AstraZeneca Pharm. LP v. Food and Drug Admin., 872 F. Supp. 2d 60, 77 (D.D.C. 2012).

Congress has spoken on the relevant question, courts use all appropriate tools of statutory interpretation.  See id.  Only if Congress's intent remains unclear after deploying these tools does the court move to "step two."  Id.  "At Chevron's second step, the inquiry focuses on 'whether the agency's answer is based on a permissible construction of the statute.'"  Id. (quoting Chevron, 467 U.S. at 843).  The court "defer[s] to the agency's interpretation unless that interpretation is unreasonable."  Lovgren v. Locke, 701 F.3d 5, 31 (1st Cir. 2012); see also Saysana v. Gillen, 590 F.3d 7, 13 (1st Cir. 2009).

### a.   Step One under Chevron

As discussed above, the Medicaid Act defines the hospital-specific DSH limit in § 1396r-4(g)(1).  The section defines the Medicaid Shortfall, in relevant part, as follows:

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section . . .) by the hospital to individuals who . . . are eligible for medical assistance under the State [Medicaid] plan . . . for services provided during the year.

Id. (emphasis added).  The unambiguous language of § 1396r-4(g)(1) provides that the payments which are to be subtracted from Medicaid costs in calculating the Medicaid Shortfall are

"payments under this subchapter . . . ."[15]  Defendants do not argue that payments from private health insurance or Medicare are "payments under this subchapter" for purposes of § 1396r-4(g)(1).  Therefore, because the language defining the payments that are to be deducted from costs is unambiguous, and that language does not include payments from private health insurance or Medicare, defendants' interpretation of the Medicaid Act appears to fail at step one of Chevron's analytical framework.

To avoid the plain language of the statute, defendants craft a novel argument: that payments from private health insurance and Medicare should be considered in the definition of the term "costs," rather than in the definition of the phrase "net of payments under this subchapter."  Defendants argue that § 1396r-4(g)(1) specifically grants the Secretary discretion in interpreting the term "costs," and, therefore, the court should proceed to step two of Chevron's framework.

The court agrees that the language of § 1396r-4(g)(1) grants the Secretary the authority to determine the meaning of the term "costs."  The Medicaid Act states that the "costs" to be included in the calculation of the hospital-specific DSH limit are costs "as determined by the Secretary."  § 1396r-

---

[15] The term "subchapter" refers to Subchapter XIX (Grants to States for Medical Assistance Programs) of Chapter 7 of Title 42 of the U.S. Code, which is the Medicaid Act, codified at 42 U.S.C. §§ 1396 – 1396w-5.

4(g)(1).  The use of the phrase "as determined by the Secretary" shows that "Congress has provided 'an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.'" Transitional Hosps. Corp. of La., Inc. v. Shalala, 222 F.3d 1019, 1026 (D.C. Cir. 2000) (quoting Chevron, 467 U.S. at 843-44).  "This . . . takes the case out of the realm of Chevron step one's de novo review, and into the realm of Chevron step two—which asks only whether the agency's interpretation is reasonable." Id.; see also San Bernadino Mountains Cmty. Hosp. Dist. v. Sec'y of Health & Human Servs., 63 F.3d 882, 886-87 (9th Cir. 1995).

Therefore, the court will proceed to step two of Chevron's analysis on the question of the Secretary's interpretation of the term "costs" as used in § 1396r-4(g)(1).  Thus, the court asks only whether the Secretary's interpretation of the term "costs" to mean "unreimbursed costs" is reasonable.

b.  Step Two under Chevron[16]

The Medicaid Act calculates the Medicaid Shortfall by using the following straightforward equation:

**Medicaid Costs − Medicaid Payments = Medicaid Shortfall**

---

[16] In plaintiffs' objection to defendants' motion to dismiss, which they incorporate into their reply to defendants' objection to their motion for preliminary injunction, plaintiffs argue that the court should not engage in step two of Chevron's analysis because the Secretary's interpretation of the Medicaid

As just mentioned, the Act specifically defines the "payments" that are to be subtracted from the "costs" to obtain the Medicaid Shortfall.  The defined payments do not include payments from private insurance or Medicare.  Nevertheless, defendants argue that, for several reasons, an interpretation of "costs" to include payments from private health insurance and Medicare is reasonable.

> i.   Costs can mean unreimbursed or uncompensated costs

Defendants urge an interpretation of the Medicaid Shortfall that defines the term "costs" as "unreimbursed" or "uncompensated" costs.  In other words, defendants contend that the following interpretation of the Medicaid Shortfall equation is reasonable:

**(Medicaid Costs – Payments) – Medicaid Payments = Medicaid Shortfall**

---

Act in FAQs 33 and 34 was not promulgated in the exercise of her authority to make rules that carry the force of law.  See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001).  Plaintiffs argue that to the extent the Secretary's interpretation survives Chevron's first step, it should be analyzed under Skidmore v. Swift & Co., 323 U.S. 134 (1944), which would give it, at best, only some "weight."  Rather than devoting pages to explaining the intricacies of the various levels of deference that can be afforded an agency's interpretation of its governing statute, the court will assume without deciding that the higher level of deference under Chevron's second step applies.

That interpretation is unreasonable and is not entitled to deference.  Defendants' reading of the Medicaid Act would double count Medicaid payments—first as reimbursements or compensation to be subtracted to determine the "costs" figure, and then again as payments specifically set forth in the statute to be subtracted from the overall costs figure.  Cf. Texas Children's Hosp., 76 F. Supp. 3d at 237-38.  Therefore, that interpretation "exceeds the bounds of the permissible."  Barnhart v. Walton, 535 U.S. 212, 218 (2002).

      ii.  <u>Costs means costs less payments from private insurance and Medicare</u>

Perhaps recognizing the futility of that interpretation, defendants appear to urge another reading of the term "costs," which would capture only payments from private insurance and Medicare, but not Medicaid payments.  Thus, defendants appear to urge the following alternative interpretation of the Medicaid Shortfall equation:

**(Medicaid Costs – Payments other than Medicaid Payments) –**
**Medicaid Payments = Medicaid Shortfall**

Although that interpretation would not double count Medicaid payments, it is also unreasonable.  The Medicaid Act separately describes the "payments" that are subtracted from the "costs" to obtain the Medicaid Shortfall.  Congress could not have intended to grant the Secretary the discretion to include other payments

within the term "costs," while separately defining payments.  If it did, the definition of payments that must be subtracted from costs to determine the Medicaid Shortfall would be surplusage. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)).

### iii. Costs is a flexible term

Defendants assert that "costs," as used in § 1396r-4(g)(1), is a "flexible term," which gives an agency "broad methodological leeway" to interpret the definition.  An agency gets such broad leeway, however, when the term "costs" stands "without any better indication of meaning than the unadorned term." Verizon Comm'ns Inc. v. FCC, 535 U.S. 467, 500 (2002). Here, although § 1396r-4(g)(1) does not define the term "costs," it provides that the "costs" must be offset against certain defined payments.  Therefore, at a minimum, Congress gave the indication that "costs" does not include "payments," and the Secretary is not afforded "leeway" to interpret the term otherwise.

In addition, this is not a case where, as in the cases cited by defendants, the Secretary is simply altering the methodology used to determine "costs."  See id. at 500-501 (discussing whether the term "costs" should be calculated as rates set on a forward-looking basis or those tied to historical investment under the Telecommunications Act); Am. Elec. Power Serv. Corp. v. FCC, 708 F.3d 183, 189 (D.C. Cir. 2013) (holding that the Federal Communications Commission reasonably reformulated pole attachment rates that utilities could charge telecommunications carriers in order to achieve equivalency with rate charged to cable television systems).  Instead, the Secretary here is defining "costs" in a way that would render superfluous the specific payments defined as offsets in the statute.  See TRW Inc., 534 U.S. at 31.

### iv.  Consistent interpretation

Defendants argue that the Secretary has been consistent in her adherence to the interpretation of the term "costs" as set forth in FAQs 33 and 34, which, they contend, supports their claim that the interpretation is reasonable.  In support, defendants cite select portions of the Preamble to the 2008 Rule.  For example, defendants point to the following language:

> [T]he costs attributable to dual eligibles should be
> included in the calculation of the uncompensated costs
> of serving Medicaid eligible individuals.  But in
> calculating those uncompensated care costs, it is

33

necessary to take into account both the Medicare and
Medicaid payments made, since those payments are
contemplated under Title XIX.

73 Fed. Reg. 77912.  Defendants are correct that this language

is consistent with the Secretary's interpretation of FAQ 34.

Other language in the Preamble, however, is not consistent

with the Secretary's interpretation.  For example, the Preamble

discusses the "reporting form" which contains the "necessary

data elements to fulfill the audit and reporting requirements."

Id. at 77921.  It states:

> The data element referring to "Total Annual
> Uncompensated Care Costs" represents the total amount
> of unreimbursed care to be considered under the
> hospital-specific DSH limit.  This figure is the
> result of summing "Total Cost of Care Medicaid IP/OP
> Services" and "Total Cost of IP/OP for uninsured" and
> then subtracting "Total Medicaid IP/OP Payments" and
> "IP/OP Uninsured Revenues," and "Total Applicable
> Section 1011 Payments."

Id. (emphasis added).  This language instructs that the hospital

and auditor should first consider the cost of services and then,

separately, subtract certain payments.  This instruction is

consistent with the language of § 1396r-4(g)(1).  In addition,

this part of the Preamble specifically defines the payments and

revenues to be subtracted from the costs of care, and it does

not include payments from private health insurance or Medicare.

In explaining the way to calculate the hospital-specific

DSH limit, the Preamble is replete with language separating the

"costs" associated with providing hospital services to Medicaid

patients and the "payments" received for those services.  For

example, the Preamble states:

- "[The statute] plainly identifies the limited population
  [of those individuals covered], whose costs were to be
  included in the calculation, and specifies offsets of
  revenues associated with those costs."  73 Fed. Reg. at
  77921.

- "Section 1923(j) of the Act instructs States to audit and
  report specific payments and specific costs."  Id. at
  77932.

- "In order to [calculate the hospital-specific DSH limit],
  all applicable revenues must be offset against all
  eligible costs.  For purposes of determining the hospital-
  specific DSH limit, revenues would include all Medicaid
  payments made to hospitals for providing inpatient and
  outpatient services to Medicaid individuals . . . and all
  payments made by or on behalf of patients with no source
  of third party coverage for the inpatient and outpatient
  hospital services they received."  Id. at 77946.

Each of these sections of the Preamble (i) separates "costs"

from "revenues" and "payments" in calculating the hospital-

specific DSH limit, and (ii) limits the revenues and payments to

be considered to those enumerated in that section, which do not

include payments from private health insurance or Medicare.

35

Therefore, the Preamble to the 2008 Rule does not support defendants' contention that the Secretary has consistently interpreted the term "costs" to include payments.[17]

     v.   Common sense

Finally, defendants argue that common sense demonstrates that the Secretary's interpretation of § 1396r-4(g)(1) is reasonable. They argue that the Medicaid Act limits hospital-specific DSH payments to "uncompensated costs" incurred by the hospital in providing care to Medicaid-eligible patients. They contend, therefore, that it "defies logic and conflicts with the law" to conclude that costs that are offset by private health insurance and Medicare payments should be counted as uncompensated costs. Doc. no. 17 at 9 of 53.

Divorced from the language of the statute, defendants' argument has merit. In the end, however, that interpretation cannot be given weight because it is directly contrary to the plain language of § 1396r-4(g)(1). See, e.g., Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (noting the

---

[17] Defendants also cite an August 16, 2002 letter from CMS to State Medicaid Directors to support their contention that the policies in FAQs 33 and 34 reflect the Secretary's consistent interpretation. Although the letter suggests that the Medicaid Shortfall should consider "net of third party payments," that language is insufficient to overcome the overwhelming evidence that the Secretary has not consistently interpreted the definition of "costs" to include "payments" in § 1396r-4(g)(1).

"cardinal canon" of statutory interpretation is "that a legislature says in a statute what it means and means in a statute what it says there"). Moreover, the term "uncompensated costs" is not used in the language of the statute itself, but rather in the caption of the statute. See § 1396r-4(g)(1) (titled "Amount of adjustment subject to uncompensated costs"). "The caption of a statute . . . cannot undo or limit that which the statute's text makes plain." Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 256 (2004) (internal quotation marks, citation, and alteration omitted).[18]

### vi. Conclusion of Chevron deference

For all of the above reasons, FAQs 33 and 34 represent an unreasonable agency interpretation of the Medicaid Act, which is not entitled to deference under Chevron. Therefore, plaintiffs are likely to show that defendants acted "in excess of statutory jurisdiction, authority . . . or short of statutory right" in promulgating and enforcing the policies in FAQs 33 and 34. See § 706(2)(C).

---

[18] Moreover, the Preamble to the 2008 Rule suggests that the use of the term "uncompensated" as it applies to the hospital-specific DSH limit is not as broad as defendants proffer. See 73 Fed. Reg. at 77921 ("The Medicare program uses a different, broader, definition of uncompensated care than is authorized for purposes of the Medicaid DSH hospital-specific limit.").

2.   FAQs 33 and 34 Alter the 2008 Rule

Plaintiffs assert that, in addition to being contrary to
the language of the Medicaid Act, FAQs 33 and 34 substantively
alter the obligations imposed by 42 C.F.R. § 447.299(c)(16) of
the 2008 Rule.  Plaintiffs contend that, as substantive rules,
the FAQs had to be, but were not, promulgated using notice-and-
comment rulemaking under the APA.  They argue that the policies
referenced in FAQs 33 and 34 should be vacated pursuant to §
706(2)(A), because they are "arbitrary, capricious, an abuse of
discretion, [and] not in accordance with law."[19]  Defendants
argue that the Secretary's policies are consistent with the 2008
Rule and "the explanatory text the Secretary published in the
[Preamble] at the time she issued the regulation."  Doc. no. 17
at 38 of 53.  They argue that the court should defer to the
policies set forth in FAQs 33 and 34 as reasonable
interpretations of the 2008 Rule.

a.   Consistency with the 2008 Rule

A plaintiff's challenge to agency action under § 706(2)(A)
of the APA generally focuses on the agency's decision-making
process, as opposed to the actual decision.  See, e.g., Motor

---

[19] Plaintiffs argue that the Secretary's failure to afford
them notice-and-comment rights violates §§ 706(2)(A) and (D).
As § 706(2)(A) contains a more clearly-defined standard, the
court addresses the challenges based on that section.

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (noting that under § 706(2)(A), "the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made'").  However, in an arbitrary and capricious analysis, a court must also determine if an agency's construction of its own regulation "is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks omitted); see also Auer v. Robbins, 519 U.S. 452, 458-59 (1997).  Although an agency's interpretation of its own regulation is due "substantial deference," the court will overturn the interpretation if an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Thomas Jefferson Univ., 512 U.S. at 512 (internal quotation marks omitted).

The APA standard gives CMS even greater deference than Chevron.  Nevertheless, even applying heightened deference, the Secretary's interpretation of the 2008 Rule is plainly erroneous.  Section 447.299(c)(16), which provides the proper calculation of the hospital-specific DSH limit for auditing purposes, states as follows:

The total annual uncompensated care cost equals the
total cost of care for furnishing inpatient hospital
and outpatient hospital services to Medicaid eligible
individuals and to individuals with no source of third
party coverage for the hospital services they receive
less the sum of regular Medicaid [fee-for-service]
rate payments, Medicaid managed care organization
payments, supplemental/enhanced Medicaid payments,
uninsured revenues, and Section 1011 payments . . . .

42 C.F.R. § 447.299(c)(16) (emphasis added).  The Rule further

defines each payment to be subtracted from the cost of care, and

does not mention private insurance or Medicare.

Defendants again argue that it is reasonable to interpret

the term "cost" in § 447.299(c)(16) as "unreimbursed" or

"uncompensated" cost.  As discussed above, that interpretation

of the term "cost" with respect to the Medicaid Act is

unreasonable.  The Preamble states several times that the 2008

Rule does not alter the calculation of the hospital-specific DSH

limit as established in the Medicaid Act.  See 73 Fed. Reg. at

77907 ("Moreover, the [2008] rule does not substantively change

the standards for DSH payments, or for the review of hospital-

specific limits on such payments."); id. at 77921 ("[T]his

regulation does not change the underlying statutory requirements

for DSH payments."); id. at 77906 ("This regulation does not

alter any of the substantive standards regarding the calculation

of hospital costs.").  Therefore, defendants' argument with

respect to the Secretary's interpretation of the 2008 Rule is

unavailing for the same reasons the court rejected their

arguments under Chevron.   See New York State Bar Ass'n v.
F.T.C., 276 F. Supp. 2d 110, 140 (D.D.C. 2003) ("The Court need
not spend much time on [the arbitrary and capricious] question
because the review of this challenge overlaps, to a large
degree, with the Court's analysis under the second step of
Chevron.").

     In addition, at several points, the Preamble references a
"General DSH Audit and Reporting Protocol," which CMS made
available on its website to "assist States and auditors in using
information from each source identified above to determine
uncompensated care costs consistent with the statutory
requirements."   73 Fed. Reg. at 77921; see id. at 77930, 77931,
77936.   The Preamble states that the Protocol provides "detailed
identification of the data elements necessary to comply with
Congressional instruction on such reporting and auditing."   Id.
at 77921.   It further states that "[t]he definitions of the data
elements track the statutory language, and do not change the
calculation that should have always been performed."   Id.   The
Protocol does not include as "data elements" payments from
either private insurance or Medicare.

     Despite the substantial deference the court must give to
CMS's interpretation of its own regulation under the APA, the
court cannot credit defendants' argument as to the 2008 Rule
because CMS has offered a "plainly erroneous interpretation."

FAQs 33 and 34 are plainly inconsistent with § 447.299(c)(16) of
the 2008 Rule, and substantively alter the calculation of the
hospital-specific DSH limit.

### b. Notice-and-Comment

Under the APA, substantive rules are subject to notice-and-
comment rulemaking, and interpretative rules are not. 5 U.S.C.
§ 553. "A substantive rule has the force of law, while an
interpretive rule is merely a clarification or explanation of an
existing statute or rule and is issued by an agency to advise
the public of the agency's construction of the statutes and
rules which it administers." La Casa Del Convaleciente v.
Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992) (internal
quotation marks and citation omitted); see also Warder v.
Shalala, 149 F.3d 73, 80 (1st Cir. 1998) ("If a rule creates
rights, assigns duties, or imposes obligations, the basic tenor
of which is not already outlined in the law itself, then it is
substantive."). Thus, where an agency's "interpretation [of a
regulation] has the practical effect of altering the regulation,
a formal amendment—almost certainly prospective and after notice
and comment—is the proper course." United States v. Hoyts
Cinemas Corp., 380 F.3d 558, 569 (1st Cir. 2004).

In light of its analysis above, the court need not engage in a lengthy discussion of plaintiffs' APA arguments.[20]  FAQs 33 and 34 made substantive changes to the formula for calculating the hospital-specific DSH limit, bind state Medicaid agencies, and effectively amend the 2008 Rule.  See Texas Children's Hosp., 76 F. Supp. 3d at 236-241 (finding that FAQ. No. 33 was a substantive rule because it had the force and effect of law, bound state Medicaid agencies, and had the effect of amending an existing legislative rule).  Therefore, FAQs 33 and 34 should have been issued in accordance with the notice-and-comment provisions of § 553.  Because they were not, plaintiffs are likely to succeed in arguing that FAQs 33 and 34 are unlawful.

3.  Summary

Plaintiffs are likely to succeed on their claims in Count I and Count II of their complaint.  For that reason, the court declines to address plaintiffs' claim in Count III that defendants' enforcement of the policies in FAQs 33 and 34 violate the Medicaid Act and the APA because the policies

---

[20] Indeed, defendants' objection devotes less than two pages to plaintiffs' notice-and-comment arguments, asserting simply that FAQs 33 and 34 are "compatible with the applicable statute and regulation [and, therefore,] should be analyzed as 'interpretive' rules . . . [which] are not subject to the notice-and-comment requirements of the APA."  Doc. no. 17 at 43 of 53.  For the reasons discussed above, the court disagrees that FAQs 33 and 34 are merely interpretive rules, compatible with the Medicaid Act or the 2008 Rule.

conflict with the language of the New Hampshire state plan but were promulgated without being subject to the state plan amendment process.

II.  Irreparable Harm

The obligation of the movant to demonstrate irreparable harm is an important prerequisite to obtaining preliminary injunctive relief.  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011).  It is not enough that the movant demonstrate the mere possibility of irreparable harm; rather, the movant must show that, in the absence of a temporary injunction, irreparable harm is likely. Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010).

Plaintiffs assert that defendants' enforcement of the policies in FAQs 33 and 34 creates irreparable economic harm because of "(1) the imminent recoupment of millions of dollars in DSH overpayments for [Fiscal Year] 2011 within the next several months; and (2) substantially reduced DSH payments due to all New Hampshire DSH hospitals on or before May 31, 2016, and thereafter."  Pls.' Mem. (doc. no. 10-2) at 32.  Plaintiffs also claim that they will suffer irreparable harm absent a preliminary injunction because they have been deprived of their notice-and-comment rights under the APA and the Medicaid Act. Defendants argue that plaintiffs claim only economic harm due to

"temporary cash flow problems," and that procedural violations do not amount to irreparable harm.[21]

In general, "economic harm in and of itself is not sufficient to constitute irreparable injury." OfficeMax Inc. v. Cty. Qwick Print, Inc., 709 F. Supp. 2d 100, 113 (D. Me. 2010) (internal quotation marks and citation omitted); see also Puerto Rico Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 507 (1st Cir. 2005). "Yet, it has also been recognized that some economic losses can be deemed irreparable." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (noting that economic loss can establish irreparable harm where it threatens a substantial loss of business or revenues). In addition, courts have recognized that economic harm is irreparable where no adequate remedy at law exists for a plaintiff to recover its alleged damages. See Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003) ("Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists."); Itek Corp. v. First Nat'l Bank of Boston, 730 F.2d 19, 22 (1st Cir. 1984) ("Itek's harm is

---

[21] Defendants also argue that plaintiffs cannot show that a preliminary injunction is needed to prevent irreparable harm because a preliminary injunction would not prevent recoupment of payments by NHDHHS.  As discussed above, that argument is unavailing.

'irreparable' and warrants an injunction only if Itek has no adequate remedy at law to reclaim money in the Ministry's hands that rightfully belongs to Itek."); see also Mank ex rel. Hannaford Health Plan v. Green, 297 F. Supp. 2d 297, 304 (D. Me. 2003) (irreparable harm exists where plaintiff could not recover funds that it would lose to defendants absent a preliminary injunction).

Here, absent a preliminary injunction, plaintiffs will sustain an imminent injury.  NHDHHS will begin the recoupment process for DSH overpayments revealed in the audit of Fiscal Year 2011 sometime this month,[22] and the funds will be redistributed to other hospitals on March 31, 2016.  See doc. no. 15-1 at 2.  NHDHHS will make its next DSH payment on or before May 31, 2016, and that payment will be significantly reduced absent a preliminary injunction.[23]

---

[22] State agencies must recoup alleged overpayments within one year of discovering them, 42 C.F.R. § 433.312(a), or the federal government will recoup its share.  42 U.S.C. § 1316(a). New Hampshire submitted its audit of Fiscal Year 2011 to CMS in March 2015.

[23] Plaintiffs estimate their lost funds as follows: Mary Hitchcock would have to pay $3,584,099 in recoupment, and its upcoming DSH payment will be reduced by approximately $21,870,057, see Naimie Decl. (doc. no. 10-7) ¶¶ 15, 16; LRGHealthcare would have to pay $1,502,015 in recoupment, and its upcoming DSH payment will be reduced by approximately $3,500,000, see Lipman Decl. (doc. no. 10-4) ¶¶ 22, 24, 25; Speare would have to pay $1,595,602 in recoupment, and its upcoming DSH payment will be reduced by approximately $1,375,908, see McEwen Decl. (doc. no. 10-5) ¶¶ 17, 20); and

The harm plaintiffs will suffer absent a preliminary injunction cannot be adequately redressed even if plaintiffs ultimately succeed in the case.  A plaintiff cannot recover money damages for an APA violation.  See, e.g., Bank of N.H. v. United States, 115 F. Supp. 2d 214, 219 (D.N.H. 2000) ("By its express terms, the APA does not waive the government's sovereign immunity with regard to claims seeking money damages.").  Thus, plaintiffs will be unable to recover the funds lost from the substantially reduced prospective DSH payments.  In addition, New Hampshire does not have a procedure for recovering DSH funds once they have been recouped by NHDHHS and, therefore, those funds are also unrecoverable.  See Lipman Decl. (doc. no. 10-4) ¶ 22; Wright Decl. (doc. no. 10-6) ¶ 19.[24]

---

Valley Regional would have to pay $998,898 in recoupment, and its upcoming DSH payment will be reduced by approximately $1,817,000, see Wright Decl. (doc. no. 10-6) ¶¶ 19, 21.

[24] Both Lipman and Wright state in their declarations that it is their "understanding" that the hospitals will be unable to challenge or appeal the recoupment.  They do not state where that understanding comes from.  The court has not found any procedure which would allow plaintiff hospitals to recover recouped DSH funds from the state of New Hampshire, and defendants have not alerted the court to any such mechanism. The lack of any procedure to recover DSH funds recouped by the state of New Hampshire would be consistent with at least two other states.  See Texas Children's Hosp., 76 F. Supp. 3d at 242 (noting the lack of procedure for recovering recouped DSH payments in Texas and Washington).  Therefore, the court credits Lipman's and Wright's understanding that the recouped funds would be unrecoverable from the state.

Plaintiffs have shown that the "harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies" at the conclusion of the case. Gonzalez v. Wright, No. 09-cv-234-JD, 2009 WL 2982792, at *1 (D.N.H. Sept. 10, 2009). Therefore, plaintiffs have carried their burden to show irreparable harm.[25]

III. <u>Balance of the Equities and the Public Interest</u>

The remaining elements required for preliminary injunctive relief call upon the court to assess the balance of the equities among the parties, and the public interest in the issuance of an injunction.[26]

The balancing of the equities inquiry requires the court to weigh "the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006).

---

[25] Because plaintiffs have shown that the harm arising out of the recoupment of past DSH payments and reduction in prospective DSH payments is irreparable, the court does not address their arguments concerning the irreparable harm arising out of their loss of notice-and-comment rights under the APA.

[26] Defendants do not meaningfully dispute that if plaintiffs have shown a likelihood of success on the merits and irreparable harm, the remaining factors weigh in plaintiffs' favor. Defendants argue simply that the remaining factors weigh in their favor because plaintiffs are not entitled to relief on the merits of their claims.

Here, the balance of the equities weighs in plaintiffs' favor.
Absent an injunction, the loss of funds will have a significant
adverse impact on plaintiff hospitals.  NHDHHS's recoupment of
DSH overpayments will likely cause LRGHealthcare, Speare, and
Valley Regional, all not-for-profit corporations, to fall out of
compliance with their bond covenants.  LRGHealthcare and Valley
Regional will likely need to cut programs and services to their
patient populations, including programs and services they
provide to Medicaid patients.  This harm represents more than
"temporary cash flow problems," and its impact on plaintiffs is
significant.  In contrast, if the court issues an injunction,
defendants will still be able to recover all overpayments that
plaintiff hospitals receive if defendants ultimately prevail,
because they can "adjust[] . . . the Federal Payment to [the]
State on account of such overpayment."  § 1396b(d)(2)(C).  "It
is thus not the case that the alleged irreparable economic
injury suffered by [plaintiffs] would be offset by the
corresponding economic injury to the Secretary."  Texas
Children's Hosp., 76 F. Supp. 3d at 246.

     The public interest weighs in favor of granting preliminary
injunctive relief.  The Medicaid Act and its regulations are
designed to protect the public interest by ensuring that
disproportionate-share hospitals remain open and able to serve
their patient populations.  Plaintiff hospitals are not-for-

profit corporations and are not fully compensated for all of the uncompensated care they provide.  Consequently, a substantial loss of DSH funds is not in the public interest.

Accordingly, the final two factors weigh in favor of granting a preliminary injunction.

IV.   Remedy

Plaintiffs request a preliminary injunction with two components.  First, they seek an injunction preventing defendants "from enforcing, applying, or implementing the policies referenced in FAQ Nos. 33 & 34 pending further Order of this Court."  Proposed Order (doc. no. 10-1) at 5 of 6.  Second, they request that the court order that "[d]efendants shall immediately notify the New Hampshire state Medicaid program that, pending further order by the Court, the enforcement of FAQ Nos. 33 & 34 is enjoined and that defendants will take no action to recoup any federal DSH funds provided to New Hampshire based on New Hampshire's noncompliance with FAQ Nos. 33 & 34."  Id.

Defendants argue that this second "kind of relief would effectively put the Court in position of supervising future agency action, which is not authorized by the APA."  Doc. no. 17 at 47 of 53.  "Plaintiffs, however, ask only that the Court direct [] defendants to inform their state partners-whose funding is contingent on compliance with [] defendants'

directives-of the injunction." Texas Children's Hosp., 76 F. Supp. 3d at 247. The court does not view this directive as going beyond the scope of the APA, and it is necessary to prevent the irreparable harm that plaintiffs face.

V.    Bond

Typically, Federal Rule of Civil Procedure 65 requires parties obtaining injunctive relief to post a bond sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, however, the court concludes that no bond is required. First, and perhaps most importantly, defendants have not asked that plaintiffs post a bond. See generally Aoude v. Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988) (rejecting a challenge to an injunction because "posting of a bond is not a jurisdictional prerequisite to the validity of a preliminary injunction, and because appellant did not raise the matter below"). Moreover, "[a]lthough the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for, inter alia, cases involving the enforcement of public interests arising out of comprehensive federal health and welfare statutes." Dartmouth-Hitchcock Clinic v. Toumpas, No. 11-CV-358-SM, 2012 WL 748575, at *1 (D.N.H. Mar. 2, 2012) (internal quotation marks and citation omitted).

## Conclusion

For the foregoing reasons, plaintiffs' motion for preliminary injunction (doc. no. 10) is granted as follows:

a.  Defendants are hereby enjoined from enforcing, applying, or implementing the policies referenced in FAQs 33 & 34 pending further Order of this Court; and

b. Defendants shall immediately notify the New Hampshire state Medicaid program that, pending further order by the Court, the enforcement of FAQs 33 & 34 is enjoined and that defendants will take no action to recoup any federal DSH funds provided to New Hampshire based on New Hampshire's noncompliance with FAQs 33 & 34.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 11, 2016

cc:   Holly J. Barcroft, Esq.
      Anthony J. Galdieri, Esq.
      James C. Luh, Esq.
      Gordon J. MacDonald, Esq.