UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| NEW HAMPSHIRE HOSPITAL ASSOCIATION, et al., | **:** | |
| | **:** | |
| Plaintiffs, | **:** | |
| | **:** | |
| v. | **:** | CIVIL ACTION No. 1:15-cv-00460 |
| | **:** | |
| SYLVIA MATHEWS BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services, | **:** | |
| | **:** | |
| ANDREW SLAVITT, in his official capacity as Acting Administrator, Centers for Medicare and Medicaid Services, | **:** | |
| | **:** | |
| and | **:** | |
| | **:** | |
| CENTERS FOR MEDICARE AND MEDICAID SERVICES, | **:** | |
| | **:** | |
| Defendants. | **:** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# I.    PRELIMINARY STATEMENT

The Defendants implemented certain policies contained in two Frequently Asked Questions posted on their website ("FAQ Nos. 33 & 34").  On November 11, 2015, the Plaintiffs brought this action, challenging the validity of those policies.  Count I of Plaintiffs' complaint alleges that the policies contained in FAQ Nos. 33 & 34 exceed the Defendants' statutory authority under 42 U.S.C. § 1396r-4(g)(1)(A) and, therefore, violate the Administrative Procedure Act ("APA").  Count II of Plaintiffs' complaint alleges that the policies contained in FAQ Nos. 33 & 34 had to be, but were not, subject to notice-and-comment rulemaking and therefore violate the APA.  Count III of Plaintiffs' complaint alleges that the policies contained in FAQ Nos. 33 & 34 had to be, but were not, incorporated into the New Hampshire State Medicaid Plan ("State Plan") using the Defendants' state plan amendment ("SPA") process.  42 C.F.R. § 430.12(c).[1]

On March 11, 2016, this Court concluded that Plaintiffs were likely to succeed on the merits with respect to Counts I and II of their complaint and entered preliminary injunctive relief in their favor.  On March 28, 2016, this Court denied the Defendants' motion to dismiss for lack of standing and failure to state a claim.  Since those orders were entered, nothing has altered the legal analysis: The policies contained in FAQ Nos. 33 & 34 remain contrary to 42 U.S.C. § 1396r-4(g)(1), the notice-and-comment requirements of the APA, and the federal SPA process.  Accordingly, the Court should grant the Plaintiffs' motion, declare the policies contained in the FAQs unlawful, and vacate those policies under the APA and the Medicaid Act.

---

[1] Without prejudice to Counts I-III of their complaint, the Plaintiffs are no longer pressing Count IV of their complaint, alleging that FAQ Nos. 33 & 34 are arbitrary and capricious in light of CMS's review of certain Medicaid Access to Care Reports created by the State of New Hampshire.  The Plaintiffs maintain, however, that the policies contained in FAQ Nos. 33 & 34 are invalid for the reasons set forth in Counts I-III of their complaint.

## II.      LEGAL FRAMEWORK

The parties' prior submissions, and this Court's March 11, 2016 order, contain an extensive discussion of the legal framework governing this case.  Thus, Plaintiffs set forth only a brief review here.

### A.      The Medicaid Act and Disproportionate Share Hospital ("DSH") Payments

#### 1.   The Medicaid Program & DSH Payments

"Congress created the Medicaid program in 1965 by adding Title XIX to the Social Security Act."  *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 (2003).  "Medicaid is a cooperative federal-state program" under which "the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).  The Medicaid Act's purpose is "to assist the poor, elderly, and disabled in obtaining medical care."  *Long Term Care Pharm. All. v. Ferguson*, 362 F.3d 50, 51 (1st Cir. 2004).  To further this purpose, each participating state must create a state plan for medical assistance and submit it to CMS for approval.  *See Wilder*, 496 U.S. at 502.

"States are not obligated to participate in Medicaid, but must rigidly comply with several federally-imposed requirements if they opt to do so."  *Consejo De Salud De La Comunidad De La Playa De Ponce, Inc., CDT v. Gonzalez-Feliciano*, 695 F.3d 83, 87 (1st Cir. 2012).  One of those requirements is that states must "take into account (in a manner consistent with section 1396r–4 of this title) the situation of hospitals which serve a disproportionate number of low-income patients with special needs" when setting hospital reimbursement rates.  42 U.S.C. § 1396a(a)(13)(A)(iv).  This statute created the Medicaid DSH program and requires states to make "payment adjustment[s]" to qualifying hospitals.  42 U.S.C. § 1396r-4(c).  These adjustments are available to qualifying hospitals.  42 U.S.C. § 1396r-4(b).

Under the Medicaid Act, a DSH payment adjustment may not exceed:

[T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A) (emphasis added).  This statutory payment cap is known as the hospital-specific DSH payment limit.  42 U.S.C. § 1396r-4(g)(1)(A) does not reference private health insurance or Medicare payments.

**2.  The Hospital-Specific DSH Payment Limit**

To ensure that the hospital-specific DSH payment limit has been calculated correctly for each DSH, Congress requires each state to provide an annual report and audit of its DSH program to the Centers for Medicare and Medicaid Services ("CMS").  42 U.S.C. § 1396r-4(j). To verify the accuracy of these reports, each state must employ an independent auditor to audit the state's compliance with the DSH program.  42 U.S.C. § 1396r-4(j).  Audits must be completed within three years of the DSH payment.  42 C.F.R. § 455.304(b).  These independent audits must verify, *inter alia*, that DSH payments made to each hospital comply with the applicable hospital-specific DSH payment limit.  42 U.S.C. § 1396r-4(j)(2).  Any overpayments that the audit reveals must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution.  42 U.S.C. § 1396b(d)(2)(C), (D).

On December 19, 2008, the Secretary promulgated a final regulation interpreting this reporting and auditing requirement (the "2008 Rule").  42 C.F.R. § 447.299(c); *Disproportionate Share Hospital Payments*, 73 Fed. Reg. 77904 (Dec. 19, 2008).  The 2008 Rule requires states to submit information "for each DSH hospital to which the State made a DSH payment."  42 C.F.R. § 447.299(c).  One piece of information each DSH hospital must submit for inclusion in the state

annual report is its "total annual uncompensated care costs."  42 C.F.R. § 447.299(c)(16).[2]  The

regulatory formula to determine such costs is as follows:

> The total annual uncompensated care cost equals the total cost of care for
> furnishing inpatient hospital and outpatient hospital services to Medicaid eligible
> individuals and to individuals with no source of third party coverage for the
> hospital services they receive less the sum of regular Medicaid [fee-for-service]
> rate payments, Medicaid managed care organization payments, supplemental
> /enhanced Medicaid payments, uninsured revenues, and Section 1011 payments
> for inpatient and outpatient hospital services.

42 C.F.R. § 447.299(c)(16).  42 C.F.R. § 447.299(c) defines each type of cost and payment

referenced in 42 C.F.R. § 447.299(c)(16).  *See* 42 C.F.R. §§ 447.299(c)(6)-(15).  42 C.F.R. §

447.299(c) does not reference private health insurance or Medicare payments.

The 2008 Rule preamble supports this unambiguous methodology.  Among other things,

the preamble states that 42 U.S.C. § 1396r-4(g)(1)(A) "plainly identifies the limited population,

whose costs were to be included in the calculation, and specifies offset of revenues associated

with those costs."  73 Fed. Reg. 77921.  It indicates that "Section 1923(j) of the Act instructs

States to audit and report specific payments and specific costs."  *Id.* at 77932.  It further states

that "[i]n order to [calculate the hospital-specific DSH limit], all applicable revenues must be

offset against all eligible costs.  For purposes of determining the hospital-specific DSH limit,

revenues would include all Medicaid payments made to hospitals for providing inpatient and

outpatient services to Medicaid individuals . . . and all payments made by or on behalf of patients

with no source of third party coverage for the inpatient and outpatient hospital services they

received."  *Id.* at 77946.

---

[2] A DSH's "total annual uncompensated care cost" under 42 C.F.R. § 447.299(c)(16) is the same as a DSH's
hospital-specific DSH payment limit under 42 U.S.C. § 1396r-4(g)(1)(A).

### 3.   CMS's Guidance

CMS developed guidance designed to help states understand how the hospital-specific DSH payment limit must be calculated.  A 1994 letter from the Defendants to State Medicaid Directors defines how the Medicaid Shortfall component of the hospital-specific DSH payment limit is calculated: "Cost of Services to Medicaid patient, less the amount paid by the State under the non-DSH payment provisions of the State plan."[3]  This letter makes no mention of Medicare and private insurance payments as offsets in the Medicaid Shortfall calculation.

As approved by the Defendants, the State Plan from 2004 to 2013 similarly set forth the costs to be included and the payments to be offset in the Medicaid Shortfall calculation.  Decl. of Anthony J. Galdieri in Supp. of Mot. for Prelim. Inj. ("Galdieri Decl."), Ex. C, ECF No. 10-11 at ECF 42-45, 53-54; *id.*, Ex. D, ECF No. 10-12 at ECF 8-10; *id.*, Ex. E, ECF No. 10-13 at ECF 9; *id.* Ex. F.[4]  It makes no mention of Medicare or private insurance payments as offsets.  *Id.*

The Defendants' General DSH Audit and Reporting Protocol provides the following specific guidance for auditors with respect to calculating the Medicaid Shortfall:

> To determine the existence of the Medicaid shortfall, Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against Medicaid IP/OP revenue received for such services in the audited State Plan rate year (including regular Medicaid rate payments, add-ons, supplemental and enhanced payments and Medicaid managed care revenues).

*See* Galdieri Decl., Ex. A, General DSH Audit and Reporting Protocol, CMS-2198-F, ECF No. 10-9  at ECF 4.  This guidance does not reference Medicare or private health insurance payments anywhere within the document.  *See id.*  CMS has also developed a form to be used to help

---

[3] Available at https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/SMD081794.pdf (last visited April 11, 2016).

[4] All exhibit page numbers reference the ECF page numbers that are affixed to the exhibit upon upload and appear in the top right portion of the document.

calculate the hospital-specific DSH limit.  Galdieri Decl., Ex. B, DSH Report Format.  This form

does not have data input columns for private health insurance or Medicare payments.  *See id.*

**B.**     **CMS's "Policy Clarifications": FAQ Nos. 33 & 34**

On or about January 10, 2010, and without using notice-and-comment rulemaking, CMS

posted answers to "frequently asked questions" regarding the federal audit and reporting

requirements.  *See* Galdieri Decl., Ex. G, ECF No. 10-15.[5]  FAQ Nos. 33 & 34 purport to require

the inclusion of Medicare and private insurance payments in the hospital-specific DSH payment

limit calculation, as that calculation is set forth in 42 U.S.C. § 1396r-4(g)(1)(A).  *Id.* at ECF 19.

### III.     RELEVANT FACTS

Pursuant to LR 56.1(a), the Defendants contend that, because the claims in this case turn

on questions of law, no administrative record is required.  The following recitation of undisputed

facts relates to the application of the Defendants' policies in New Hampshire as well as the

Plaintiffs' standing to pursue these claims.  In the interest of simplicity and economy, the

Plaintiffs draw on the already ample record before the Court, in addition to declarations

submitted in support of summary judgment.

The Plaintiff Hospitals, Mary Hitchcock Memorial Hospital, LRGHealthcare (including

Franklin Regional Hospital and Lakes Region General Hospital), Speare Memorial Hospital, and

Valley Regional Hospital, all qualify for DSH payments under New Hampshire's Medicaid State

Plan.  Decl. of Tina E. Naimie in Supp. of Mot. for Prelim. Inj. ("Naimie Decl. I"), ECF No. 10-

7 at ¶¶ 5-7; Decl. of Henry Lipman in Supp. of Mot. for Prelim. Inj. ("Lipman Decl. I"), ECF

No. 10-4 at ¶¶ 5-7; Decl. of Michelle McEwen in Supp. of Mot. for Prelim. Inj. ("McEwen Decl.

I"), ECF No. 10-5 at ¶¶ 5-6; Decl. of Peter J. Wright in Supp. of Mot. for Prelim. Inj. ("Wright

---

[5] Available at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/financing-and-reimbursement/downloads/additionalinformationonthedshreporting.pdf (last visited April 10, 2016).

Decl. I"), ECF No. 10-6 at ¶¶ 5-6.  Plaintiff New Hampshire Hospital Association ("NHHA") is

a non-profit trade association.  Decl. of Stephen Ahnen in Supp. of Mot. for Prelim. Inj., ECF

No. 10-3 at ¶ 3.  Including plaintiff hospitals, all New Hampshire hospitals that qualify as DSH

hospitals under the State Plan are NHHA members.  *Id.* at ¶ 4.

## A.      Application and Enforcement of the FAQs in New Hampshire

The Defendants' enforcement of the policies referenced in FAQ Nos. 33 & 34 will

require "recoupment" of millions of dollars of alleged overpayments identified in audits of DSH

payments.  It will also materially reduce DSH payments due to Plaintiff Hospitals on a going-

forward basis.  *See* Lipman Decl. I, ECF No. 10-4 at ¶¶ 21-29; McEwen Decl. I, ECF No. 10-5 at

¶¶ 16-24; Wright Decl. I, ECF No. 10-6 at ¶¶ 18-24; Naimie Decl. I, ECF No. 10-7 at ¶¶ 14-16.

### 1.      DHHS Indicates It Will Act in Accordance With CMS's Guidance as to the Enforcement of FAQ Nos. 33 & 34

The New Hampshire Department of Health and Human Services ("DHHS") retained an

independent audit firm, Myers and Stauffer, LC, to perform an audit of DSH payments made to

New Hampshire hospitals in November 2010 (State Fiscal Year ("SFY") 2011).  *See* Galdieri

Decl., Ex. N, ECF No. 10-22.  On March 3, 2015, Kathleen A. Dunn, DHHS's Associate

Commissioner, circulated a letter enclosing the independent auditor's February 6, 2015

draft/preliminary Report on Disproportionate Share Hospital Verifications (With Independent

Accountant's Report Thereon) for DSH Year Ended September 30, 2011.  *Id.* at ECF 4-21.

The letter acknowledged and discussed a preliminary order that had been granted against

the Defendants by another federal court, *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224,

247 (D.D.C. 2014), enjoining application of FAQ No. 33:

> The U.S. Department of Justice has not yet completed its review of this injunction
> against CMS nor has CMS announced its intended course of action.  As a result,
> CMS has not provided any new or changed instructions to firms performing

independent audits of FY2011 DSH payment amounts. The Department has and will continue to seek guidance from CMS on its policy response to this court order, but since the litigation is pending and the federal court order is only an interim order, it may be months or longer before a final decision is made.

Galdieri Decl., Ex. N, ECF No. 10-22 ECF 2. Associate Commissioner Dunn explained that:

"The Department has until midyear of SFY 2016 before it will have to act on any recoupment of DSH 'overpayments,' so it has decided not to take any recoupment actions on these DSH payment audit results at this time. We expect that before any action on these audit results is due, a clear federal policy on this issue will have been issued in accordance with federal reviewing court decisions." *Id.*

### 2. Defendants Deny Plaintiffs' Petition for Relief Under the APA

On June 17, 2015, Plaintiffs petitioned CMS requesting the agency repeal the policies referenced in FAQ Nos. 33 & 34 regarding the inclusion of private health insurance and Medicare payments in the calculation of the Medicaid Shortfall component of the hospital-specific DSH payment limit. Galdieri Decl., Ex. P, ECF No. 10-24; *id.*, Ex. Q, ECF No. 10-25 (supplement to petition). In a letter dated October 6, 2015, defendant Slavitt refused to reconsider the illegal policies Plaintiffs had challenged. Galdieri Decl., Ex. R, ECF No. 10-26 at ECF 2-3. CMS would only stop implementing the policies to the extent FAQ No. 33 requires private health insurance payments to be included in the hospital-specific DSH payment limit calculation in Texas and Washington, stating that: "For all other states, including New Hampshire, CMS may disallow federal financial participation if a state does not comply with the policy articulated in FAQ No. 33." *Id.*

### 3. DHHS Continues to Act in Accordance With Federal Guidance and Authority

Denied relief by the Defendants, Plaintiffs filed this action on November 11, 2015. At the time, it appeared that the deadline to begin recoupment was December 31, 2015. Acting on

guidance from the Defendants, DHHS ultimately extended that deadline to March 2016.  *See* Pls.' Response to Defs.' Mot. for Extension of Time, Ex. A, ECF No. 15-1.

By letter dated January 27, 2016 to the NHHA, DHHS Commissioner Jeffrey Meyers made clear his department's position about the effect of a potential court order in this case: "If your request for injunctive relief is granted, it is our view that NHDHHS would not be able to require recoupment while the injunction is in place, or be obligated to redistribute, based on the 2011 Myers and Stauffer audit, to the extent that recoupment is required due to the application by the auditor of the principles in FAQ Nos. 33 & 34."  Suppl. Explanatory Decl. of Stephen Ahnen in Supp. of Pls.' Obj. to Defs.' Mot. to Dismiss, Ex. A, ECF No. 25-3 (emphases added).

On January 28, 2016, DHHS issued a "Notice of Overpayment and Repayment Agreement."  *See, e.g.,* Suppl. Explanatory Decl. of Henry Lipman in Supp. of Pls.' Obj. to Defs.' Mot. to Dismiss, Ex. A, ECF No. 25-5.  The notice stated that DHHS is "taking the necessary steps to comply with the Federal Medicaid provisions and the New Hampshire State Plan as approved by CMS" to impose limits on the DSH payments received in 2011.  *See, e.g., id.*  The Repayment Agreement indicates that DHHS will not proceed with recoupment of funds affected by an order in this case.  *Id.* at ¶¶ 3-5 & Ex. A, ECF Nos. 25-4 & 25-5.  Plaintiff Hospitals signed the Repayment Agreement.  *See, e.g., id.* at Ex. A, ECF No. 25-5.[6]

Thereafter, DHHS prepared a report form for hospitals to use to report their uncompensated care costs for purposes of calculating the DSH payment to be made by May 31, 2016 ("UCC reporting form").  Decl. of Paula Minnehan in Supp. of Reply to Defs.' Opp. to Pls.' Mot. for Prelim. Inj., Ex. A, ECF No. 21-2.  The report form included data input boxes for

---

[6] The other Plaintiff Hospital Repayment Agreements have been similarly executed.  Suppl. McEwen Decl., Ex. A, ECF No. 25-7; Suppl. Wright Decl., Ex. A, ECF No. 25-9; Suppl. Naimie Decl., Ex. A, ECF No. 25-11.

Medicare and other third party payments that implemented the policies contained in FAQ Nos.

33 & 34.  *Id.* at Section D, 3 lines b & c.  The report form also required a certification:

> In connection with Hospital Cost Report (CMS 2552-10) reporting procedures
> and Disproportionate Share Hospital provisions under 42 USC 1396r-4(a)-(d) and
> (g), aka Section 1923(a)-(d) and (g) of the federal Social Security Act, and federal
> regulations at 42 CFR 447.299, I certify that the information provided herein and
> the amounts claimed for inclusion in the calculation of eligibility for certain
> Disproportionate Share Hospital (DSH) reimbursement is true, accurate, complete
> and in accordance with generally accepted accounting principles and, to the best
> of my knowledge, applicable Federal and State laws.

*Id.* at Section G (emphases added).

### 4.  DHHS's Actions After This Court's Preliminary Injunction Issued

On March 11, 2016, this Court granted Plaintiffs' request for preliminary injunctive

relief.  The Court's order enjoined the Defendants from "enforcing, applying, or implementing

the policies referenced in FAQs 33 & 34 pending further Order of this Court" and required

Defendants to "immediately notify the New Hampshire state Medicaid program that, pending

further order by the Court, the enforcement of FAQs 33 & 34 is enjoined and that Defendants

will take no action to recoup any federal DSH funds provided to New Hampshire based on New

Hampshire's noncompliance with FAQs 33 & 34."  Order, ECF No. 31 at ECF 52.

As of April 15, 2016, DHHS has not acted to recoup any alleged "overpayments" from

Plaintiff Hospitals that application of the policies contained in FAQ Nos. 33 & 34 had created,

consistent with the terms of the Repayment Agreements between the parties.  Decl. of Henry

Lipman in Supp. of Pls.' Mot. for Summ. J., at ¶ 6; Decl. of Tina Naimie in Supp. of Pls.' Mot.

for Summ. J., at ¶ 4; Decl. of Michelle McEwen in Supp. of Pls.' Mot. for Summ. J., at ¶ 4; Decl.

of Peter Wright in Supp. of Pls.' Mot. for Summ. J., at ¶ 4.

Additionally, on March 23, 2016, DHHS entered into a letter agreement with the NHHA

regarding the UCC reporting form.  Decl. of Stephen Ahnen in Supp. of Pls.' Mot. for Summ. J.,

¶¶ 3-4 & Exhibit A.  The letter agreement permits omission of data relating to Medicare and other third party payments from the report.  *Id.*, Ex. A at ECF 2-3.  It further permits New Hampshire hospitals to add the following sentence to the report's certification: "I understand that DHHS will not insert any information for Section D, 3 line b [related to Medicare payments], and the information for Section D, 3 line c [related to third party payments], is omitted in accordance with letter agreement dated March 23, 2016, based on the Preliminary Injunction Order obtained in NHHA v. Burwell, CIVIL ACTION No. 1:15-cv-00460."  *Id.* at ECF 2.  The letter further indicates that the finalized report form would be due to DHHS by March 28, 2016.  *Id.* at ECF 3.  On March 28, 2016, Plaintiff Hospitals filed the finalized report form, as modified by letter agreement dated March 23, 2016, with DHHS.  *See, e.g.,* Decl. of Henry Lipman in Supp. of Pls.' Mot. for Summ. J., at ¶¶ 4-5.

## IV.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), the Court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The APA provides further standards for judicial review.  Under the APA, this Court must hold unlawful and set aside agency action that exceeds an agency's statutory authority, is without observance of procedure required by law, or is not in accordance with law.  5 U.S.C. §§ 706(2)(A), (C)-(D).

As previously noted, the Defendants assert that Plaintiffs' claims present pure issues of law that can be resolved on the merits without production of the administrative record.  The Plaintiffs agree that testing the FAQs themselves against the statutory and regulatory authorities at issue raises pure questions of law that the Court can resolve without an administrative record.  *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266-67 (D.C. Cir. 2001)

(holding administrative record was not required to determine whether agency rule violated statute; the claim could be resolved solely by reference to the statute and its legislative history); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 440 n.37 (5th Cir. 2001) (administrative record not required because "review is limited to interpreting the extent to which the regulation is consistent with the statute").

## V.     ARGUMENT

### A.  Plaintiffs Have Substantive and Procedural Standing to Maintain their Claims

From the outset of this litigation, the Defendants have contended that the Plaintiffs lack standing to pursue their claims.  This Court correctly rejected those arguments in both its March 11 and 28, 2016 orders.  To the extent the Defendants persist with this argument, the Court should reject it again based on applicable legal principles and the undisputed record before it.

### 1.  Applicable Principles

"The Constitution limits the judicial power of federal courts to actual cases and controversies."  *Culhane v. Aurora Loan Servs. of Neb.*, 708 F.3d 282, 289 (1st Cir. 2013) (citing U.S. Const. Art. III, § 2, cl. 1).  It therefore requires litigants to have standing to maintain claims in federal court.  "The essence of standing is that a plaintiff must have a personal stake in the outcome of the litigation."  *Id.*  Two doctrines of standing apply in this case: substantive standing and procedural standing.

Substantive standing requires Plaintiffs to meet the traditional three-part test: injury, causation, and redressability.  *Id.*  Injury requires Plaintiffs to show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Causation requires "a causal connection between the injury and the conduct complained of—the

injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'"  *Id.* at 560-61 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  Redressability requires it to "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

"A special standing doctrine applies when litigants attempt to vindicate procedural rights, such as the right to have notice of proposed regulatory action and to offer comments relating to such action."  *Ctr. for Auto Safety, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 342 F. Supp. 2d 1, 11-12 (D.D.C. 2004).  In such cases, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Lujan*, 504 U.S. at 572 n.7.  With respect to redressability, all that is required in cases of procedural injury is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

"When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to government action or inaction . . . ."  *Lujan*, 504 U.S. at 562.  In order to establish causation and redressability in such a circumstance, a plaintiff must "adduce facts showing that those [third party] choices have been or will be made in such manner as to produce causation and permit redressability of injury."  *Id.*  Thus, causation and redressability have been found to exist where the "third party would very likely alter its behavior based on [the court's] decision, even if not bound by it."  *Teton Hist. Aviation Found. v. United States DOD*, 785 F.3d 719, 728 (D.C. Cir. 2015); *see, e.g.*, *Nat'l Parks*

13

*Conservation Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005) (holding state agency was not "the sort of truly independent actor who could destroy the causation required for standing").

   **2.   Plaintiffs Have Substantive and Procedural Standing**

   Plaintiffs have asserted substantive and procedural injuries sufficient to maintain their claims.  Enforcement of the policies referenced in FAQ Nos. 33 & 34 will require "recoupment" of millions of dollars of alleged overpayments identified in recently completed audits of DSH payments made in November 2010.  It will also materially reduce DSH payments due to Plaintiff Hospitals on a going-forward basis.  The consequences of these substantial economic losses will adversely impact Plaintiff Hospitals and the patient populations Plaintiff Hospitals serve.  Moreover, because Defendants created FAQ Nos. 33 & 34 without notice-and-comment rulemaking and failed to incorporate them into the State Plan, Plaintiffs have lost their procedural rights under the APA and the Medicaid Act and its regulations.  These injuries are actual and imminent and concrete and particularized.

   These injuries are also directly traceable to the illegal policies contained in FAQ Nos. 33 & 34.  Absent final relief from this Court, the DHHS will act to recoup past DSH payments for SFY 2011 because its independent audit revealed alleged "overpayments" to hospitals based on the application of the policies contained in FAQ Nos. 33 & 34.  Additionally, application of the policies contained in FAQ Nos. 33 & 34 will lower the hospital-specific DSH limit for Plaintiff Hospitals, resulting in lower DSH payments due to them from New Hampshire under RSA 167:64.  And the loss of Plaintiffs' notice-and-comment rights has led directly to the uninformed application of the policies contained in FAQ Nos. 33 & 34 to Plaintiff Hospitals.

   Finally, a favorable final order in this case declaring the policies contained in FAQ Nos. 33 & 34 unlawful and vacating them will redress Plaintiff Hospitals' injuries.  Such an order will

restore the status quo ante for calculating the hospital-specific DSH payment limit, eliminate any "overpayments" created by FAQ Nos. 33 & 34, increase future DSH payments the hospitals receive under RSA 167:64, and will restore Plaintiffs' notice-and-comment rights.

Nonetheless, the Defendants have suggested throughout this case that redressability does not exist because DHHS could ignore federal law and this Court's orders and act in accordance with FAQ Nos. 33 & 34 even if those policies are declared unlawful and vacated.  This argument lacks merit.  In its March 3, 2015 letter, DHHS referenced the *Texas Children's Hospital* litigation and indicated that it would act in accordance with CMS's guidance regarding the policies contained in FAQ Nos. 33 & 34.  It then engaged in a course of conduct designed to postpone any recoupment action it had to take until the last moment possible, hoping a "clear federal policy" with respect to the issue of including third party payments in the hospital-specific DSH limit would emerge.

After this Court issued its March 11, 2016 preliminary injunction order, which required the Defendants to inform DHHS that the policies contained in FAQ Nos. 33 & 34 had been enjoined, DHHS altered its UCC reporting form to permit New Hampshire hospitals to report their Medicaid Shortfall without including Medicare or third party payments in that equation. DHHS has also taken no action to recoup alleged "overpayments" created by the policies contained in FAQ Nos. 33 & 34, consistent with the Repayment Agreements.  Thus, this Court's March 11, 2016 preliminary injunction order has produced causation and redressibility, consistent with the statements contained in DHHS's March 3, 2015 letter.  Thus, there is no reason to believe that, if this Court grants the final relief requested in this motion, DHHS would not continue to follow the results such an order creates.  Accordingly, Plaintiffs have standing to maintain their claims.

**B.  The FAQs Exceed The Defendants' Statutory Authority**

The Court's March 11, 2016 order sets forth an extensive discussion with respect to the merits of the Plaintiffs' claims.  It correctly concluded that the Plaintiffs are likely to succeed on Count I which seeks to vacate the FAQs because the Defendants have exceeded their statutory authority.  Nothing has altered that legal analysis.  As it did in its preliminary order, the Court should apply the framework set forth in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and its progeny, and conclude that the Defendants have acted "in excess of statutory jurisdiction, authority  . . . or short of statutory right," 5 U.S.C. § 706(2)(C), in promulgating and enforcing the policies in FAQ Nos. 33 and 34.

**1.  FAQ Nos. 33 & 34 Fail *Chevron* Step**

"Under *Chevron*, [this Court] ask[s] first if Congress has addressed the precise question at issue."  *Dickow v. United States*, 654 F.3d 144, 149 (1st Cir. 2011).  "If so, that ends the matter."  *Castaneda v. Souza*, 810 F.3d 15, 23 (1st Cir. 2015).  As this Court concluded, "defendants' interpretation of the Medicaid Act appears to fail at step one of *Chevron's* analytical framework."  Order, ECF No. 31 at ECF 28.  The analysis ends there.

FAQ Nos. 33 & 34 invoke and purport to interpret 42 U.S.C. § 1396r-4(g).  They require all days, costs, and payments associated with Medicaid-eligible patients, including Medicare and private health insurance payments, to be included in the hospital-specific DSH payment limit calculation.  Thus, the precise question at issue is whether Congress intended all payments or only certain payments associated with Medicaid-eligible individuals to be included in that statutory calculation.

This analysis begins with the statute's plain text.  *Dickow*, 654 F.3d at 150.  The text of 42 U.S.C. § 1396r-4(g)(1)(A) makes Congress' intent clear.  It sets forth a specific formula to

calculate the hospital-specific DSH payment limit.  That formula specifies the costs and the

payments included in that calculation as follows: the cost of providing care to Medicaid-eligible

and uninsured patients, "net of payments under this subchapter, other than under this section, and

by uninsured patients."  42 U.S.C. § 1396r-4(g)(1)(A).  As used in 42 U.S.C. § 1396r-4(g)(1)(A),

"this subchapter" means Title XIX, the Medicaid Act.  The statute makes no mention of

including Medicare or private insurance payments as offsets in this specific calculation.  *See*

Order, ECF No. 31 at ECF 28; *see also Tex. Children's Hosp.*, 76 F. Supp. 3d at 236 ("The Act

does not include private-insurance payments among those that are specifically enumerated as

offsets.  Only Medicaid payments – those 'under this subchapter' – are mentioned.").

The text and structure of the statute reinforce this plain language analysis.  Specifically,

the term "third party" appears only three times in subsection (g).  The first is in reference to

payments made on behalf of persons with "no health insurance (or other source of third party

coverage) for services provided during the year."  42 U.S.C. § 1396r-4(g)(1)(A).  Congress then

limited the meaning of the term "third party coverage" in the next sentence, wherein the phrase

appears for the second time: "For purposes of the preceding sentence, payments made to a

hospital for services provided to indigent patients made by a State or a unit of local government

within a State shall not be considered to be a source of third party payment."  *Id.*  Thus, in

drafting 42 U.S.C. § 1396r-4(g)(1)(A), Congress clearly understood how to exclude "third party"

payments such as Medicare and private insurance payments but expressly chose not to include

them as offsets to Medicaid-eligible costs.

The third appearance of the term "third party" is particularly telling.  It appears in 42

U.S.C. § 1396r-4(g)(2)(A), which provides additional DSH payment amounts to certain hospitals

with high disproportionate share.  In calculating payment adjustments under that section,

17

Congress expressly required all third party payments to be excluded from that calculation.  *Id.*
Congress stated:  "In determining the amount that is used for such services during a year, there
shall be excluded <u>any amounts received . . . from third party payors (not including the State plan
under this subchapter)</u> that are used for providing such services during the year." *Id.* (emphasis
added).  Thus, the notion that Congress meant to include all third party payments, including
Medicare and private health insurance payments, as offsets to Medicaid-eligible costs in 42
U.S.C. § 1396r-4(g)(1)(A) rings hollow.  *See Loughrin v. United States*, 134 S. Ct. 2384, 2390
(2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in
another—let alone in the very next provision—this Court presume[s] that Congress intended a
difference in meaning.").

     The regulation implementing the reporting and audit statute, 42 C.F.R. § 447.299,
confirms this plain language analysis.  It expressly details the costs to be included and the
payments to be offset in the statutory calculation.  It makes absolutely no mention of Medicare or
private insurance payments as separate offsets.  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at 237
(noting that the regulation further defines costs and payments, "making no mention of payments
from private insurance").  A 1994 letter from the Defendants to State Medicaid Directors further
confirms this plain language analysis by defining the Medicaid Shortfall as: "Cost of Services to
Medicaid patient, less the amount paid by the State under the non-DSH payment provisions of
the State plan."[7]  It makes no mention of Medicare and private insurance payments as offsets nor
does it interpret the term "costs incurred" to include "payments."  Passages from the Preamble to
the 2008 Rule also confirm this plain language analysis.  *See* Section II(A)(3), *supra*.

---

[7] Available at https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/SMD081794.pdf (last
visited April 11, 2016).

In short, nearly every authority, formal or informal, that purports to interpret or explain 42 U.S.C. § 1396r-4(g)(1)(A) specifies that only certain statutorily defined payments are to be offset from costs.  Consequently, because Congress has unambiguously defined the payments to be included in the hospital-specific DSH limit calculation, the Court's *Chevron* Step One inquiry is satisfied.

   **2.  Under *Chevron* Step Two, FAQ Nos. 33 & 34 Warrant No Deference.**

   Where statutory ambiguity exists, *Chevron* "step two" accords deference to an agency interpretation in certain circumstances.  As argued above, 42 U.S.C. § 1396r-4(g)(1)(A) is not ambiguous.  However, even if it is, *Chevron* deference is not warranted in these circumstances.

   *Chevron* deference does not apply to every agency pronouncement.  Whether *Chevron* deference applies depends on the circumstances under which the agency pronouncement was created.  *See, e.g.*, *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 54-55 (1st Cir. 2014); *Lovegren v. Locke*, 701 F.3d 5, 30 (1st Cir. 2012); *Noviello v. City of Boston*, 398 F.3d 76, 90 n.3 (1st Cir. 2005).  FAQ Nos. 33 & 34 purport to be substantive rules developed without formal notice-and-comment rulemaking, and they lack the authoritative hallmarks that typically give rise to *Chevron* deference.  *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001).  Under these circumstances, the Court should conclude that *Chevron* deference does not apply to them; at most, weight under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), applies.

   Under *Skidmore*, the weight accorded FAQ Nos. 33 & 34 "'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control.'"  *Mead Corp.*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140).  Applying these factors, the FAQs lack the power to persuade.  In conclusory fashion, they

purport to require the inclusion of Medicare and private insurance payments as express offsets in the hospital-specific DSH payment limit calculation.  By all indicia, there is no evidence that FAQ Nos. 33 & 34 have been "thoroughly considered."  They conflict with the plain terms of both 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299, and they make no attempt to reconcile these conflicts.  Their author is not disclosed, the persons who asked the questions at issue are not disclosed, and there is no indication in the FAQ document itself regarding who reviewed the document and authorized its posting on CMS's website.  The FAQs are devoid of any remote link to the notion that the terms "costs" or "costs incurred" as used in the statute or regulation includes "payments."  In short, FAQ Nos. 33 & 34 lack the "scrupulousness," "analytic rigor," thoroughness of consideration, and consistency with the statutory text they purport to interpret to be deserving of any weight under *Skidmore*.  *Merrimon*, 758 F.3d at 56; *see also Mead Corp.*, 533 U.S. at 231.  Thus, FAQ Nos. 33 & 34 lack the power to persuade.

Even if *Chevron* deference applied, however, as this Court previously concluded, the Defendants' interpretation of the statute fails.  Order, ECF No. 31 at ECF 29-37.  The discretion Congress gave to the Secretary to determine costs is limited to determining the costs that are allowable under the Medicaid statute, *i.e.*, all medically necessary costs associated with Medicaid-eligible individuals; it does not encompass payments.  *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear.").

The Defendants' interpretation that costs includes payments is, as this Court concluded, unreasonable for several reasons.  Order, ECF No. 31 at 29-37.  First, it would double count Medicaid-related payments, a nonsensical result given the evident purpose of the statute.  *Id.* at ECF 31.  Under the Defendants' reading, Medicaid "costs" would be first offset to the extent that

hospitals have been "compensated" or "reimbursed" for them, and then offset again by the payments specifically enumerated in the statute.  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at 237-38 (construing 42 C.F.R. § 447.299(c) and concluding, "defendants' reading would appear to double count Medicaid-related payments . . . ."); *see also* Order ECF No. 31 at ECF 31 (concluding that such an interpretation "exceeds the bounds of the permissible.").

Second, it is unreasonable to conclude that, while specifying the payments to be subtracted, Congress also intended to give the Secretary discretion to include other payments within the term "costs."  That would, as this Court concluded, render the definition of payments to be subtracted from costs surplusage.  Order, ECF No. 31 at 31-32; *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (explaining statutes should "be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Third, the term "costs" is not as elastic as the Defendants have contended.  It is only when the term "costs" stands alone, "without any better indication of meaning than the unadorned term," that an agency is given "broad methodological leeway."  *Verizon Commc'ns Inc. v. FCC,* 535 U.S. 467, 500 (2002).  That is not the case under 42 U.S.C. § 1396r-4(g)(1)(A). That statute specifies the "costs" to be offset against certain defined payments.  Thus, under 42 U.S.C. § 1396r-4(g)(1)(A), "costs" does not include payments and the agency is afforded no leeway to interpret the statute otherwise.  *See* Order ECF No. 31 at ECF 32.

Finally, the regulations and agency guidance surrounding 42 U.S.C. § 1396r-4(g)(1)(A) do not support the Defendants' interpretation.  As this Court noted, the preamble to the 2008 Rule itself "is replete with language separating the 'costs' associated with providing hospital services to Medicaid patients and the 'payments' received for those services."  Order, ECF No. 31 at ECF 34-35 (citing and quoting 73 Fed. Reg. at 77921, 77932, and 77946).  Other

authoritative guidance from the Defendants over the years is to the same effect.  *See* Section II.A.3, *supra*.  Thus, even when accorded *Chevron* deference, Defendants' interpretation is unreasonable.  Defendants have therefore acted "in excess of statutory jurisdiction, authority . . . or short of statutory right," 5 U.S.C. § 706(2)(C), in promulgating and enforcing the policies in FAQ Nos. 33 and 34.  Accordingly, the Court should declare them unlawful and vacate them.

## C.  The Defendants Failed to Use Notice-and-Comment Rulemaking

Count II alleges that the Defendants violated APA § 706(2)(A) and (D) by failing to engage in notice-and-comment rulemaking with respect to FAQ Nos. 33 & 34 as required under APA § 553.  The Defendants claim that the FAQs are interpretive rules and are therefore exempt from rulemaking.  *See* 5 U.S.C. § 553(b)(3)(A).  Because the FAQs are substantive, however, the Court must grant summary judgment as to Count II.

Only legislative or substantive rules have the force and effect of law.  *Perez v. Mortg. Bankers Ass'n.*, 135 S. Ct. 1199, 1203 (2015).  Interpretive rules do not.  *Id.*  "An interpretive rule is one that 'derive[s] a proposition from an existing document whose meaning compels or logically justifies the proposition.'"  *Tex. Children's Hosp.*, 76 F. Supp. at 240 (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)).  Thus, if a rule assigns duties, imposes new obligations, or alters or enlarges existing obligations, the rule is a legislative rule, not merely an interpretive rule, and notice-and-comment rulemaking under the APA is required.  *See, e.g.*, *Aviators for Safe & Fairer Reg., Inc. v. FAA*, 221 F.3d 222, 226-27 (1st Cir. 2000); *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998).

FAQ Nos. 33 & 34 add Medicare and private insurance payments to the hospital-specific DSH limit calculation under 42 U.S.C. § 1396r-4(g)(1)(A).  That statute, however, "does not include private-insurance payments among those that are specifically enumerated as offsets."

*Tex. Children's Hosp.*, 76 F. Supp. 3d at 236.  Nor does it include Medicare payments among those enumerated offsets.  "Only Medicaid payments – those 'under this subchapter' – are mentioned."  *Id.* (quoting 42 U.S.C. § 1396r-4(g)(1)(A)).  Similarly, 42 C.F.R. § 447.299 makes no mention of Medicare or private insurance payments.  42 C.F.R. § 447.299 contains a "step-by-step guide to calculating . . . 'unreimbursed costs,' including specific definitions of what makes up the 'cost' side of the equation and what makes up the 'payment' side."  *Tex. Children's Hosp.*, 76 F. Supp. 3d at 237.  Those components do "not contemplate the inclusion of private-insurance payments" or Medicare payments "for Medicaid-eligible services."  *Id.*  Thus, 42 C.F.R. § 447.299 cannot be interpreted consistent with the text of FAQ Nos. 33 & 34.

The policies contained in FAQ Nos. 33 & 34 effectively amend 42 C.F.R. § 447.299. They impose new requirements on state Medicaid agencies, auditors, and DSH-qualifying hospitals, and therefore constitute substantive rather than interpretive rules.  Several features of FAQ Nos. 33 & 34 support this conclusion.  First, FAQ Nos. 33 & 34 substantively alter the existing regulatory calculation.  *Mendoza*, 754 F.3d at 1021 ("[a] rule is legislative if it . . . effects a substantive change in existing law or policy").  Second, the changes FAQ Nos. 33 & 34 impose are binding on state Medicaid agencies.  Indeed, the Defendants have threatened to enforce FAQ Nos. 33 & 34 against New Hampshire by withholding federal funds if New Hampshire fails to comply with their terms.   Third, FAQ Nos. 33 & 34 are inconsistent with the existing regulatory regime and effectively amend it.  *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) ("APA rulemaking would still be required if [the agency] adopted a new position inconsistent with . . . existing regulations").

Thus, FAQ Nos. 33 & 34 are substantive rules.  They had to be, but were not, subject to notice-and-comment rulemaking under the APA.  *See Tex. Children's Hosp.*, 76 F. Supp. 3d at

23

241 (preliminarily concluding FAQ No. 33 was a substantive change that could only be made using the notice-and-comment procedures of APA § 553).  As the foregoing discussion sets forth, and as this Court has already concluded, even if the heightened deference that applies under APA § 706(2)(A) applies here, the Defendants' interpretation does not withstand scrutiny and is plainly erroneous.  Order ECF No. 31 at ECF 38-42.  The Court should therefore declare the policies contained in FAQ Nos. 33 & 34 unlawful and vacate them.

## D.  The Court Should Declare the FAQs Unlawful Because They Violate the SPA Process

Count III alleges that FAQ Nos. 33 & 34 are void under APA §§ 706(2)(A) and (D) because they were not incorporated into the State Plan using the Defendants' SPA process.  The Medicaid Act requires New Hampshire to have a State Plan in place.  *Wilder*, 496 U.S. at 502. Under the Defendants' regulations, the State Plan must be amended "whenever necessary to reflect—(i) Changes in Federal law, regulations, policy interpretations, or court decisions."  42 C.F.R. § 430.12(c)(1)(i).  The State Plan language is important in this context because one of the data sources used to complete the independent certified DSH audit is the "[a]pproved Medicaid State plan for the Medicaid State plan rate year under audit."  42 C.F.R. § 455.304(c)(1).

Before Defendants can approve SPAs that alter the rates paid to hospitals, certain notice and comment processes must occur.  42 U.S.C. § 1396a(a)(13)(A) ("Section 13(A)"); 42 C.F.R. § 447.205.  Under Section 13(A), if the amendment would change the rate paid to hospitals, a public notice-and-comment process is required.  The Medicaid Act treats DSH payments as hospital rate adjustments.  *See, e.g.*, 42 U.S.C. § 1396a(a)(13)(A)(iv); 42 U.S.C. §§ 1396r-4(a)(1)(B), (c)(3).  Thus, any change in the DSH payment methodology that alters the level of DSH payments DSHs receive necessarily affects hospital rates and is subject to notice and

comment under Section 13(A).  42 C.F.R. § 447.205 contains a similar notice-and-comment procedure for any "significant proposed change" in the methods for setting payment rates.

It is undisputed that the State Plan was never amended to include the changes created by FAQ Nos. 33 & 34 in accordance with 42 C.F.R. § 430.12(c).  Indeed, for SFY 2011 (the only audit year currently at issue in this litigation), the State Plan sets forth the hospital-specific DSH limit calculation and that calculation makes no mention of Medicare or private insurance payments as separate offsets.  Galdieri Decl., Ex. C, ECF No. 10-11 at ECF 42-45, 53-54; *id.*, Ex. D, ECF No. 10-12 at ECF 8-10; *id.*, Ex. E, ECF No. 10-13 at ECF 9.[8]  It is also undisputed that FAQ Nos. 33 & 34 effect significant methodological changes that profoundly depress the DSH payment adjustments Plaintiff Hospitals receive to their rates.  Thus, the SPA process had to be invoked, 42 C.F.R. § 430.12(c)(1)(i), and notice-and-comment under Section 13(A) and 42 C.F.R. § 447. 205 had to be provided.  Because FAQ Nos. 33 & 34 were not promulgated in this way, they violate the Medicaid Act and its regulations, as well as APA §§ 706(2)(A), (C)-(D).

## VI.    CONCLUSION

For the above reasons, the policies contained in FAQ Nos. 33 & 34 violate the APA and the Medicaid Act and must be declared unlawful and vacated under those authorities.  Accordingly, Plaintiffs are entitled to summary judgment on Counts I, II, and III of their complaint.

---

[8] The State Plan describing the hospital-specific DSH limit was amended two times during SFY 2011.  The following SPAs controlled during that SFY: TN No. 03-004, TN No. 10-011, and TN No. 11-006.

Respectfully submitted,

**PLAINTIFF NEW HAMPSHIRE HOSPITAL
ASSOCIATION & PLAINTIFF HOSPITALS**

By Their Attorneys,

**NIXON PEABODY LLP**

Dated:  April 15, 2016               */s/ Anthony J. Galdieri, Esq.*
                                     Gordon J. MacDonald, Esq.
                                     N.H. Bar No. 11011
                                     Anthony J. Galdieri, Esq.
                                     N.H. Bar No. 18594
                                     Holly J. Barcroft, Esq.
                                     N.H. Bar No. 16463
                                     900 Elm Street, 14th Floor
                                     Manchester, NH  03101-2031
                                     (603) 628-4000
                                     gmacdonald@nixonpeabody.com
                                     agaldieri@nixonpeabody.com
                                     hbarcroft@nixonpeabody.com

## CERTIFICATE OF SERVICE

I, Anthony J. Galdieri, hereby certify that on this 15th day of April 2016, a copy of the foregoing *Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment* was served *via* the Court's electronic mail system to all parties of record.

                                     */s/ Anthony J. Galdieri, Esq.*
                                     Anthony J. Galdieri, Esq.