**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

New Hampshire Hospital
Association, et al.

     v.

Sylvia Matthews Burwell
et al.

Civil No. 15-cv-460-LM
Opinion No. 2017 DNH 040 P

**O R D E R**

Several New Hampshire hospitals[1] and the New Hampshire Hospital Association ("NHHA"), a non-profit trade association, bring this suit against the Secretary of Health and Human Services (the "Secretary"), the Centers for Medicare and Medicaid Services ("CMS"), and the Administrator of CMS, alleging that defendants have set forth certain "policy clarifications" that contradict the plain language of the Medicaid Act and violate the Administrative Procedure Act ("APA"). The court granted plaintiffs' motion for a preliminary injunction barring defendants from enforcing the policy clarifications during the pendency of this litigation. See doc. no. 31. The parties now cross-move for summary judgment.

---

[1] Plaintiff hospitals are Mary Hitchcock Memorial Hospital, LRGHealthcare, Speare Memorial Hospital, and Valley Regional Hospital, Inc.

**Standard of Review**

The parties agree that because this is an action for review of agency action under the APA, the case can and should be resolved on summary judgment.  See 5 U.S.C. § 706; Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013).  The First Circuit has observed that the summary judgment "rubric has a special twist in the administrative law context."  Assoc. Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  The court's job on summary judgment "is only to determine whether the Secretary's [policy] was consonant with [her] statutory powers, reasoned, and supported by substantial evidence in the record."  Id.  On cross motions for summary judgment, the standard of review is applied to each motion separately.  See Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006) (applying the standard to each motion where cross motions were filed); see also Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006).[2]

**Background**

I.   The Medicaid Act

Medicaid is a cooperative federal-state program designed to provide medical services to those members of society who,

---

[2] The parties agree that the issues in this case raise pure questions of law that the court can resolve without an administrative record.

because they lack the necessary financial resources, cannot otherwise obtain medical care.  See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502 (1990).  That is, the program provides medical care to a population generally consisting of the poor, including dependent children, the disabled, and the elderly. See 42 C.F.R. § 430.0.  Legislation creating the program, the Medicaid Act, 42 U.S.C. §§ 1396 et seq., "provides financial support to states that establish and administer state Medicaid programs in accordance with federal law."  Long Term Care Pharm. All. v. Ferguson, 362 F.3d 50, 51 (1st Cir. 2004).

"Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of [the Medicaid Act]."  Harris v. McRae, 448 U.S. 297, 301 (1980).  In order to qualify for Medicaid funding, a state must adopt a Medicaid "plan," 42 U.S.C. § 1396a(a), which must be approved by CMS, a subdivision of the United States Department of Health and Human Services.  See Ferguson, 362 F.3d at 51.  "The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals."  Wilder, 496 U.S. at 502.  If CMS approves a state's plan, the federal government provides reimbursements to the state for a portion of the expenditures that it incurs for

Medicaid benefits, and for necessary and proper costs of administering the state plan.  See 42 U.S.C. § 1396b(a).  The state is responsible for the remainder of its Medicaid expenditures.  See § 1396b.

Concerned with the "greater costs it found to be associated with the treatment of indigent patients," D.C. Hosp. Ass'n v. District of Columbia, 224 F.3d 776, 777 (D.C. Cir. 2000), Congress amended the Medicaid Act in 1981 to ensure that payments to hospitals providing Medicaid-eligible services to indigent patients "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." § 1396a(a)(13)(A)(iv). Congress's "intent was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients." Va., Dep't of Med. Assistance Servs. v. Johnson, 609 F. Supp. 2d 1, 3 (D.D.C. 2009).

Under the Medicaid Act, states must ensure that such hospitals receive an "appropriate increase in the rate or amount of payment for such services" and that the reimbursements "reflect not only the cost of caring for Medicaid recipients, but also the cost of charity care given to uninsured patients." Louisiana Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs., 346 F.3d 571, 573 (5th Cir. 2003) (discussing

42 U.S.C. § 1396r-4(b)(1), (3)).  Such increased payments are available to any hospital that treats a disproportionate share of Medicaid patients (a "disproportionate-share hospital" or "DSH").  § 1396r-4(b).[3]

In 1993, Congress amended the DSH program to limit DSH payments on a hospital-specific basis.  See § 1396r-4(g). Congress enacted the hospital-specific limit in response to reports that some hospitals received DSH payment adjustments that exceeded "the net costs, and in some instances the total costs, of operating the facilities."  Omnibus Budget Reconciliation Act of 1993, H.R. Rep. No. 103-111, at 211-12 (1993).  The hospital-specific limit was established in § 1396r-4(g)(1), which is captioned: "Amount of adjustment subject to uncompensated costs."  That section provides that DSH payments made to a hospital cannot exceed:

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State [Medicaid] plan or have no health insurance (or other source of third party coverage) for services provided during the year.

---

[3] The increased payments made to disproportionate-share hospitals are referred to as "DSH payments."

§ 1396r-4(g)(1)(A).[4]  Thus, for Medicaid patients (as opposed to uninsured patients), the Medicaid Act sets the hospital-specific DSH limit as the costs a hospital incurs in furnishing hospital services to Medicaid-eligible patients "as determined by the Secretary and net of payments" under the Medicaid Act.[5]

II.   Audit and Reporting Requirements

In 2003, to monitor DSH payments, Congress enacted into law a requirement that each state provide to the Secretary an annual report and audit on its DSH program.  See § 1396r-4(j).  The audit must confirm, among other things, that "[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [§ 1396r-4(g)(1)(A)] . . . are included in the calculation of the hospital-specific limits."  § 1396r-4(j)(2)(C).  Any overpayments that an audit reveals must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution.  See § 1396b(d)(2)(C).

---

[4] The term "subchapter" refers to Subchapter XIX (Grants to States for Medical Assistance Programs) of Chapter 7 of Title 42 of the U.S. Code, which is the Medicaid Act, codified at 42 U.S.C. §§ 1396 - 1396w-5.

[5] The parties often refer to the portion of § 1396r-4(g)(1)(A) dealing with the costs of furnishing hospital services to Medicaid-eligible patients as the "Medicaid Shortfall."  The court uses that shorthand description at times throughout this opinion.

On December 19, 2008, CMS promulgated a final rule implementing the statutory reporting and auditing requirement (the "2008 Rule").  See Disproportionate Share Hospital Payments, 73 Fed. Reg. 77904 (Dec. 19, 2008).  The 2008 Rule requires that states annually submit information "for each DSH hospital to which the State made a DSH payment."  42 C.F.R. § 447.299(c).  One such piece of required information is the hospital's "total annual uncompensated care costs," which is defined as follows:

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments . . . .

§ 447.299(c)(16).  This section establishes a formula for a state to determine whether the hospital-specific DSH limit, as set forth in § 1396r-4(g)(1)(A), was calculated correctly.

The 2008 Rule also provides that any audits of DSH payments made prior to Fiscal Year 2011 would not result in the recoupment or reduction of federal funds used for DSH payments.  See 73 Fed. Reg. 77906.  Beginning with payments made in Fiscal Year 2011, any DSH overpayments must be recovered by the state

and returned to the federal government, unless they "are
redistributed by the State to other qualifying hospitals."  Id.

III. FAQs 33 and 34

On January 10, 2010, CMS posted answers on its website to
"frequently asked questions" regarding the audit and reporting
requirements of the 2008 Rule.  See Additional Information on
the DSH Reporting and Auditing Requirement,

https://www.medicaid.gov/medicaid/financing-and-
reimbursement/downloads/part-1-additional-info-on-dsh-reporting-
and-auditing.pdf (last visited March 2, 2017).  Two of the
frequently asked questions, FAQ 33 and FAQ 34, and CMS's
responses to those questions are at issue in this case.  FAQ 33
and CMS's response thereto are as follows:

> **33:  Would days, costs, and revenues associated with
> patients that have both Medicaid and private insurance
> coverage (such as Blue Cross) also be included in the
> calculation of the ... DSH limit in the same way
> States include days, costs and revenues associated
> with individuals dually eligible for Medicaid and
> Medicare?**
>
> Days, cost[s], and revenues associated with patients
> that are dually eligible for Medicaid and private
> insurance should be included in the calculation of the
> Medicaid inpatient utilization rate (MIUR) for the
> purposes of determining a hospital eligible to receive
> DSH payments. Section 1923(g)(1)[6] does not contain an
> exclusion for individuals eligible for Medicaid and
> also enrolled in private health insurance.  Therefore,
> days, costs, and revenues associated with patients
> that are eligible for Medicaid and also have private

_____

[6] Section 1923 is the same as § 1396r-4.

insurance should be included in the calculation of the hospital-specific DSH limit.

Id. at 18.  FAQ 34 and CMS's response thereto state:

> **34. The regulation states that costs for dual eligibles should be included in uncompensated care costs. Could you please explain further? Under what circumstances should we include Medicare payments?**
>
> Section 1923(g) of the Act defines hospital-specific limits on FFP for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals. Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligibles.

Id.

Thus, CMS's responses to FAQs 33 and 34 provide that in calculating the hospital-specific DSH limit, a state must subtract payments received from private health insurance (FAQ 33) and Medicare (FAQ 34) for dually-eligible Medicaid patients from the costs incurred in providing hospital services to those

patients.  In the remainder of this order, the court uses "FAQ 33" and "FAQ 34" to refer to CMS's responses to those FAQs and the requirements stated in the responses.

IV.  <u>Texas Children's Hospital v. Burwell</u>

On December 5, 2014, two disproportionate-share hospitals, Texas Children's Hospital and Seattle Children's Hospital, brought suit against the same defendants named in this case in the District Court for the District of Columbia.  <u>See</u> <u>Texas Children's Hospital v. Burwell</u>, Civil Action No. 14-2060 (EGS) (D.D.C. 2014).  The plaintiffs in <u>Texas Children's Hospital</u> assert that FAQ 33 is contrary to the provisions of the Medicaid Act and that CMS's publication of FAQ 33 violates the procedural requirements of the APA.  On December 29, 2014, the court in <u>Texas Children's Hospital</u> granted the plaintiffs' motion for preliminary injunction and entered an order enjoining CMS from enforcing, applying, or implementing FAQ 33 pending further order of the court.  <u>Texas Children's Hosp. v. Burwell</u>, 76 F. Supp. 3d 224, 246-47 (D.D.C. 2014).  The court further ordered CMS to notify the Texas and Washington State Medicaid programs that, pending further order by the court, the enforcement of FAQ 33 is enjoined and CMS will take no action to recoup federal DSH funds provided to Texas and Washington based on the states' noncompliance with FAQ 33.  <u>Id.</u>  The plaintiffs in that case

have not challenged FAQ 34 or CMS's policy regarding patients
dually eligible for Medicare and Medicaid.

V.   Plaintiffs' Petition to CMS

On June 17, 2015, plaintiffs petitioned CMS requesting that
the agency repeal the policies referenced in FAQs 33 and 34
regarding the inclusion of private health insurance and
Medicare payments in the calculation of the Medicaid Shortfall.
See doc. no. 10-24.  Plaintiffs submitted a supplement to the
petition dated June 24, 2015.  See doc. no. 10-25.  The petition
and the supplement asserted that FAQs 33 and 34 operate as
substantive amendments to existing federal law and regulations,
as well as to the New Hampshire State Medicaid Plan.  See doc.
nos. 10-24 and 10-25.  The petition and supplement also asserted
that the policies are illegal and void and requested that CMS
repeal and revoke them.  Id.

In a letter dated October 6, 2015, CMS Acting Administrator
Andrew Slavitt responded to plaintiffs' petition.  See doc. no.
10-26.  In the letter, Slavitt stated:

> The CMS continues to maintain that this longstanding,
> consistent policy, which is reflected in FAQ No. 33
> with respect to private insurance payments, and is
> discussed elsewhere in the FAQs and in the preamble to
> the December 2008 regulation with respect to
> Medicare payments for dually-eligible beneficiaries,
> reflects a valid interpretation of the statute
> governing the calculation of uncompensated care costs
> for purposes of the DSH hospital-specific limit, 42
> U.S.C. § 1396r-4, and the associated regulations.

Id. at 2 (citations omitted).  Slavitt acknowledged the

preliminary injunction in Texas Children's Hospital, but stated:

> For all other states, including New Hampshire, CMS may
> disallow federal financial participation if a state
> does not comply with the policy articulated in FAQ No.
> 33.
>
> Moreover, for state plan rate year 2011 and
> thereafter, any other audit-identified DSH payments
> that exceed documented hospital-specific DSH limits
> may be treated as provider overpayments that, pursuant
> to 42 CFR Part 433, Subpart F, trigger the return of
> the federal share to the federal government.

Id. at 2-3.

## VI.  Preliminary Injunction

Plaintiffs filed this lawsuit on January 15, 2016.  That

same day, they filed a motion for preliminary injunction, which

sought to enjoin defendants from enforcing or applying FAQs 33

and 34 during the pendency of this case.  Defendants objected to

the motion, plaintiffs filed a reply, and defendants filed a

surreply.  On February 18, 2016, the court held an evidentiary

hearing, during which the court heard oral argument and

plaintiffs submitted evidence.

On March 11, 2016, the court granted plaintiffs' motion for

a preliminary injunction.  See N.H. Hosp. Assoc. v. Burwell, 15-

cv-460-LM, 2016 WL 1048023 (D.N.H. Mar. 11, 2016).  The court

held that plaintiffs had carried their burden to show that they

were likely to prove that defendants violated the APA and that

they would suffer irreparable harm absent a preliminary injunction, and that the remaining factors weighed in favor of granting a preliminary injunction.  The parties now cross-move for summary judgment.

### Discussion

Plaintiffs' complaint sets forth four counts, all of which allege violations of the APA: (1) violation of 5 U.S.C. § 706(2)(C) (Count I); (2) violation of 5 U.S.C. §§ 706(2)(A), (D) (Count II); (3) violation of 5 U.S.C. §§ 706(2)(A), (D) (Count III); and (4) violation of 5 U.S.C. § 706(2)(A) (Count IV). Plaintiffs state in their summary judgment memorandum that they "are no longer pressing Count IV of their complaint."  Doc. no. 33-1 at n.1.  The parties move for summary judgment on each of the three remaining counts.

As a threshold matter, defendants argue in their summary judgment motion that they are entitled to summary judgment because plaintiffs lack standing to pursue their claims. Plaintiffs argue in their summary judgment motion and objection to defendants' motion that they do have standing to pursue their claims.  Therefore, the court addresses the parties' arguments as to standing before proceeding to the merits of each claim. See Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006) ("A federal court must satisfy itself as to its jurisdiction,

13

including a plaintiff's Article III standing to sue, before addressing his particular claims . . . .").

I.  Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const., Art. III, § 2).  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"  Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).[7]

_____

[7] Plaintiffs contend that they have both substantive standing, because of their injuries arising out of the recoupment and prospective loss of DSH funding, and procedural standing, because of defendants' failure to afford plaintiffs the right to notice-and-comment under the APA.  Because, as discussed below, the court finds that plaintiffs have

Defendants argue that the harm plaintiffs allege they will suffer in this case—harm from potential recoupment of past DSH overpayments and harm from reduction in prospective DSH payments—is not fairly traceable to federal policy or likely to be redressed by a favorable decision.

"When the suit is one challenging the legality of government action or inaction . . . [and] a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else . . . ., causation and redressability ordinarily hinge on the response of the regulated . . . third party to the government action." Lujan, 504 U.S. at 561-62.  In that case, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."  Id. at 562.  Standing may be established in such situations "where the record presents substantial evidence of a causal relationship between the government policy and the third party conduct, leaving little doubt as to causation and likelihood of redress."  Constitution Party of Penn. v. Aichele, 757 F.3d 347, 366 (3d Cir. 2014) (citation and alteration omitted).

---

substantive standing, the court does not address plaintiffs' arguments concerning procedural standing.

15

A.   Recoupment of Past DSH Overpayments

Plaintiffs assert that the audit of their DSH payments for Fiscal Year 2011 revealed that plaintiff hospitals were overpaid because the auditors followed the policies set forth in FAQs 33 and 34.  They contend, therefore, that the recoupment of past DSH overpayments based on the audit is directly traceable to FAQs 33 and 34.  They further argue that no recoupment would be required if defendants were enjoined from enforcing the policies.

Defendants contend that when, as here, a DSH audit reveals an overpayment to a hospital, the recoupment of that overpayment is in the hands of state authorities and subject to state law. Defendants argue that, because the state controls recoupments, an injunction issued against them in this case would not bar the State of New Hampshire from recouping funds from plaintiff hospitals and redistributing them to other disproportionate-share hospitals.[8]  They contend, therefore, that plaintiffs' injury due to NHDHHS's recoupment of past DSH payments is not

---

[8] The New Hampshire Department of Health and Human Services ("NHDHHS") is the state agency charged with administration of the Medicaid program.  Therefore, NHDHHS is the entity responsible for recouping past DSH overpayments and for making prospective DSH payments to plaintiff hospitals.

fairly traceable to FAQs 33 and 34, and is not likely to be redressed by any action against them.

There is no doubt that the recoupment of past DSH payments by NHDHHS is fairly traceable to defendants' enforcement of FAQs 33 and 34.  Defendants do not meaningfully dispute that (i) NHDHHS is set to recoup past DSH payments for Fiscal Year 2011 from plaintiff hospitals; and (ii) it will recoup those payments because its audit revealed overpayments to those hospitals based on FAQs 33 and 34.  Therefore, plaintiffs' injury is fairly traceable to defendants' conduct that is challenged in this case.[9]  See Nat'l Wrestling Coaches Assoc. v. Dep't of Educ., 383 F.3d 1047, 1049 (D.C. Cir. 2004) (Plaintiffs could show causation "if they could show that the agency's allegedly illicit action was a substantial factor in bringing about the injurious conduct of the third parties.") (internal quotation marks and citation omitted); see also Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 45 (1st Cir. 2005) ("The

---

[9] Under the Medicaid Act, the federal government cannot compel states to recoup funds from disproportionate-share hospitals in the event of an overpayment.  Rather, in those circumstances, the federal government adjusts the amount paid to the states one year after the overpayment is discovered.  See 42 U.S.C. § 1396b(d)(2)(C).  As discussed below, however, evidence in the record establishes that NHDHHS is set to recoup DSH overpayments revealed in the Fiscal Year 2011 audit from plaintiff hospitals.

requirement that an alleged injury be fairly traceable to the defendant's action does not mean that the defendant's action must be the final link in the chain of events leading up to the alleged harm.").

The same is true for redressability.  Defendants argue that plaintiffs' injury in the form of recoupment of past DSH overpayments is not redressable because even if the court grants plaintiffs' summary judgment motion, NHDHHS could still recoup funds from plaintiff hospitals and redistribute them to other disproportionate-share hospitals.  If FAQs 33 and 34 are unenforceable, however, the audit of Fiscal Year 2011 based on FAQs 33 and 34 is no longer accurate.  Defendants do not explain why NHDHHS would recoup funds from plaintiff hospitals if no overpayments were made.

In addition, defendants' argument is belied by the evidence in this case.  As the court explained in its order granting plaintiffs' motion for preliminary injunction, evidence in the record at the time the court granted the motion, including several communications from NHDHHS, demonstrated that NHDHHS would act in accordance with CMS's guidance as to the enforcement of FAQs 33 and 34, and would not seek recoupment of past DSH payments if FAQs 33 and 34 were unenforceable.  See doc. no. 31 at 18-20.

After the court issued the preliminary injunction, NHDHHS took no action to recoup alleged overpayments from plaintiff hospitals created by FAQs 33 and 34.  See doc. nos. 33-4 at ¶ 6; 33-5 at ¶ 4; 33-6 at ¶ 4; 33-7 at ¶ 4.  Therefore, plaintiffs have shown that defendants' enforcement of FAQs 33 and 34 has a sufficient causal connection to plaintiffs' injuries arising from recoupment of past DSH payments, and judgment for plaintiffs which would enjoin defendants' enforcement of the FAQs would likely redress plaintiffs' injuries in that regard.

B.    Reduction in Prospective DSH Payments

Defendants contend that any reduction in prospective DSH payments would not be traceable to federal policy.[10]  Defendants note that the New Hampshire state government and New Hampshire hospitals, including plaintiffs, had, until 2014, been involved in several lawsuits concerning New Hampshire's Medicaid reimbursement system.  Defendants assert that those lawsuits were resolved in 2014 by a global settlement agreement, which governs prospective DSH payments beginning in 2016.  That

---

[10] Defendants do not appear to argue lack of redressability from the reduction in prospective DSH payments.  Even if they had made such an argument, it would be without merit.  The record evidence shows that after the court issued the preliminary injunction, the NHDHHS entered into a letter agreement with the NHHA permitting plaintiff hospitals to omit data relating to Medicare and other third party payments from 2016 uncompensated care costs for purposes of calculating the 2016 hospital-specific DSH limit.  See doc. no. 33-3.

settlement agreement sets out formulas for determining each of plaintiff hospitals' DSH funding levels.  Defendants argue that plaintiffs' voluntary decision to enter into the settlement agreement precludes them from claiming they are injured by the federal standards that are incorporated into the agreement.

Defendants' argument is without merit.  The settlement agreement changed New Hampshire's DSH program beginning in Fiscal Year 2016, and provides that DSH funding levels are set at a specific percentage, depending on the hospital, of a hospital's total annual uncompensated care costs.  The hospital-specific DSH limit, however, applies to plaintiff hospitals regardless of the existence of the settlement agreement.  FAQs 33 and 34 have the effect of lowering the calculation of the total annual uncompensated care costs, which necessarily lowers the DSH funding levels.  Therefore, plaintiffs have shown that there is a causal relationship between defendants' enforcement of FAQs 33 and 34 and the reduction in prospective DSH payments.

Accordingly, plaintiffs have standing to maintain their claims.[11]

---

[11] Defendants do not dispute that if plaintiff hospitals have standing, the NHHA has standing as well.  See, e.g., Friends of the Earth, 528 U.S. at 180-81.

II.  <u>Claims</u>

The parties cross-move for summary judgment on Counts I-III
of the complaint.  Although each count represents a separate
challenge to defendants' actions, all allege that defendants'
enforcement of FAQs 33 and 34 violates the APA.

Under the APA, a court must "hold unlawful and set aside
agency action, findings, and conclusions" that are "in excess of
statutory jurisdiction, authority, or limitations, or short of
statutory right," 5 U.S.C. § 706(2)(C), "arbitrary, capricious,
an abuse of discretion, or otherwise not in accordance with
law," id. § 706(2)(A), or "without observance of procedure
required by law," id. § 706(2)(D).[12]  Plaintiffs assert that
defendants' implementation and enforcement of FAQs 33 and 34
violate all three sections of the APA.[13]

_____

[12] Count I alleges a violation of § 706(2)(C).  Counts II
and III allege separate violations of both § 706(2)(A) and §
706(2)(D).

[13] A prerequisite to plaintiffs' APA claims is that FAQs 33
and 34 represent "final agency action" that may be challenged
under 5 U.S.C. § 704.  Although plaintiffs allege that the FAQs
represent "final agency action," neither plaintiffs nor
defendants address that requirement in their motions for summary
judgment.  Therefore, the court assumes the parties agree that
this requirement is met.  See Texas Children's Hosp., 76 F.
Supp. 3d at 240-41 (holding that FAQ 33 "likely constitutes a
final agency action that may be challenged pursuant to 5 U.S.C.
§ 704").

A.   Count I

Count I alleges that in promulgating and enforcing FAQs 33 and 34, defendants have acted in excess of their statutory authority under the Medicaid Act.  Specifically, plaintiffs allege that FAQs 33 and 34 conflict with the unambiguous language of the Medicaid Act.  See § 1396r-4(g)(1)(A). Defendants argue that FAQs 33 and 34 do not conflict with the Medicaid Act, and instead represent a reasonable interpretation of the statute entitled to deference under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

Plaintiffs contend that FAQs 33 and 34 are not entitled to any deference but, if they are so entitled, the court should give them "at most, weight under Skidmore v. Swift & Co., 323 U.S. 134 (1944)."  Doc. no. 33-1 at 20.  Plaintiffs argue that, regardless of whether FAQs 33 and 34 are entitled to any level of deference, defendants' interpretation of the Medicaid Act still violates the APA.

1.   Chevron Deference

In Chevron, the Supreme Court established a test for determining whether to afford deference to an agency's interpretation of a law which the agency administers.  See Chevron, 467 U.S. at 842-43.  "First, [courts] look to the statute to ascertain whether 'Congress has directly spoken to

the precise question at issue.'" Santana v. Holder, 731 F.3d 50, 55 (1st Cir. 2013) (quoting Chevron, 467 U.S. at 842).  "If the statute is clear in its meaning, [courts] must 'give effect to the unambiguously expressed intent of Congress.'"  Id. (quoting Chevron, 467 U.S. at 842–43).  Only if Congress's intent is unclear does the court move to step two.  Id.  "At Chevron's second step, the inquiry focuses on 'whether the agency's answer is based on a permissible construction of the statute.'"  Id. (quoting Chevron, 467 U.S. at 843).  The court "defer[s] to the agency's interpretation unless that interpretation is unreasonable." Lovgren v. Locke, 701 F.3d 5, 31 (1st Cir. 2012); see also Saysana v. Gillen, 590 F.3d 7, 13 (1st Cir. 2009).

In recent years, however, the Supreme Court has limited the applicability of Chevron deference.  In United States v. Mead Corp., 533 U.S. 218 (2001), the Supreme Court introduced a threshold inquiry to determine whether the two-step Chevron analysis is applicable to the agency action in question.[14]  The Supreme Court held "that administrative implementation of a particular statutory provision qualifies for Chevron deference

---

[14] This threshold inquiry into whether the Chevron framework applies at all is often referred to as "Chevron Step Zero." Pharm. Research & Mfrs. of Am. v. United States Dep't of Health & Human Servs., 43 F. Supp. 3d 28, 36 (D.D.C. 2014).

when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-27. If the agency action fails that threshold step, it is not entitled to Chevron deference. Id.

Plaintiffs do not dispute that, in the Medicaid Act, Congress delegated authority to CMS to make rules carrying the force of law. The Medicaid Act defines the hospital-specific DSH limit in § 1396r-4(g)(1)(A). That section defines the Medicaid Shortfall, in relevant part, as follows:

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section . . .) by the hospital . . . .

Id. (emphasis added). The use of the phrase "as determined by the Secretary" shows that "Congress has provided 'an express delegation of authority to the agency to elucidate a specific provision of the statute . . . .'" Transitional Hosps. Corp. of La., Inc. v. Shalala, 222 F.3d 1019, 1026 (D.C. Cir. 2000) (quoting Chevron, 467 U.S. at 843-44). Therefore, whether FAQs 33 and 34 are entitled to Chevron deference depends on whether these FAQs were promulgated in the exercise of that authority.

Here, FAQs 33 and 34 fail this threshold inquiry, and the Chevron analysis is inapplicable to the facts of this case. The

24

phrase "as determined by the Secretary" grants an agency the authority to interpret a statute by regulation. Texas Children's Hosp., 76 F. Supp. 3d at 236 ("At most, [§ 1396r-4(g)(1)(A)] might have delegated to the Secretary the ability to determine by regulation that additional payments should be considered."); Transitional Hosps. Corp. of La., 222 F.3d at 1026 (noting that "as determined by the Secretary" means that Congress has granted an agency the authority to interpret a statute "by regulation"); see also Anderson v. U.S. Sec'y of Agric., 30 C.I.T. 1742, 1747 (Fed. Cl. 2006) (same).

FAQs 33 and 34 are not regulations.  Thus, although in § 1396r-4(g)(1)(A) Congress delegated authority to CMS to make rules carrying the force of law, i.e., regulations, FAQs 33 and 34 were not "promulgated in the exercise of that authority." Therefore, they are not entitled to Chevron deference.  See Nat'l Ass'n of the Deaf v. Harvard Univ., No. 3:15-cv-30023-MGM, 2016 WL 3561622, at *8 (D. Mass. Feb. 9, 2016) (noting that the Department of Education's responses to frequently asked questions represent "non-regulatory general pronouncements . . . . [that] are not eligible for Chevron deference" (citing Massachusetts v. FDIC, 102 F.3d 615, 621 (1st Cir. 1996)), report and recommendation adopted, No. CV 15-30023-MGM, 2016 WL 6540446 (D. Mass. Nov. 3, 2016); U.S., ex rel. Jamison v.

25

McKesson Corp., 784 F. Supp. 2d 664, 677 n.10 (N.D. Miss. 2011) (noting that answers to FAQs posted on an agency's website "lack the force of law [and] do not warrant judicial deference" (internal quotation marks and citation omitted)); see also Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 55 (1st Cir. 2014) (noting that the Department of Labor's interpretation of certain ERISA provisions set forth in an amicus brief requested by the court was not entitled to Chevron deference because it was spoken "with something less than the force of law").

Defendants assert that the Secretary's interpretation of § 1396r-4(g)(1)(A) as stated in FAQs 33 and 34 finds it source in the 2008 Rule, which is a regulation and, therefore, is entitled to Chevron deference. Defendants point to the following language in the Preamble to the 2008 Rule:

> [T]he uncompensated care cost eligible under the hospital-specific DSH limit include the unreimbursed costs of providing inpatient and outpatient hospital services to Medicaid eligible individuals and the unreimbursed costs of providing inpatient and outpatient hospital services to individuals with no source of third party reimbursement for the inpatient and outpatient hospital services they receive.

73 Fed. Reg. 77920. Defendants assert that because the policies in FAQs 33 and 34 can be found in the 2008 Rule, which carries the force of law, Chevron deference applies.

Defendants' argument is without merit. The text of the 2008 Rule and other sections in the Preamble make clear that the

"Rule cannot support defendants' policy and that FAQ 33 [and FAQ 34 are] the sole authority for it."  Texas Children's Hosp., 76 F. Supp. 3d at 238.

The Preamble, read as a whole, is not consistent with the Secretary's interpretation.  For example, the Preamble discusses the "reporting form" which provides the "necessary data elements to fulfill the audit and reporting requirements."  73 Fed. Reg. 77921.  It states:

> The data element referring to "Total Annual Uncompensated Care Costs" represents the total amount of unreimbursed care to be considered under the hospital-specific DSH limit.  This figure is the result of summing "Total Cost of Care Medicaid IP/OP Services" and "Total Cost of IP/OP for uninsured" <u>and then subtracting "Total Medicaid IP/OP Payments" and "IP/OP Uninsured Revenues," and "Total Applicable Section 1011 Payments</u>."

Id. (emphasis added).  As such, the hospital and auditor are directed to add up the costs of certain services provided and then subtract certain payments and revenue from the total of the costs.  That calculation is consistent with the language of § 1396r-4(g)(1)(A).  In addition, the Preamble lists the three types of payments and revenues to be subtracted from the costs of care, and the list does not include payments from private health insurance or Medicare.

The Preamble consistently refers to the specific costs and payments that are used to calculate the Medicaid Shortfall.  For example, the Preamble states:

- "[The statute] plainly identifies the limited population [of those individuals covered], whose costs were to be included in the calculation, and specifies offsets of revenues associated with those costs." 73 Fed. Reg. 77921.

- "Section 1923(j) of the Act instructs States to audit and report specific payments and specific costs." Id. at 77932.

- "In order to [calculate the hospital-specific DSH limit], all applicable revenues must be offset against all eligible costs.  For purposes of determining the hospital-specific DSH limit, revenues would include all Medicaid payments made to hospitals for providing inpatient and outpatient services to Medicaid individuals . . . and all payments made by or on behalf of patients with no source of third party coverage for the inpatient and outpatient hospital services they received." Id. at 77946.

Each of these sections of the Preamble limits the revenues and payments to be considered to those enumerated in § 1396r-4(g)(1)(A), which do not include payments from private health

insurance or Medicare. Therefore, the Preamble to the 2008 Rule does not support defendants' contention that the Secretary established the relevant policies in the 2008 Rule.

In addition, the text of the 2008 Rule plainly does not include Medicare or private insurance payments for Medicaid-eligible services in calculating the hospital-specific DSH limit. The 2008 Rule defines "total annual uncompensated care costs" as:

> [T]he total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they
>
> receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments.

42 C.F.R. § 447.299(c)(16). These components are further defined elsewhere in the 2008 Rule, and they do not include payments from Medicare or private insurance for Medicaid-eligible patients. See id. §§ 447.299(c)(6)–(15).

In short, the evidence in the record shows that the authority for the relevant policies is FAQs 33 and 34. For the reasons discussed above, the FAQs do not carry the force of law and, therefore, do not qualify for Chevron deference.

29

2.   <u>Skidmore Deference</u>

For agency actions that fail the <u>Chevron</u> threshold analysis, the agency's interpretation may still be entitled to deference, albeit less deference, as provided in <u>Skidmore</u>, 323 U.S. at 139-40.  The application of <u>Skidmore</u> deference depends upon the circumstances of the case and requires courts to give "some deference to informal agency interpretations of ambiguous statutory dictates."  <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, 400 F.3d 1352, 1365 (Fed. Cir. 2005).

<u>Skidmore</u> deference has "produced a spectrum of judicial responses, from great respect . . . to near indifference."  <u>Id.</u> (internal citation omitted); <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000) ("'[i]nterpretations such as those in opinion letters'" are "'entitled to respect'" in proportion to their "'power to persuade'" (quoting <u>Skidmore</u>, 323 U.S. at 134)); <u>Metro. Stevedore Co. v. Rambo</u>, 521 U.S. 121, 136 (1997) ("Director's reasonable interpretation . . . brings at least some added persuasive force"); <u>Martin v. Occupational Safety & Health Review Comm'n</u>, 499 U.S. 144, 157 (1991) ("informal interpretations are still entitled to some weight on judicial review").  Overall, the level of deference depends "'upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" Mead, 533 U.S. at 228 (quoting Skidmore, 323 U.S. at 140). A court may also consider "the formality of the agency process that produced the decision." Tangney v. Burwell, 186 F. Supp. 3d 45, 55 (D. Mass. 2016) (citing Doe v. Leavitt, 552 F.3d 75, 81 (1st Cir. 2009)).

Here, after consideration of the relevant factors, the court finds that FAQs 33 and 34 are not entitled to any deference under Skidmore because they lack the "power to persuade." As discussed above, FAQs 33 and 34 are inconsistent with the 2008 Rule and CMS had not consistently, if ever, applied those policies to the hospital-specific DSH limit prior to issuing the FAQs. See, e.g., Statesman II Apartments, Inc. v. United States, 66 Fed. Cl. 608, 623 (Fed. Cl. 2005) (holding that HUD's interpretation of the Housing Act set forth in a notice was not entitled to Skidmore deference because "it is inconsistent with HUD's various earlier interpretations of" the statute).[15]  In addition, there is no evidence in the record

_____

[15] Defendants cite an August 16, 2002 letter from CMS to State Medicaid Directors to support their contention that the policies in FAQs 33 and 34 reflect the Secretary's consistent interpretation. Even if the letter supported the policies reflected in FAQs 33 and 34, it would be insufficient to overcome the evidence that the Secretary has not consistently applied those policies. That evidence includes the plain text of the 2008 Rule and a 1994 letter from CMS to State Medicaid Directors defining the Medicaid Shortfall, which makes no

about CMS's process by which the policies set forth in the FAQs were considered or formed.  See Tangney, 186 F. Supp. 3d at 56 (the validity of the interpretation depends "on whether the agency has consulted appropriate sources, employed sensible heuristic tools, and adequately substantiated its ultimate conclusion" (quoting Leavitt, 552 F.3d at 82)); Neang Chea Taing v. Napolitano, 567 F.3d 19, 30 (1st Cir. 2009) (holding that an agency interpretation lacks the power to persuade when it "does not engage in an adequate analysis of the statutory text"); De La Mota v. U.S. Dep't of Educ., 412 F.3d 71, 82 (2d Cir. 2005) (noting that an agency interpretation is not entitled to Skidmore deference "when there is no indication in the record of the process through which the agency arrived at its interpretation . . . because we cannot say with confidence that the agency's interpretation came about as the result of a reasoned process." (internal quotation marks, citation and alterations omitted)).

---

mention of Medicare or private insurance payments as offsets.
See Letter from Sally K. Richardson, Ctrs. for Medicare &
Medicaid Servs., U.S. Dep't of Health and Human Servs., to State
Medicaid Directors (Aug. 17, 1994),
https://downloads.cms.gov/cmsgov/archived-
downloads/SMDL/downloads/SMD081794.pdf (last visited March 2,
2017).  It also includes CMS's approval of the New Hampshire
State Medicaid Plan, which does not include Medicare or private
insurance as offsets, from 2004 to 2013.

In light of the relevant Skidmore factors, FAQs 33 and 34 lack the power to persuade.  Therefore, they are not entitled to any deference under Skidmore.

### 3.    Excess of Statutory Jurisdiction or Authority

Plaintiffs allege in Count I that FAQs 33 and 34 were promulgated "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  § 706(2)(C).

A claim that agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right [under] 5 U.S.C. § 706(2)(C) . . . . necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor, 745 F.3d 653, 679 (3d Cir. 2014) (internal quotation marks and citation omitted).  A determination of whether an agency has acted within the limitations of its delegated authority "begins with a delineation of the scope of the [agency's] authority and discretion." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Schilling v. Rogers, 363 U.S. 666, 676–77 (1960).  Then, the court determines whether it can "reasonably conclude that the agency's grant of authority contemplates the actions taken." Comite de Apoyo a

33

los Trabajadores Agricolas v. Solis, 933 F. Supp. 2d 700, 711
(E.D. Pa. 2013) (citing Citizens to Preserve Overton Park, 401
U.S. at 415-16).

As discussed above, the Medicaid Act defines the Medicaid
Shortfall in § 1396r-4(g)(1)(A).  The Medicaid Shortfall is
comprised of the "costs incurred" in furnishing hospital
services to Medicaid-eligible patients "as determined by the
Secretary and net of" Medicaid payments.  Id.  The Medicaid
Shortfall makes no mention of Medicare payments or private
insurance payments as offsets to costs.

The phrase "as determined by the Secretary" necessarily
grants the Secretary discretion to define "costs incurred."
Defendants contend that this grant of authority includes the
discretion to include Medicare payments and private insurance
payments as offsets to costs.

Assuming without deciding that § 1396r-4(g)(1)(A) grants
the Secretary such interpretive discretion, the statute does not
authorize the Secretary's actions that are challenged in this
case.  "At most, the statute might have delegated to the
Secretary the ability to determine by regulation that additional
payments should be considered."  Texas Children's Hosp., 76 F.
Supp. 3d at 236.  As discussed above, the Secretary did not
exercise that discretion in the 2008 Rule.  Instead, the

Secretary expressed the new interpretation, that Medicare payments and private insurance payments were included in the statutory phrase "costs incurred," by issuing FAQs 33 and 34.

Defendants offer no support for the theory that the Secretary has the power to define the phrase "costs incurred" in FAQs.  Thus, even if § 1396r-4(g)(1)(A) authorizes the Secretary to interpret the statute to mean that Medicare payments and private insurance payments should be included as offsets to costs, the statute does not authorize the Secretary to do so through FAQs on CMS's website.  Because FAQs 33 and 34 are not regulations, in promulgating those FAQs, defendants acted "in excess of statutory jurisdiction, authority . . . or short of statutory right."  § 706(2)(C).  Therefore, plaintiffs are entitled to summary judgment on Count I.[16]

---

[16] In granting plaintiffs' motion for preliminary injunction, the court assumed without deciding that the Chevron framework applied and held that, based on the limited record before it at the time, FAQs 33 and 34 failed under that analysis.  See doc. no. 31.  With the benefit of the entire record and for the reasons discussed above, the court concludes that the Secretary's interpretation of the Medicaid Act as set forth in FAQs 33 and 34 is not entitled to deference under either Chevron or Skidmore.  The court does not address the separate question, not raised here, as to whether § 1396r-4(g)(1)(A) could support a validly promulgated rule that codifies defendants' policy, or the extent to which that rule might be entitled to any deference.  See Texas Children's Hosp., 76 F. Supp. 3d at 241 ("Considerations of judicial economy and restraint counsel against deciding whether 42 U.S.C. § 1396r-4(g)(1)(A) could support a validly promulgated rule that codified the defendants' policy in the future.").

B.   Count II

Count II alleges that FAQs 33 and 34 violate the APA because they represent agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), and "without observance of procedure required by law." § 706(2)(D).  Specifically, plaintiffs allege that FAQs 33 and 34 substantively alter the obligations imposed by a section of the 2008 Rule, 42 C.F.R. § 447.299(c)(16).  Plaintiffs contend that, as substantive rules, the FAQs had to be, but were not, promulgated using notice-and-comment rulemaking under the APA.  Defendants contend that the policies in FAQs 33 and 34 are "compatible with the terms of" the 2008 Rule and, therefore, are not substantive rules that implicate plaintiffs' notice-and-comment rights.  Doc. no. 35-1 at 29.

Under the APA, substantive rules are subject to notice-and-comment rulemaking, and interpretative rules are not.  5 U.S.C. § 553.  "A substantive rule has the force of law, while an interpretive rule is merely a clarification or explanation of an existing statute or rule and is issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."  La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992) (internal

quotation marks and citation omitted); see also Warder v. Shalala, 149 F.3d 73, 80 (1st Cir. 1998) ("If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." (internal quotation marks and citation omitted)). Thus, where an agency's "interpretation [of a regulation] has the practical effect of altering the regulation, a formal amendment—almost certainly prospective and after notice and comment—is the proper course." United States v. Hoyts Cinemas Corp., 380 F.3d 558, 569 (1st Cir. 2004).

As discussed above, § 447.299(c)(16), which provides the proper calculation of the hospital-specific DSH limit for auditing purposes, provides as follows:

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments . . . .

§ 447.299(c)(16) (emphasis added).  Other sections of the 2008 Rule further define each payment to be subtracted from the cost of care, and do not mention private insurance or Medicare.

Defendants argue that it is reasonable to interpret the "total cost of care" as that phrase is used in § 447.299(c)(16)

to mean "unreimbursed" or "uncompensated" cost.  The Preamble to the 2008 Rule, however, states several times that the 2008 Rule does not alter the calculation of the hospital-specific DSH limit as established in the Medicaid Act.  See 73 Fed. Reg. 77907 ("Moreover, the [2008] rule does not substantively change the standards for DSH payments, or for the review of hospital-specific limits on such payments."); id. at 77921 ("[T]his regulation does not change the underlying statutory requirements for DSH payments."); id. at 77906 ("This regulation does not alter any of the substantive standards regarding the calculation of hospital costs.").  As discussed above, the Medicaid Act does not include payments from Medicare or private insurance in the Medicaid Shortfall.  Therefore, defendants' argument with respect to the Secretary's interpretation of the 2008 Rule is unavailing.

In addition, at several points, the Preamble references a "General DSH Audit and Reporting Protocol," which CMS made available on its website to "assist States and auditors in using information from each source identified above to determine uncompensated care costs consistent with the statutory requirements."  73 Fed. Reg. 77921; see id. at 77930, 77931, 77936.  The Preamble states that the Protocol provides "detailed identification of the data elements necessary to comply with

38

Congressional instruction on such reporting and auditing." Id.
at 77921.  It further states that "[t]he definitions of the data
elements track the statutory language, and do not change the
calculation that should have always been performed." Id.
Unlike FAQs 33 and 34, the Protocol does not include as "data
elements" payments from either private insurance or Medicare.

FAQs 33 and 34 add payments that must be deducted in
calculating the costs incurred in furnishing hospital services
for purposes of the hospital-specific DSH limit.  As such, FAQs
33 and 34 change the calculation provided in § 447.299(c)(16) of
the 2008 Rule.  Therefore, the FAQs are considered substantive
rules, and should have been, but were not, promulgated through
notice-and-comment rulemaking under the APA.  Because of the
lack of rulemaking procedure, FAQs 33 and 34 represent agency
action that is "arbitrary, capricious, an abuse of discretion,
or otherwise not in accordance with law," § 706(2)(A), and
"without observance of procedure required by law." § 706(2)(D).
See Coal. for Common Sense in Gov't Procurement v. Sec'y of
Veterans Affairs, 464 F.3d 1306, 1319 (Fed. Cir. 2006) (setting
aside agency's substantive rule under § 706(2)(D) because agency
failed to follow notice-and-comment procedures); see also
Dialysis Patient Citizens v. Burwell, No. 4:17-CV-16, 2017 WL
365271, at *3-6 (E.D. Tex. Jan. 25, 2017) (granting plaintiffs'

motion for a preliminary injunction because plaintiffs were likely to show that agency's failure to follow notice-and-comment procedures violated § 706(2)(A)).[17]

Accordingly, plaintiffs are entitled to summary judgment on Count II.

C. Count III

As with Count II, Count III alleges FAQs 33 and 34 represent agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), and "without observance of procedure required by law." § 706(2)(D).  Specifically, plaintiffs allege that from July 1, 1995 to November 1, 2013, the New Hampshire State Medicaid Plan (the "State Plan") required only Medicaid payments to be deducted from costs when determining the Medicaid Shortfall component of the hospital-specific DSH limit.

---

[17] In arguing that FAQs 33 and 34 are compatible with the 2008 Rule, defendants assert that the court should give "substantial deference to an agency's interpretation of its own regulations," relying on Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  Although defendants continually refer to FAQs 33 and 34 as interpretative rules, for the reasons discussed above, they are substantive rules.  See Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 211 (D.D.C. 2007) (holding that a court should "not defer to the agency's view that its regulations are a mere clarification of an existing rule pursuant to the APA; instead, the court conducts its own inquiry into whether the new rules work substantive changes in prior regulations" (internal quotation marks and citations omitted)).

Plaintiffs allege that FAQs 33 and 34 are contrary to the plain language of the State Plan and, therefore, substantively amend it.  Plaintiffs argue that under 42 U.S.C. § 1396a(a)(13)(A) and 42 C.F.R. § 447.205, they had to be, but were not, provided with federal notice-and-comment rights prior to any amendments to their State Plan.

As discussed above, in order to qualify for Medicaid funding, a state must adopt a Medicaid "plan," 42 U.S.C. § 1396a(a), which must be approved by CMS.  See Ferguson, 362 F.3d at 51.  "Before granting approval, [CMS] reviews the State's plan and amendments to determine whether they comply with the statutory and regulatory requirements governing the Medicaid program."  Douglas v. Indep. Living Ctr. of S. Cal., Inc., 565 U.S. 606, 610 (2012); see 42 U.S.C. § 1396a(b).

42 C.F.R. § 430.12 governs the "submittal of State plan and plan amendments."  The regulation provides that a state plan "must provide that it will be amended whenever necessary to reflect—(i) Changes in Federal law, regulations, policy interpretations, or court decisions."  § 430.12(c)(1)(i). Before a state plan can be amended, the state must provide plaintiffs and Medicaid patients an opportunity for notice and comment.  See § 1396a(a)(13)(A) (noting that a State plan must provide "for a public process for determination of rates of

41

payment under the plan for hospital services"); Dartmouth-Hitchcock Clinic v. Toumpas, 856 F. Supp. 2d 315, 323 (D.N.H. 2012) ("Broadly speaking, subsection (13)(A) requires something on the order of notice and comment rule-making for states in their setting of rates for reimbursement of hospital services . . . provided under the Medicaid Act." (internal quotation marks and citations omitted)); see also § 447.205 (requiring "public notice of changes in Statewide methods and standards for setting payment rates").

Plaintiffs assert that defendants' enforcement of FAQs 33 and 34 represents a de facto amendment to the State Plan, which requires defendants to follow the amendment provisions of § 430.12(c) and, therefore, the notice-and-comment requirements of § 1396a(a)(13)(A) and § 447.205.  Plaintiffs assert that defendants' failure to comply with those requirements violates the APA.

As discussed above, defendants were required to provide notice-and-comment rights prior to implementing FAQs 33 and 34 because the FAQs substantively amended the 2008 Rule. Plaintiffs, however, fail to explain persuasively how the public notice requirements of § 1396a(a)(13)(A) and § 447.205 are implicated by defendants' actions.

42

Sections 1396a(13)(A) and 447.205 impose public notice obligations on the state prior to submitting any amendment to a state plan to CMS.  Section 1396a(13)(A) establishes the requirement that "a state must provide notice of proposed rates together with the methodologies and justifications used to establish those rates, and give concerned state residents . . . a reasonable opportunity to review and comment on them." Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 315 (3d Cir. 2013) (internal quotation marks and citations omitted) (emphasis added); HCMF Corp. v. Allen, 238 F.3d 273, 276 (4th Cir. 2001) (noting that § 1396a(a)(13)(A) "requires that states determine their reimbursement rates via a public process that allows providers notice and an opportunity to comment on the proposed rates" (internal quotation marks and citation omitted)); Am. Soc. of Consultant Pharmacists v. Concannon, 214 F. Supp. 2d 23, 28 (D. Me. 2002) (noting that § 1396a(a)(13)(A) addresses the "duty of the state to provide . . . individuals with a reasonable opportunity for review and comment" (internal quotation marks and citation omitted)).  Section 447.205 provides "further guidance on the substantive requirements of that notice," which "must be satisfied in order for a state plan amendment to receive approval." Christ the King Manor, 730 F.3d at 315; see

also 46 Fed. Reg. 58677-78 (Dec. 3, 1981) (noting that § 447.205 is directed toward the states); Indep. Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000) (noting that § 447.205 "require[s] the State to furnish public notice of any significant proposed change in its methods and standards for setting payment rates for services").

        A state's failure to provide notice-and-comment rights prior to amending a state plan may support a claim under §§ 706(2)(A) or (D) against CMS if CMS approved a state plan amendment but the state failed to comply with its relevant public notice obligations.  See Christ the King Manor, 730 F.3d at 315 (noting that a claim against the Secretary under § 706(2)(A) based on failure to comply with § 1396a(13)(A) necessarily focuses on whether the Secretary acted arbitrarily and capriciously when she accepted the state's "assurance that it had provided adequate notice of the proposed changes" to the state plan); Indep. Acceptance Co., 204 F.3d at 1252 ("Thus the inquiry for our review is whether the Secretary acted arbitrarily or capriciously when she accepted the State's assurance of notice [under § 447.205] as satisfactory to her, in light of the record presented by the State regarding notice for SPA 90-20.").  That is not the case here.

Plaintiffs offer no developed argument to show that the Secretary or CMS can be held liable absent those circumstances outlined above based on <u>their</u> failure to comply with the public notice requirements of § 1396a(a)(13)(A) and § 447.205. Therefore, defendants are entitled to summary judgment on Count III.

D.   <u>Relief Sought</u>

Defendants argue that they are entitled to summary judgment because plaintiffs' requests for specific relief are improper. They note that in addition to asking defendants to set aside FAQs 33 and 34, the complaint requests that the court

> "permanently enjoin" enforcement of those policies and
> "to notify New Hampshire's Medicaid program that . . .
> the enforcement of those policies are enjoined and
> that Defendants will take no action to recoup any
> federal funds provided to New Hampshire or to penalize
> New Hampshire in any way for its noncompliance with
> those policies."

Doc. no. 35-1 at 30 (quoting doc. no. 1 at 33) (alterations omitted).  Defendants argue that this "kind of relief would effectively put the Court in the position of supervising future agency action, which is not authorized by the APA."  <u>Id.</u>

Plaintiffs' successful claims challenged defendants' actions in promulgating and enforcing FAQs 33 and 34, in

violation of the APA, 5 U.S.C. §§ 706(2)(C) and 706(2)(A) & (D).
In similar circumstances, District Judge Emmet Sullivan
concluded that appropriate relief for actions in violation of
the APA would be "that the agency's previous practice . . . is
reinstated and remains in effect unless and until it is replaced
by a lawfully promulgated regulation." Texas Children's Hosp.,
76 F. Supp. 3d at 247 (quoting Croplife Am. v. EPA, 329 F.3d
876, 884-85 (D.C. Cir. 2003) (internal quotation marks omitted).
As provided below, that is the relief granted to plaintiffs in
this case, and it is appropriate under the APA.

III. <u>Motion to Intervene</u>

On February 6, 2017, more than a year after plaintiffs
filed their complaint and more than eight months after
plaintiffs filed their summary judgment motion, Jeffrey Meyers,
the Commissioner of NHDHHS, moved to intervene (doc. no. 46).
Plaintiffs object.

Meyers offers no persuasive justification for his failure
to move to intervene sooner.  Therefore, Meyers' motion is
denied. Daggett v. Comm'n on Governmental Ethics & Election
Practices, 172 F.3d 104, 113 (1st Cir. 1999) (A "district court
can consider almost any factor rationally relevant but enjoys

very broad discretion in granting or denying [a] motion" to
intervene under Rule 24(b).).[18]

### Conclusion

For the foregoing reasons, plaintiffs' motion for summary
judgment (doc. no. 33) is granted as to Counts I and II and
denied as to Count III as provided in this order.  Defendants'
motion for summary judgment (doc. no. 35) is granted as to Count
III but denied as to Counts I and II.  Count IV is voluntarily
dismissed.

Defendants are permanently enjoined from enforcing FAQs 33
and 34.  Defendants shall follow the policies and procedures in
effect before defendants issued FAQs 33 and 34, until and unless
those policies and procedures are replaced by an enforceable and
properly promulgated regulation.

Jeffrey Meyers' motion to intervene (doc. no. 46) and
plaintiffs' motion to strike Meyers' motion to intervene (doc.
no. 50) are denied.  The clerk of court is directed to enter
judgment accordingly.

Plaintiffs' complaint asks this court to "[a]ward
Plaintiffs their reasonable attorney's fees and costs pursuant

---

[18] Plaintiffs move to strike Meyers' motion to intervene.
See doc. no. 50.  Although that motion is not yet ripe, the
court sees no reason to strike Meyers' motion from the record.
Therefore, plaintiffs' motion to strike (doc. no. 50) is denied.

to 28 U.S.C. 2412(d)(1)(A)."  Doc. no. 1 at 34.  To the extent
plaintiffs intend to seek an award of fees, within 30 days of
the date judgment is entered, plaintiffs shall submit to the
court an application of fees in accordance with 28 U.S.C. §
2412(d)(1)(B).

      SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 2, 2017

cc:   Anthony J. Galdieri, Esq.
      James C. Luh, Esq.
      Gordon J. MacDonald, Esq.
      W. Scott O'Connell, Esq.
      Nancy J. Smith, Esq.